CLEAN WISCONSIN, INC. p/k/a Wisconsin's
Environmental Decade Institute, Inc.,
SC Johnson & Son, Inc. and Calpine Corporation,
Petitioners-Respondents-Cross-Appellants-
Cross-Respondents,

TOWN OF CALEDONIA,
Petitioner-Cross-Respondent,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN and
Wisconsin Department of Natural Resources,
Respondents-Co-Appellants-Cross-Respondents,

WISCONSIN ELECTRIC POWER COMPANY, W.E. Power,
LLC and Wisconsin Energy Corporation,
Interested Parties-Appellants-Cross-Respondents,

DAIRYLAND POWER COOPERATIVE,
Interested Party-Cross-Respondent,

MADISON GAS & ELECTRIC COMPANY and Wisconsin
Public Power, Inc., Interested
Parties-Co-Appellants-Cross-Respondents,

CITY OF OAK CREEK,
Interested Party-Respondent-Cross-Appellant,

Robert H. OWEN, Interested
Party-Respondent-Cross-Respondent.

CALPINE CORPORATION, Petitioner,

v.

250

PUBLIC SERVICE COMMISSION OF WISCONSIN and Wisconsin Department of Natural Resources, Respondents,

WISCONSIN ELECTRIC POWER COMPANY, Wisconsin Energy Corporation, W.E. Power, LLC, Dairyland Power Cooperative, Madison Gas & Electric Company, Robert H. Owen, Jr. and City of Oak Creek, Interested Parties.

CLEAN WISCONSIN, INC. p/k/a Wisconsin's Environmental Decade Institute, Inc. and SC Johnson & Son, Inc., Petitioners,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent,

WISCONSIN PUBLIC POWER, INC., City of Oak Creek, Dairyland Power Cooperative, Madison Gas & Electric Company, Wisconsin Electric Power Company, Wisconsin Energy Corporation and W.E. Power, LLC, Interested Parties.

CALPINE CORPORATION, Petitioner,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent,

CITY OF OAK CREEK, Dairyland Power Cooperative, Madison Gas & Electric Company, Wisconsin Public Power, Wisconsin Electric Power Company, Wisconsin Energy Corporation and W.E. Power, LLC, Interested Parties.

CITY OF OAK CREEK,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN,
Respondent.

TOWN OF CALEDONIA,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN,
Respondent,

WISCONSIN ELECTRIC POWER COMPANY, Wisconsin
Energy Corporation, W.E. Power, LLC, Dairyland
Power Cooperative, Madison Gas & Electric
Company, Robert H. Owen, Jr. and Wisconsin
Public Power, Inc., Interested Parties.

Supreme Court

*No. 2004AP3179. Oral argument March 30, 2005.
—Decided June 28, 2005.*

2005 WI 93

(Also reported in 700 N.W.2d 768.)

264

268

271

272

279

285

288

For the respondents-co-appellants-cross-respondents, Public Service Commission of Wisconsin and Wisconsin Department of Natural Resources, there were briefs by *David J. Gilles* and *Edward S. Marion*, Madison, and oral argument by *Edward S. Marion*.

For petitioner-respondent-cross-appellant-cross-respondent, Calpine Corporation, there were briefs by *Peter L. Gardon, Bryan K. Nowicki* and *Reinhart Boerner VanDeuren, S.C.*, Madison, and oral argument by *Peter L. Gardon*.

For the petitioners-respondents-cross-appellants-cross-respondents, Clean Wisconsin, Inc. and S.C. Johnson & Son, Inc., there were briefs by *Carl A. Sinderbrand* and *Wickwire Gavin, P.C.*, Madison (on behalf of S.C. Johnson & Son, Inc.); and *Pamela R. McGillivray* and *Garvey & Stoddard, S.C.*, Madison (on behalf of Clean Wisconsin, Inc.), and oral argument by *Carl A. Sinderbrand*.

For the interested parties-co-appellants-cross-respondents, Wisconsin Public Power, Inc. and Madison Gas & Electric Company, there were briefs by *Richard K. Nordeng, Barbara A. Neider* and *Stafford Rosenbaum LLP*, Madison, and oral argument by *Richard K. Nordeng*.

For the interested parties-appellants-cross-respondents, Wisconsin Electric Power Company, W.E. Power, LLC and Wisconsin Energy Corporation, there were briefs by *Larry J. Martin, John A. Casey, Brian D. Winters* and *Quarles & Brady LLP*, Milwaukee; *Matthew W. O'Neill* and *Friebert, Finerty & St. John, SC*, Milwaukee; *Linda H. Bochert* and *Michael Best & Friedrich LLP*, Madison; *R. Ryan Stoll* and *Skadden, Arps, Slate, Meagher & Flom, LLP*, Chicago, IL, and oral argument by *R. Ryan Stoll*.

For the interested party-respondent-cross-appellant, City of Oak Creek, there were briefs by *William J. Mulligan, Tyson A. Ciepluch* and *Davis & Kuelthau, S.C.*, Milwaukee; and *Lawrence J. Haskin*, Oak Creek, and oral argument by *William J. Mulligan*.

For the interested party-cross-respondent, Dairyland Power Cooperative, there were briefs by *Jeffrey L. Landsman, Janet L. Kelly* and *Wheeler, Van Sickle & Anderson, S.C.*, Madison.

An amicus curiae brief was filed by *Lee Cullen, Kira E. Loehr* and *Cullen Weston Pines & Bach LLP*, Madison, on behalf of the Wisconsin Energy Customers.

An amicus curiae brief was filed by *Gerardo H. Gonzalez, J. Manuel Raneda* and *Gonzalez, Saggio & Harlan, L.L.P.*, Milwaukee, on behalf of The Hispanic Chamber of Commerce of Wisconsin, The African American Chamber of Commerce, Inc., and The Metropolitan Milwaukee Association of Commerce, Inc.

An amicus curiae brief was filed by *Brady C. Williamson, Jennifer Cotner*, and *LaFollette Godfrey & Kahn*, Madison, on behalf of American Transmission Company, LLC, Wisconsin Manufacturers and Commerce, and Wisconsin Merchants Federation.

An amicus curiae brief was filed by *Lisa Madigan*, Attorney General, *Matthew Dunn*, Chief, Environmental Enforcement/Asbestos Litigation Division, *Ann Alexander*, Assistant Attorney General, Chicago, IL and *David C. Bender* and *Bender Law Offices*, Madison, on behalf of the State of Illinois.

An amicus curiae brief was filed by *Howard A. Learner, Shannon Fisk, Meleah Geertsma*, and *Environmental Law & Policy Center*, Chicago, IL; and *Bruce Nilles* and *Sierra Club*, Madison, on behalf of Clean Air Task Force, Citizens for Responsible Power, Environmental Law and Policy Center, Lake Michigan Federation, Physicians for Social Responsibility of Madison, River Alliance of Wisconsin, Sierra Club, Union of Concerned Scientists, Wisconsin Interfaith Climate and Energy Campaign, and Wisconsin Public Interest Research Group.

An amicus curiae brief was filed by *Dennis P. Birke* and *DeWitt Ross & Stevens S.C.*, Madison, on behalf of the Wisconsin Utilities Association.

¶ 1. JON P. WILCOX, J., DAVID T. PROSSER, J., PATIENCE DRAKE ROGGENSACK, J., and LOUIS B. BUTLER JR., J. This case is before the court on a motion to bypass, pursuant to Wis. Stat. § (Rule) 809.60 (2001–02).[1] It represents a consolidation of five separate actions seeking judicial review of a final decision and order of the Public Service Commission (PSC) that

---

[1] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

issued a Certificate of Public Convenience and Necessity (CPCN) to Wisconsin Electric Corporation (WEC)[2] for the construction of two large super-critical, coal-fired electric power plants on the shore of Lake Michigan in the City of Oak Creek. The Dane County Circuit Court, David T. Flanagan, III, Judge, vacated the PSC's order and remanded for further proceedings. Specifically, the circuit court concluded that the PSC erred in determining that WEC's application was complete and that the PSC erred in commencing the CPCN approval process based on that application. Additionally, the circuit court concluded that the PSC erroneously issued its order because the PSC did not comply with an assortment of statutes governing the granting of CPCNs. Finally, the court vacated the PSC's modification of a mitigation payment agreement between the City of Oak Creek and WEC.

¶ 2. Various parties seek review of the circuit court's decision. We reverse the order of the circuit court and uphold the PSC's final decision and order in all respects.

¶ 3. We begin our discussion by explaining the historical role of the PSC and setting forth the factual background and procedural posture of this case. We then systematically address the issues presented by the parties in an analysis divided into three principal sections. Due to the complexity of this case, we set forth the following table of contents to aid the reader:[3]

---

[2] WEC owns Wisconsin Electric Power Company (WEPCO), another party in this suit. In this opinion, we refer to both interchangeably.

[3] Attached at the end of this opinion is an appendix compiling the relevant terms and acronyms utilized in this opinion.

## Table of Contents

I. The Public Service Commission ¶ 4

II. Factual Background/Procedural Posture ¶ 11

III. Standard of Review ¶ 35

IV. Analysis ¶ 47

A. Completeness of CPCN Application ¶ 48

B. Issuance of the CPCN ¶ 98

 1. Wisconsin's Energy Priorities Law ¶ 98

 2. The Plant Siting Law ¶ 135

 a. Reasonable Needs/Public Interest ¶ 141

 b. Adverse Impact on Environmental Values ¶ 163

 c. Effect on Wholesale Competition ¶ 169

 d. Common Systems Approval ¶ 182

 3. Environmental Impact Statement ¶ 187

 4. Conditional Issuance of CPCN ¶ 227

C. Mitigation Payments ¶ 263

V. Conclusion ¶ 281

## I. THE PUBLIC SERVICE COMMISSION

¶ 4. As we evaluate the PSC's action in this matter, we find it helpful to consider the historical role of the PSC. Wisconsin's progressive roots made this state a leader in the trend toward increased utility regulation at the dawn of the twentieth century. Under Governor Robert M. La Follette, this state became known for progressive reforms. Paul D. Carrington & Erica King,

*Law and the Wisconsin Idea,* 47 J. Legal Educ. 297, 299, 314 (1997). One of the main features of La Follette's "Wisconsin Idea" was the regulation of railroads and other public utilities. *Id.*

¶ 5. In 1905 Wisconsin created the Railroad Commission and charged it with the duty of regulating railroad rates.[4] To this end, the Railroad Commission had the power to "fix and order" rates it determined to be "just and reasonable" if it found a railroad's practices "unreasonable" or its service "inadequate." Wis. Stat. ch. 87, § 1797–12 (1911).

¶ 6. Two years later, the legislature substantially expanded the Railroad Commission's power.[5] First, the Railroad Commission was given the power to regulate all "public utilit[ies]," including companies providing telephone service, heat, light, water, or power to the public. Wis. Stat. ch. 87, § 1797m-1(1) (1911). The Commission's power was very broadly defined: "The railroad commission of Wisconsin is vested with power and jurisdiction to supervise and regulate every public utility in this state and to do *all things necessary and*

---

[4] *See* ch. 62, Laws of 1905. The Railroad Commission was comprised of three commissioners, as is the PSC today. Wis. Stat. ch. 87, § 1797(1) (1911). The Act required every railroad to "furnish reasonably adequate service," Wis. Stat. ch. 87, § 1797(3) (1911), as current law requires of all public utilities. *Cf.* Wis. Stat. § 196.03(1).

[5] Chapter 499, Laws of 1907. One of the principal drafters of the law was Professor Eugene Gilmore of the University of Wisconsin Law School who celebrated the bill's passage by proclaiming it "the consummation of the movement towards a more effective control of public service companies." Paul D. Carrington & Erica King, *Law and the Wisconsin Idea,* 47 J. Legal Educ. 297, 325–26 (1997). Gilmore hoped that the law would spur privately owned utilities with monopolies to provide better service. *Id.*

*convenient in the exercise of such power* and jurisdiction."
Wis. Stat. ch. 87, § 1797m-2 (1911) (emphasis added).
Every public utility was required to furnish "reasonably
adequate service." Wis. Stat. ch. 87, § 1797m-3 (1911).[6]

¶ 7. In Wis. Stat. ch. 87, § 1797m-60(2) (1911), the
legislature reiterated that if the Commission determined
that any "service is inadequate or that any service which
can reasonably be demanded cannot be obtained, the
commission shall determine and declare and by order fix
reasonable . . . service to be furnished . . . in the fu-
ture . . . ."[7]

¶ 8. In 1931 the legislature faced a crisis caused
by the confluence of the Great Depression and the
"electrification" of Wisconsin farms. Paul W. Glad, *The
History of Wisconsin Volume V: War, a New Era, and
Depression, 1914–1940* at 382 (State Historical Society

---

[6] The primary duties of the Railroad Commission were set
out in Wis. Stat. ch. 87, § 1797m-46(2) (1911):

> If [the Commission finds] any . . . service complained of is . . .
> insufficient . . . or if it be found that any service is inadequate or
> that any reasonable service cannot be obtained, the commission
> shall have power to substitute therefor such other regulations,
> measurements, practices, service or acts and to make such order
> respecting, and such changes in such regulations, measurements,
> practices, service or acts as shall be just and reasonable.

[7] One commentator noted that because of this legislation,
"[c]redit for the first development of the public service commis-
sion type of control is shared jointly by Wisconsin and New
York." William E. Mosher & Finla G. Crawford, *Public Utility
Regulation* at 22 (Harper & Bros. 1933). Between 1907 and
1914, 27 other states followed Wisconsin's lead, and nearly
every state had a public service commission by 1920. Robert L.
Swartwout, *Current Utility Regulatory Practice from a Histori-
cal Perspective,* 32 Nat. Res. J. 289, 301 (1992). Most of the laws
authorizing public service commissions in other states are
modeled on Wisconsin's law. *Id.*

of Wisconsin, 1990). The legislature responded by broadening the Commission's ratemaking authority and renaming it the "Public Service Commission of Wisconsin." § 2, ch. 183, Laws of 1931; Wis. Stat. § 195.01(9) (1931). The new PSC retained the authority of the Railroad Commission to require utilities to upgrade inadequate service. Wis. Stat. § 196.37(2) (1931).

¶ 9. The legislature also gave the PSC the authority to issue "conditional, temporary, emergency and supplemental orders." Wis. Stat. § 196.395 (1931). Later, this court construed this authorization to include the power to set temporary and emergency rates under certain circumstances. *See, e.g., Friends of the Earth v. PSC,* 78 Wis. 2d 388, 401, 254 N.W.2d 299 (1977).

¶ 10. In 1977 some of the PSC's auxiliary functions related to transportation regulation were assigned to other agencies, making the PSC's primary focus the regulation of public utilities.[8] Today, 100 years after the establishment of the Railroad Commission, the PSC retains much of the form and authority of the original Commission, especially the power to "make any just and reasonable order" to ensure that utilities provide adequate service. Wis. Stat. § 196.37(2).

## II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶ 11. Wisconsin utilities must provide "reasonably adequate service and facilities" to the public. Wis. Stat. § 196.03(1). The PSC must determine whether a utility is providing "reasonably adequate service" and may make "any just and reasonable order" to correct the

___

[8] *See* § 1291m, ch. 29, Laws of 1977 (creating Chapter 189, authorizing the Transportation Commission).

problem. Wis. Stat. § 196.37(1)-(3); *Weyauwega Tel. Co. v. PSC,* 14 Wis. 2d 536, 550 n.5, 111 N.W.2d 559 (1961).[9]

¶ 12. To ensure that it satisfies this statutory requirement, an electric utility must plan ahead. Due to the long lead time associated with constructing new power generation facilities, the PSC recommends planning at least five years into the future. In the late 1990s, sharply increased energy demands led both WEC and regulatory agencies to identify "a need for new baseload [power] generation after 2007." WEC determined that its peak customer demand would grow from a peak rate of 5764 megawatts (MW) in 2002 to 7612 MW in 2011—an annual growth rate of 2.9 percent.

¶ 13. WEC subsequently determined that it could not satisfy this need without a "substantial increase in electric generation resources." Accordingly, it designed a plan styled "Power the Future" (PTF). WEC planned to implement PTF in two stages. In the first stage, (PTF-I), WEC proposed to construct two 545 MW gas-fueled units at its site in Port Washington, Wisconsin. In the second stage, (PTF-II), WEC proposed to construct three coal-fired units (two 615 MW units and one 600 MW unit), described as its Elm Road Generating Station (ERGS), near its existing facility in Oak Creek, Wisconsin.[10] WEC filed a combined CPCN application for both phases of PTF on January 31, 2002.[11]

---

[9] In this opinion, we need not attempt to fully define the phrase "reasonably adequate service" or delineate its scope. It seems plain enough that to provide "reasonably adequate service," an electric utility must amass and maintain the capacity to provide reliable electric service to its customers.

[10] WEC's PTF-II application proposed two Super-Critical Pulverized Coal (SCPC) electric generating units one Integrated Gasoline Combined-Cycle (IGCC) unit.

[11] After submitting this application to the PSC, WEC nego-

¶ 14. WEC's filing triggered several statutory time deadlines and substantive requirements relating to the PSC's review of CPCN applications. Within 30 days of such a filing, the PSC must determine whether an application is "complete." Wis. Stat. § 196.491(3)(a)2. Essentially, the PSC must determine whether an application contains all the information required in Wis. Admin. Code § PSC 111.53 (June, 2000)[12]("CPCN applications for large electric generating facilities.").

¶ 15. After it determines that an application is "complete," the PSC has 180 days to approve or reject the application. Wis. Stat. § 196.491(3)(g). The PSC may petition the Dane County Circuit Court to extend that deadline by an additional 180 days. *Id.* If the PSC does not act within that time limit, the CPCN is issued by operation of law. *Id.*

¶ 16. During the review period, the PSC must comply with all of the requirements expressed in Wis. Stat. § 196.491(3)(d), known as the Plant Siting Law, and must make certain express findings regarding a project. For example, the PSC must find that a proposed facility "satisfies the reasonable needs of the public for an

tiated an agreement with the PTF-II host municipality, the City of Oak Creek, under which WEC would make mitigation payments to offset the impacts of the project on the City. With certain minor exceptions, the parties agreed that the agreement would "not [become] effective until, and [would become effective] only so long as, the PSCW issues the CPCN for the New Facilities in the City . . . ."

[12] All subsequent references to Wis. Admin. Code § PSC 111 are to the June 2000 version unless otherwise indicated.

adequate supply of electric energy,"[13] that "the design . . . is in the public interest,"[14] that "[t]he proposed facility will not have undue adverse impact on . . . environmental values,"[15] and that "[t]he proposed facility will not have a material adverse impact on competition in the relevant wholesale electric service market."[16] Its approval decision must also take the legislative policy embodied in Wisconsin's Energy Priorities Law (EPL) into account. Wis. Stat. § 1.12(4). *See also* Wis. Stat. § 196.025(1).

¶ 17. Simultaneously, the PSC must prepare an Environmental Impact Statement (EIS) pursuant to Wis. Stat. § 1.11(2) and Wis. Admin. Code § PSC 4.30 (June, 2000).[17] Generally, an EIS must "inform the [PSC] and the public of significant environmental impacts of a proposed action and its alternatives, and reasonable methods of avoiding or minimizing adverse environmental effects." Wis. Admin. Code § PSC 4.30(1)(a). The PSC may prepare the EIS in conjunction with the Department of Natural Resources (DNR). *See* Wis. Admin. Code § 4.60(3).

¶ 18. After undertaking this analysis, the PSC may ultimately issue a CPCN authorizing the applicant to construct the facility.

---

[13] Wis. Stat. § 196.491(3)(d)2.

[14] Wis. Stat. § 196.491(3)(d)3. In making this determination, the PSC must consider a variety of factors, including "alternative sources of supply, alternative locations or routes, individual hardships, engineering, economic, safety, reliability and environmental factors . . . ." *Id.*

[15] Wis. Stat. § 196.491(3)(d)4.

[16] Wis. Stat. § 196.491(3)(d)7.

[17] All subsequent references to Wis. Admin. Code § PSC 4 are to the June 2000 version unless otherwise indicated.

¶ 19. In this case, the PSC split WEC's application into two parts, one covering PTF-I and the other covering PTF-II. Only WEC's PTF-II application is before us.[18] Several times, the PSC asked WEC to submit additional information. Finally, on November 15, 2002, the PSC determined that the PTF-II application was complete. Clean Wisconsin, Inc. and S.C. Johnson & Son, Inc. challenged the PSC's interim order declaring WEC's application to be complete. The PSC issued an order on April 18, 2003, rejecting the challenge and refusing to reopen its determination.

¶ 20. The PSC's "completeness" determination triggered the statutory provision requiring the PSC to issue its final judgment on the application within 180 days. Wis. Stat. § 196.491(3)(g). Eventually, the PSC exercised its option to petition the Dane County Circuit Court for a 180–day extension to this time period. *See id.* The circuit court granted the extension on April 29, 2003. Accordingly, the PSC had until November 10, 2003, (360 days after the November 15, 2002 completeness determination) to make its final decision.

¶ 21. During the PSC's evaluation, Calpine Corporation (Calpine) entered the case in opposition to the project, arguing that it could meet WEC's power generation needs more economically than WEC's proposal. S.C. Johnson & Son also intervened, alleging that the WEC proposal was not in the public interest and was not the least cost alternative.

---

[18] After WEC made several additional PTF-I filings at the PSC's request, the PSC deemed the PTF-I application complete on April 25, 2002. On December 20, 2002, the PSC mailed its final decision and order conditionally approving the CPCN application for PTF-I. That decision is not before us.

¶ 22. The PSC mailed its final decision on November 10, 2003. The PSC made 14 findings of fact, including the following:

1. Energy conservation, renewable resources, or other energy priorities listed in Wis. Stat. §§ 1.12 and 196.025, or their combination, are not cost-effective or technically feasible alternatives to the projects proposed in this docket.

. . . .

3. Part II of PTF . . . satisfies the reasonable needs of the public for an adequate supply of electric energy.

4. The public convenience and necessity require WEC to construct the two [615 MW] units, subject to the conditions specified in this final decision.

5. The two [615 MW] units are reasonable and in the public interest after considering alternative sources of supply, individual hardships, engineering, economic, safety, reliability, and environmental factors. The [600 MW] unit does not meet this standard.

. . . .

7. The two [615 MW] units will not have undue adverse impact on other environmental values.

. . . .

9. The two [615 MW] units will not have a material adverse impact on competition in the Wisconsin Upper Michigan System (WUMS) wholesale electric service market.

. . . .

12. The conditions attached to the CPCN for the two [615 MW] units, as described in this Final Decision, are reasonable.

301

¶ 23. The PSC's decision concluded: "W.E. Power LLC . . . may commence construction of two 615 MW Super-Critical Pulverized Coal (SCPC) electric generating units, as described in WEC's project application . . . ." However, the PSC listed 26 conditions and instructions relevant to its CPCN approval, including the following:

> 1. W.E. Power LLC and its subsidiaries may construct [the two 615 MW units] . . . subject to the conditions specified in this Final Decision. Although the application to construct [the 600 MW unit] is denied, W.E. Power LLC and its subsidiaries may construct common facilities with the [615 MW] units to accommodate up to 3000 MW of generation at this site.
>
> . . . .
>
> 26. This Final Decision takes effect on the day after it is mailed. The CPCN for the ERGS facility only takes effect when the DNR issues all permits and approvals that it identified, pursuant to Wis. Stat. § 196.491(3)(a)3.a., as being required prior to construction of the facility.

¶ 24. In a split decision, the PSC also ordered WEC to reduce the amount of its mitigation payment to the host municipality, Oak Creek, in light of increased shared revenue payments that were available to Oak Creek under 2003 Wis. Act 31. *See generally* Wis. Stat. § 79.04.

¶ 25. S.C. Johnson & Son, joined by Clean Wisconsin (hereinafter collectively referred to as Clean Wisconsin), Calpine, and Oak Creek sought review of the PSC's decision in the Circuit Court for Dane County, pursuant to Wis. Stat. § 227.52.[19] The circuit court

---

[19] "Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction,

consolidated the actions and issued an order dated November 29, 2004, vacating the PSC's order.

¶ 26. In its order, the court addressed various points of alleged error in the PSC's decision.[20] First, the court concluded that the PSC erred when it deemed WEC's CPCN application "complete." The court gave three reasons for this conclusion: 1) the application did not contain at least two proposed "sites," pursuant to Wis. Stat. § 196.491(3)(d)3. and Wis. Admin. Code § PSC 111.53(1)(e); 2) the application did not contain the regulatory approvals required by Wis. Admin. Code § PSC 111.53(1)(f)1.; and 3) the application did not contain certain information about transmission line facilities required by Wis. Admin. Code § PSC 111.53(1)(f)4.

¶ 27. Second, although it approved parts of the PSC's order issuing the CPCN, the circuit court ultimately determined that the PSC erroneously approved WEC's CPCN application. The court reached the following conclusions in this regard: 1) The PSC properly determined that there was a reasonable need for the power to be produced by the project; 2) the PSC's computer modeling system appropriately examined the effects of the project; 3) the PSC did not sufficiently consider the necessity for associated power transmission facilities "integral and necessary to the planned generation plant"; 4) the PSC did not adhere to

whether affirmative or negative in form, are subject to review as provided in this chapter . . . ." Wis. Stat. § 227.52.

[20] We are cognizant that "the focus of our review is the PSC's Order . . . , not the circuit court's decision." *Responsible Use of Rural and Agricultural Land (RURAL) v. PSC*, 2000 WI 129, ¶ 20, 239 Wis. 2d 660, 619 N.W.2d 888. However, the circuit's court's order frames many of the parties' arguments in this court, and so we recite the court's conclusions.

Wisconsin's Energy Priority Law; 5) the PSC improperly authorized WEC to construct certain "common systems" that would be used both by the approved generation equipment and, potentially, by future generation equipment; and 6) the PSC approved the CPCN before the applicant had received all applicable DNR permits, in violation of Wis. Stat. § 196.491(3)(e).

¶ 28. Third, the court held that the EIS, prepared by the combined efforts of the PSC and the DNR, satisfied the requirements in Wis. Stat. § 1.11(2)(c).

¶ 29. Fourth, the court held that the PSC's finding that "the proposed facility will not have a material adverse impact on competition in the relevant wholesale electric service market," *see* Wis. Stat. § 196.491(3)(d)7., was not erroneous.

¶ 30. Fifth, the court held that the PSC had no authority to modify the mitigation agreement between WEC and Oak Creek; the PSC's authority, the court stated, is limited to simply approving or rejecting such agreements.

¶ 31. Various parties petitioned for review of the circuit court's decision, and we granted WEC and PSC's motion to bypass the court of appeals. We summarize the parties' respective arguments on appeal as follows. Clean Wisconsin challenges the PSC's initial determination that WEC's CPCN application was complete. Clean Wisconsin and Calpine also raise various challenges to the PSC's issuance of the CPCN. Finally, the City of Oak Creek challenges the PSC's decision to reduce mitigation payments that WEC agreed to pay in exchange for Oak Creek agreeing to host the proposed plants.

¶ 32. After considering these arguments, we hold as follows. First, we uphold the PSC's determination that WEC's application was "complete." In reaching this

conclusion, we hold: that the PSC's determination of completeness is judicially reviewable; that the PSC reasonably concluded that WEC's application contained two distinct site alternatives; that WEC's application contained all necessary information relating to DNR permits; and that WEC's application contained all necessary information relating to transmission line agreements.

¶ 33. Second, we conclude that the PSC's approval of WEC's CPCN application was not contrary to law or unreasonable. When it approves an application for a power-generating facility like the one WEC proposed, the PSC must interpret, harmonize, and apply the provisions of Wisconsin's Energy Priority Law (Wis. Stat. § 1.12(4)),[21] the Plant Siting Law (Wis. Stat. § 196.491(3)(d)),[22] and the Wisconsin Environmental Policy Act (Wis. Stat. § 1.11).[23] Applying a deferential standard of review, we find that the PSC reasonably performed all these tasks in issuing the CPCN. We also conclude that the PSC did not exceed its authority in conditionally issuing the CPCN.

[21] The Energy Priorities Law requires agencies to consider energy sources in a particular order, to the extent cost-effective and technically feasible. Wis. Stat. § 1.12(4). Wisconsin Stat. § 196.025 provides that § 1.12(4) applies to the PSC.

[22] The Plant Siting Law requires the PSC to make a variety of findings concerning the impact of the proposed facility, including that the project satisfies the needs of the public for an "adequate supply of electric energy," that the project will have no undue adverse environmental impacts, and that the project will not have a negative effect on wholesale competition.

[23] The Wisconsin Environmental Policy Act requires the PSC to prepare an Environmental Impact Statement (EIS) to aid in evaluating the environmental impacts of the proposed facility.

¶ 34. Third, we conclude the PSC did not exceed its authority or act irrationally when it reduced the mitigation payments from WEC to the City of Oak Creek, as we conclude this decision was a proper exercise of the PSC's ratemaking authority.

## III. STANDARD OF REVIEW

¶ 35. This is a review of an agency decision under Wis. Stat. § 227.52. The issue this court must decide is whether the PSC erroneously approved WEC's application for a CPCN. It is not the function of this court to determine this state's energy policy. Nor is it this court's place to decide whether the construction of the power plants at issue in this case is in the public interest. These are legislative determinations that the legislature has assigned to the PSC. *See* Wis. Stat. § 196.491(3)(d)3. Whether a given decision is in the public interest "is a matter of public policy and statecraft and not in any sense a judicial question." *Westring v. James,* 71 Wis. 2d 462, 473, 238 N.W.2d 695 (1976). This court "cannot substitute its judgment for that of an administrative agency determining a legislative matter within its province." *City of Beloit v. Town of Beloit,* 37 Wis. 2d 637, 647, 155 N.W.2d 633 (1968).

¶ 36. This is the philosophy with which we approach our review of the PSC's decision under Wis. Stat. § 227.52. The scope of our review is limited, pursuant to Wis. Stat. § 227.57, to whether the PSC *erroneously* approved WEC's CPCN application. As such, we will not substitute our judgment for that of the PSC. Although we must ultimately affirm or reverse the circuit court, when an agency's action is challenged on appeal, we

review the decision of the agency and not that of the circuit court. *Responsible Use of Rural and Agricultural Land (RURAL) v. PSC,* 2000 WI 129, ¶ 20, 239 Wis. 2d 660, 619 N.W.2d 888.

¶ 37. The parties dispute whether the PSC properly interpreted and applied a number of statutes relating to the issuance of a CPCN. This court has historically applied one of three levels of deference to an agency's interpretation and application of statutes: great weight deference, due weight deference, or no deference (de novo review). *Hutson v. Wis. Pers. Comm'n,* 2003 WI 97, ¶ 31, 263 Wis. 2d 612, 665 N.W.2d 212.

¶ 38. The level of deference accorded to such decisions depends on a number of factors including "the extent to which the 'administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute[]' " and " 'the comparative institutional capabilities and qualifications of the court and the administrative agency[.]' " *Id.* (quoting *Kelley Co. v. Marquardt,* 172 Wis. 2d 234, 244, 493 N.W.2d 68 (1992) and *State ex rel. Parker v. Sullivan,* 184 Wis. 2d 668, 699, 517 N.W.2d 449 (1994)).

¶ 39. Great weight deference, the highest level of deference, is appropriate where:

> " '(1) the agency was charged by the legislature with the duty of administering the statute; (2)[] the interpretation of the statute is one of long-standing; (3)[] the agency employed its expertise or specialized knowledge in forming the interpretation; and (4)[] the agency's

interpretation will provide uniformity and consistency in the application of the statute.' "

*Id.,* ¶ 32 (quoting *UFE, Inc. v. LIRC,* 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996) (in turn quoting *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 660, 539 N.W.2d 98 (1995))).

¶ 40. However, the appropriate test for great weight deference is not whether the agency has "decided a case presenting the precise facts raised by [the present] appeal . . . ." *Va. Sur. Co. v. LIRC,* 2002 WI App 227, ¶ 13, 258 Wis. 2d 665, 654 N.W.2d 306. Rather, the correct test is whether the agency " 'has experience in interpreting [the] particular statutory scheme' " at issue. *Honthaners Rests., Inc. v. LIRC,* 2000 WI App 273, ¶ 12, 240 Wis. 2d 234, 621 N.W.2d 660 (quoting *Town of Russell Volunteer Fire Dep't. v. LIRC,* 223 Wis. 2d 723, 733–34, 589 N.W.2d 445 (Ct. App. 1998)).

¶ 41. Additionally, we should defer to an agency interpretation when the " 'legal question is intertwined with factual determinations or with value or policy determinations' " and the agency involved " 'has primary responsibility for determination of fact and policy.' " *Hutson,* 263 Wis. 2d 612, ¶ 32 (quoting *Sauk County v. WERC,* 165 Wis. 2d 406, 413, 477 N.W.2d 267 (1991)(in turn quoting *West Bend Educ. Ass'n v. WERC,* 121 Wis. 2d 1, 12, 357 N.W.2d 534 (1984))). Under the great weight standard, we will uphold an agency's interpretation of a statute so long as it is reasonable, even if a more reasonable interpretation exists. *Id.*

¶ 42. This court applies an intermediate level of deference, "known as 'due weight' or 'great bearing[,]' "

*id.*, ¶ 33 (quoting *Kelley Co.*, 172 Wis. 2d at 244), where " 'the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court.' " *Id.* (quoting *UFE*, 201 Wis. 2d at 286). This intermediate standard of review is based on recognition that the legislature entrusted application of the particular statute to the agency and not on the agency's expertise. *Id.* Under the due weight deference standard, we will uphold an agency's interpretation of a statute so long as it is reasonable and the court finds that no other more reasonable interpretation is available. *Id.*

¶ 43. Finally, de novo review, under which an agency's interpretation of a statute is "given no weight at all," *id.*, ¶ 34, is applied "when the issue *is* 'clearly one of first impression' for the agency or 'when an agency's position on an issue has been so inconsistent [such that it] provide[s] no real guidance.' " *Id.* (quoting *UFE*, 201 Wis. 2d at 285). However, regardless of the level of deference given, this court "will not uphold an agency's interpretation of a statute if it is contrary to the clear meaning of a statute." *Bosco v. LIRC*, 2004 WI 77, ¶ 19, 272 Wis. 2d 586, 681 N.W.2d 157.

¶ 44. As this review implicates the PSC's interpretation and application of several statutes, we will discuss the appropriate standard of deference in our discussion of each respective statutory provision.

¶ 45. This review also implicates the PSC's interpretation and application of its own administrative rules governing the issuance of CPCNs. "This court has frequently held that great weight should be given to the administrative agency's interpretation and application of its own rules, unless plainly erroneous or inconsis-

tent with the regulation so interpreted. This is especially so in an area calling for special expertise." *Vonasek v. Hirsch & Stevens, Inc.,* 65 Wis. 2d 1, 7, 221 N.W.2d 815 (1974)(citation omitted). *See also Trott v. DHFS,* 2001 WI App 68, ¶ 4, 242 Wis. 2d 397, 626 N.W.2d 48 (accord).

¶ 46. Finally, this review implicates various factual findings made by the PSC. Pursuant to Wis. Stat. § 227.57(6), a court will not disturb an agency's factual findings unless they are not supported by "substantial evidence." An agency's findings are supported by substantial evidence if a reasonable person could arrive at the same conclusion as the agency, taking into account all the evidence in the record. *RURAL,* 239 Wis. 2d 660, ¶ 20.

## IV. ANALYSIS

¶ 47. As noted, the challenges to the PSC's order in this case fall into three general categories: 1) the PSC's determination that WEC's application was complete; 2) the PSC's decision to grant the CPCN; and 3) the PSC's decision to reduce the mitigation payments to the City of Oak Creek.

### A. Completeness of CPCN Application

¶ 48. As discussed *supra,* the initial step in the CPCN process is filing an application with the PSC: "An application in the form and containing the information required by commission rules for such certificate shall be filed with the commission not less than 6 months prior to the commencement of construction of a facility." Wis. Stat. § 196.491(3)(a)1. In turn,

Wis. Admin. Code § PSC 111.53 sets forth the required contents of CPCN applications for large electric generating facilities. Of particular importance to the present case, the regulation requires, in part:

> (e) At least two proposed sites for the proposed facility, including a description of the siting process and a list of the factors considered in choosing the alternatives.
>
> (f) Site–related information for each proposed power plant site, including all of the following:
>
> 1. The regulatory approvals required for construction and operation of the facility.
>
> 2. The construction schedule and timeline, showing construction activities and permitting expectations from the beginning of construction to the in–service date.
>
> . . . .
>
> 4. Any required transmission line construction, agreements for use of the transmission system to deliver plant power, transmission losses, and effects on system reliability. If a certificate of authority under s. 196.49, Stats., is required to construct the transmission line, the location of termini, length in miles, and voltage for each transmission line.
>
> 5. Other auxiliary facilities, including fuel storage and water storage.
>
> . . . .

Wis. Admin. Code § PSC 111.53(1)(e)-(f).

¶ 49. After an application is filed, the PSC has 30 days to determine whether the application is "complete." Wis. Stat. § 196.491(3)(a)2.[24] If the PSC deter-

_____

[24] Wisconsin Stat. § 196.491(3)(a)2. provides:

311

mines an application is incomplete, it must notify an applicant and provide reasons for its determination. *Id.* However, an applicant may refile an application previously determined to be incomplete, and there is no limit as to how many times an application may be refiled. *Id.* If the PSC fails to make a completeness determination within 30 days after the application is filed, the application is rendered complete by operation of law. *Id.* Once an application is determined to be complete, the PSC must hold a public hearing on the application. Wis. Stat. § 196.491(3)(b). Following the public hearing, the PSC must determine whether the proposed facility meets the statutory requirements set forth in Wis. Stat. § 196.491(3)(d)2.-7. before the CPCN may be issued. Wis. Stat. § 196.491(3)(d).

¶ 50. As noted *supra,* after determining that WEC's application was incomplete on a number of occasions, the PSC issued a letter on November 15, 2002, advising WEC that the PSC had determined its application to be complete in light of its latest supplement. The letter stated:

> The Commission has reviewed [WEC's] supplement to the application to construct the facilities described above as required by Wis. Stat. § 196.491(3)(a)2 and Wis. Admin. Code § PSC 111.53. The DNR also re-

---

The commission shall determine whether an application filed under subd. 1. is complete and, no later than 30 days after the application is filed, notify the applicant about the determination. If the commission determines that the application is incomplete, the notice shall state the reason for the determination. An applicant may supplement and refile an application that the commission has determined to be incomplete. There is no limit on the number of times that an applicant may refile an application under this subdivision. If the commission fails to determine whether an application is complete within 30 days after the application is filed, the application shall be considered to be complete.

viewed appropriate application materials for completeness purposes. Based on this review, the Commission determines that the application is complete . . . .

However, the letter also indicated that the PSC expected WEC to provide further environmental information concerning items that were identified as being deficient in the PSC's previous review.

¶ 51. Clean Wisconsin challenged the PSC's determination that WEC's application was complete by filing a petition to review the PSC's interim completeness determination on the ground that the WEC application did not meet the "alternative sites" requirement of Wis. Admin. Code § PSC 111.53(1)(e). Specifically, Clean Wisconsin argued that WEC's application was not complete because WEC's alternative sites for the proposed plants were all located on the grounds of WEC's existing Oak Creek Generating Plant. Clean Wisconsin argued that in order to comply with the regulation, WEC's application must contain at least one site that is at a location other than the existing Oak Creek facility.

¶ 52. In an order dated April 18, 2003, the PSC declined to reopen its determination that WEC's CPCN application was complete. Following the PSC's final decision and order issuing the CPCN to WEC, Clean Wisconsin renewed its argument concerning the PSC's completeness determination in the circuit court. In addition to arguing that the application was incomplete because it failed to satisfy the "alternative site" requirement, Clean Wisconsin asserted that the application was incomplete because it did not contain required regulatory approvals under Wis. Admin. Code § PSC 111.53(1)(f)1. and did not contain sufficient information concerning transmission line facilities as required by Wis. Admin. Code § PSC 111.53(1)(f)4.

313

¶ 53. The circuit court agreed, concluding that WEC's application did not meet the "alternative site" requirement in § PSC 111.53(1)(e) because all of the listed alternatives were different configurations of the same plant located on the same 1000 acre parcel of land. The circuit court also ruled that it was error for the PSC to deem the application complete because § PSC 111.53(1)(f)1. requires a CPCN application to contain all regulatory permits that are necessary before the facility can be built and WEC's application did not contain the required approvals from the DNR. Finally, the circuit court ruled that the PSC erred in determining that the application was complete because § PSC 111.53(1)(f)4. requires a CPCN application to contain agreements for transmission lines that will be utilized, and WEC's application did not contain any such agreements.

¶ 54. Clean Wisconsin again argues before this court that it was legal error for the PSC to determine that WEC's application was complete. It again argues that WEC's application failed to satisfy the "alternative site" requirement and that it failed to contain the necessary transmission line agreements. Further, it contends that the PSC erred in determining that the application was complete because its completeness letter indicated that the application was incomplete. However, Clean Wisconsin does not argue before this court that WEC was required to include all necessary regulatory permits in its CPCN application.

¶ 55. The PSC argues that it correctly determined that WEC's application met the "alternative site" requirement and that its conclusion that the requirement was satisfied is entitled to great weight deference. The PSC further asserts that the application contained all the necessary information pertaining to regulatory permits and transmission line agreements and that requiring a CPCN application to contain the actual regulatory

permits required for construction of the facility and the actual transmission line agreements would be inconsistent with its own rules and related statutes. Additionally, the PSC argues that its request for additional information in its November 15, 2002, completeness letter did not undermine its ultimate conclusion that the application was complete. WEC makes substantially the same arguments as the PSC. Furthermore, Dairyland Power Cooperative (Dairyland),[25] in addition to making the same arguments as the PSC and WEC, asserts that § 196.491 gives the PSC the power to conclusively determine whether a CPCN application is complete and that the PSC's determination that the CPCN application was complete is not reviewable.

¶ 56. We begin by addressing Dairyland's argument that the PSC's determination that a CPCN application is complete is not reviewable. According to Dairyland, a determination by the PSC that a CPCN application is complete is unreviewable because § 196.491 does not require the PSC to provide reasons for determining that an application is complete and deems an application complete as a matter of law if the PSC takes no action. Further, Dairyland argues that § 196.491(3)(d), governing the final issuance of a CPCN, makes no reference to the completeness of a CPCN application as a prerequisite to the issuance of the CPCN. Finally, Dairyland argues that § 196.491(3)(a)1. allows the PSC to determine what information is necessary for an application to be complete and provides no standards for reviewing the PSC's completeness determination.

---

[25] Dairyland is a not-for-profit generation and transmission electric cooperative that is an interested party in this litigation.

¶ 57. We reject Dairyland's argument for three reasons. First, as noted by Clean Wisconsin, Wis. Stat. § 196.491(3)(j) explicitly provides that "[a]ny person whose substantial rights may be adversely affected . . . by a certificate of public convenience and necessity may petition for judicial review, under ch. 227, of *any decision of the commission regarding the certificate.*" (Emphasis added.) As discussed, the filing of the CPCN application and the PSC's determination that the application is complete are the first two steps in the process leading up to the ultimate issuance of the CPCN. As the CPCN application cannot move forward to the public hearing stage without the PSC first determining that it is complete, the PSC's determination that an application is complete clearly qualifies as a "decision of the commission regarding the certificate." Wis. Stat. § 196.491(3)(j).

¶ 58. Second, although the PSC's decision that a CPCN application is complete is not itself a final decision, case law establishes that it is nonetheless subject to judicial review. In *Friends of the Earth,* 78 Wis. 2d at 410, this court held that a PSC interim order regarding ratemaking was reviewable in connection with the final order in the case, even though the interim order was not immediately subject to judicial review. *See also Cities & Villages of Algoma v. PSC,* 91 Wis. 2d 252, 265, 283 N.W.2d 261 (Ct. App. 1978)("[J]udicial review of the PSC's action on the interim order may be had upon judicial review of the final order so as to protect the interests of the ratepayer."). We see no reason why this reasoning is not applicable here, particularly in light of the aforementioned language in Wis. Stat. § 196.491(3)(j).

¶ 59. Finally, we reject Dairyland's assertion that

the relevant statutes provide no standards by which the PSC's completeness determination may be reviewed. Section 196.491(3)(a)1. requires that every CPCN application be in the form required by the PSC and contain "the information required by commission rules for such certificate[.]" In turn, Wis. Admin. Code § PSC 111.53(1) sets forth the information that a CPCN application must contain before it is considered to be complete.

¶ 60. It is this rule that provides the standards by which a court reviews a PSC determination that a CPCN application is complete. Thus, while § 196.491(3)(a)1. does not itself provide such standards, it specifically states that an application must contain the information required by PSC rules. The PSC has promulgated a list of items in § PSC 111.53(1) that an application must contain before it is considered complete; therefore, the PSC is not free to ignore those requirements in making its completeness determination.

¶ 61. Having determined that the PSC's decision regarding the completeness of a CPCN application is indeed subject to judicial review, we now address what level of deference is appropriate when reviewing a PSC determination that a CPCN application is complete. As noted previously, "[t]his court has frequently held that great weight should be given to the administrative agency's interpretation and application of its own rules, unless plainly erroneous or inconsistent with the regulation so interpreted. This is especially so in an area calling for special expertise." *Vonasek,* 65 Wis. 2d at 7 (citation omitted). No one disputes that the PSC has special expertise in determining whether a CPCN application is complete.

¶ 62. The PSC's determination that a CPCN application is complete "represents its conclusion that the

requirements of [Wis. Admin. Code § PSC 111.53(1)] have been met on the facts before it with respect to the application under consideration. It is thus an application or interpretation of law . . . entitled to great weight deference from a reviewing court." *Citizens' Util. Bd. v. PSC,* 211 Wis. 2d 537, 552, 565 N.W.2d 554 (Ct. App. 1997).

¶ 63. Clean Wisconsin challenges the PSC's completeness determination on the ground that the application failed to contain information required by various provisions of § PSC 111.53(1) and that the PSC erroneously interpreted these requirements. Whether the PSC's interpretations of the various provisions of § PSC 111.53(1) at issue are entitled to great weight deference will be discussed below. As we conclude that the PSC's interpretation of each relevant provision is given great weight deference, its application of those provisions and ultimate conclusion that the application was complete will be upheld if it is reasonable. *Harnischfeger,* 196 Wis. 2d at 661; *Citizens' Util. Bd.,* 211 Wis. 2d at 552. As we conclude that great weight deference is appropriate, it is Clean Wisconsin's burden to demonstrate that there is no rational basis for the PSC's completeness determination. *Id.* at 553.

1. Alternative Site Requirement

¶ 64. Wisconsin Admin. Code § PSC 111.53(1)(e) requires a CPCN application for a large electric generating facility to contain information concerning "[a]t least two proposed sites for the proposed facility, including a description of the siting process and a list of the factors considered in choosing the alternatives." Clean Wisconsin argues that WEC's application failed to sat-

318

isfy this requirement because it contained only alternative configurations of the proposed plants on the same site rather than two distinct alternate proposed sites.

¶ 65. Clean Wisconsin argues that alternative configurations at the same site are allowed only under the circumstances described in Wis. Admin. Code § PSC 111.53(2)(b). Clean Wisconsin also argues that the PSC's test for determining whether an application proposes sufficiently different alternatives is contrary to the plain meaning of Wis. Admin. Code § PSC 111.53(1)(e) and that even if the PSC's test is appropriate, WEC's application clearly failed to meet that test.

¶ 66. No one disputes that § PSC 111.53(1)(e) requires an applicant to submit information concerning proposed alternative sites. The threshold question is really how different or distinct must two proposals be to qualify as "alternative sites." The text of the regulation does not answer this question. In rejecting Clean Wisconsin's initial challenge to the PSC's determination that WEC's CPCN application was complete, the PSC explained how it evaluates site "alternatives":

> The Commission's standard for reviewing site alternatives in a CPCN application is based upon both the rule of reason and the principle that alternatives must serve the public purpose underlying the issuance of a CPCN. The Commission first reviews a CPCN application to determine that each proposed site is "reasonable," i.e. is a feasible location for the project that would not directly conflict with any of the criteria for granting a CPCN expressed in Wis. Stat. § 196.491(3). In addition, the Commission's practice is to require that the sites are sufficiently distinct to offer different packages of costs and benefits, and thus present the Commission with a choice.
>
> The fact that alternative sites may be geographically close to each other does not render them unrea-

319

sonable. The Commission has accepted CPCN applications for several projects where the alternative sites were close together or even adjacent to each other.

¶ 67. We cannot conclude that the PSC's interpretation of its own rule in this instance is inconsistent with the text of the rule. As noted, the rule itself provides no indication as to when different proposals are sufficiently distinct so as to constitute "alternative sites." The pertinent dictionary definition of "alternative" is "[a]llowing or necessitating a choice between two or more things." *The American Heritage Dictionary of the English Language* 55 (3d ed. 1992). Additionally, "site" is defined as "[t]he place where a structure or group of structures was, is, or is to be located." *Id.* at 1688. Thus, the "alternative site" provision requires a CPCN applicant to provide information regarding locations where the proposed power plants are to be located sufficient to present the PSC with a choice.

¶ 68. The PSC's interpretation of its rule is not inconsistent with these definitions, as it requires "that the sites are sufficiently distinct to offer different packages of costs and benefits, and thus present the Commission with a choice." While Clean Wisconsin argues that WEC's proposal contained only different configurations on the same site, this argument is merely a matter of semantics and begs the ultimate question of how distinct the locations of the proposed plants must be to qualify as "alternative sites."

¶ 69. The PSC's interpretation differentiates "sites" on the basis of whether they offer sufficiently distinct costs and benefits so as to allow the PSC to make an actual choice between the two. This interpretation comports with the overall statutory scheme

governing the issuance of CPCNs. One of the criteria for granting a CPCN is that the proposed facility "is in the public interest considering . . . alternative locations . . . ." Wis. Stat. § 196.491(3)(d)3. By requiring that an applicant present information concerning "sites [that] are sufficiently distinct to offer different packages of cost and benefits, and thus present the commission with a choice[,]" the PSC ensures that it is able to evaluate whether the proposed facility "is in the public interest considering . . . alternative locations . . . ." Wis. Stat. § 196.491(3)(d)3.

■

¶ 70. As the PSC's interpretation of its own rule is not contrary to the text of the rule, we accord it great weight deference. Thus, the PSC's determination that a CPCN application has met the "alternative sites" requirement will not be disturbed unless it is without a rational basis.

¶ 71. WEC's CPCN application originally contained three proposed sites that were described in the PSC's final order approving the CPCN:

> The North Site is in the City of Oak Creek in Milwaukee County at the east end of Elm Road, north of the existing OCPP [Oak Creek Power Plant] units. The South Site would place the generating units on a portion of the OCPP property south of existing Units 5–8, in the town of Caledonia in Racine County. The South Site—Exp is a variation on the South Site, placing the SCPC units in the same location but with the IGCC facility on a federal/state-owned shooting range (land that WEC would need to purchase).

¶ 72. In its decision rejecting Clean Wisconsin's original challenge to its completeness determination, the PSC applied its interpretation of § PSC 111.53(1)(e) to WEC's application and reasoned:

321

At least two of the three sites WEC has included in its CPCN application meet the Commission's standards. The petitioners allege that 11 or more different characteristics of these sites are functionally identical, but this situation is difficult to avoid when searching for locations to install a new coal-fired plant where generation already exists. The similarities highlight the fact that each site alternative is relying on existing infrastructure at a brownfield generating site, and the Commission has encouraged the use of such locations because they tend to make electric generation projects less expensive and less environmentally damaging. The Commission also noted two significant distinctions among the sites WEC is proposing. The primary site is located in the city of Oak Creek, Milwaukee County, while the alternative sites are found in the town of Caledonia, Racine County. In addition, construction at the primary site would require WEC to cut and fill 10 million cubic yards of earth, while at Alternative Site A it would only need to move 7.3 million cubic yards.

The site alternatives WEC is proposing are "different enough" to meet the Commission's requirements in Wis. Admin. Code § PSC 111.53(1)(e).

¶ 73. Clean Wisconsin asserts that there is no difference between the "alternatives" WEC proposed because their cost is the same and there are no distinct benefits that distinguish the alternatives from one another. Clean Wisconsin also notes that the information WEC provided as to its proposed alternatives was sparse in comparison to the information provided for the primary, preferred location.

¶ 74. The PSC noted that while there were many similarities between the proposed sites, this was unavoidable because of the type of facility that was being

proposed and because the PSC prefers applicants to choose sites that are located on brownfields, so as to minimize any adverse environmental impacts of the proposed facility.[26] The PSC also stated that the proposed sites were located in different cities and counties. While Clean Wisconsin argues these facts have no relevance, the record indicates that the alternate proposed locations had different physical attributes from which the PSC could reasonably determine that the proposals offered competing packages of benefits and costs.

¶ 75. For instance, the proposed South Site would require a different coal conveyor system and possible adaptation of on-site haul roads. In addition, the South Site and South Site-Exp would require the relocation of a planned commercially-owned wallboard plant. The South Site-Exp would require WEC to purchase 70 acres of land from the federal government that is currently used as a shooting range. The South Site-Exp is located closer to Lake Michigan than the other proposed sites, and it would therefore allow equipment requiring cooling to be located closer to the lake. Additionally, the South Side-Exp would require less bluff removal than the other two sites and would allow certain facilities to be more accessible. Although all three sites would require a significant amount of earth removal, there is a difference of 2.7 million cubic yards of earth that would need to be removed among some of the alternate sites.

¶ 76. Furthermore, the fact that the proposed alternatives were located in different communities is not

[26] Brownfields are abandoned industrial sites, some of which have actual or perceived environmental contamination. Their use is encouraged so as to reduce building on greenfields (pristine, undisturbed land). *See* U.S. Envtl. Prot. Agency, *Brownfields Fact Sheet*, EPA Publication No. 500–F-00–241 (Oct. 2000).

inconsequential. It is reasonable to assume that a project the size of the one being proposed may garner different levels of public support depending upon the community in which it is located. It is reasonable to assume that an entity proposing to build a project the size of the one at issue here might have varying degrees of difficulty obtaining necessary permits depending upon in which community the project is located and that different communities may desire different levels of mitigation payments.[27]

¶ 77. In sum, we cannot say that the PSC's ultimate conclusion that WEC's CPCN application satisfied the "alternate site" requirement was without a rational basis, particularly in light of the PSC's stated goal of reducing the adverse environmental impacts of the proposed project. While an opposite conclusion on the facts before us might be equally reasonable or even more reasonable, the PSC's determination must stand under our deferential standard of review.[28]

2. Regulatory Permits

¶ 78. In addition to requiring information about alternative sites for the proposed facility, § PSC

---

[27] The parties argue about whether the environmental impacts of the various proposals, as stated in the EIS, sufficiently distinguish the sites proposed by WEC. Because this environmental impact information was not before the PSC when it made its completeness determination, we do not consider it in our analysis.

[28] While Clean Wisconsin takes issue with the amount of information WEC provided relative to each proposed site, it is not the function of this court to dictate the quantity of information that must be filed with the PSC. All that is required is for the applicant to file sufficient material so as to allow the PSC to make a rational completeness determination.

111.53(1)(f) requires an applicant to submit "[s]ite related information for each proposed power plant site, including . . . 1. The regulatory approvals required for construction and operation of the facility." WEC attached to its CPCN application a table listing various potential permits and approvals required for construction of ERGS. The table included 17 different permits from ten different agencies, described the permits required, and set forth the applicable governing statutes.

¶ 79. The circuit court ruled that WEC's application was incomplete because it concluded that § PSC 111.53(1)(f)1. requires an applicant to file the regulatory permits and approvals themselves, not merely list and describe the permits needed before construction begins. Specifically, the circuit court concluded that WEC's application was incomplete because it failed to include necessary DNR permits. This issue was not raised before the PSC, and none of the parties supporting the circuit court's decision defend its ruling on this issue before this court. Although we review the PSC's decision and not that of the circuit court and no party adverse to the PSC's decision has pursued this issue on appeal, we nonetheless address this issue because WEC, the PSC, and Dairyland devoted significant portions of their briefs to this issue, the issue is one of great public importance, and an analysis of this issue will affect our discussion of whether WEC was required to file transmission line agreements with its CPCN application.

¶ 80. The PSC has interpreted § PSC 111.53(1)(f)1. as requiring a CPCN applicant to submit only information *concerning* the required permits and not the actual permits. Wisconsin Admin. Code § PSC 111.53(1)(f) requires an applicant to submit "[s]ite-

related *information* for each proposed power plant site, *including . . . . [t]he regulatory approvals* required for construction and operation of the facility." (Emphasis added.) We conclude that the PSC's interpretation of this regulation is not inconsistent with the text of the regulation or plainly erroneous for several reasons.

¶ 81. First, if one considers the regulatory permits themselves to be "information," and that the regulation requires the actual permits to be filed, other portions of the regulation will be rendered absurd. Among the other "information" an applicant must supply under § PSC 111.53(1)(f) is "[o]ther auxiliary facilities," Wis. Admin. Code § PSC 111.53(1)(f)5., "natural resources at each site," Wis. Admin. Code § PSC 111.53(1)(f)6., and "[a]esthetics[,]" Wis. Admin. Code § PSC 111.53(1)(f)8. *Wis. Citizens Concerned for Cranes and Doves v. DNR,* 2004 WI 40, ¶ 6, 270 Wis. 2d 318, 677 N.W.2d 612 (statutes and regulations must be read in the context in which they appear). If all the items listed in § PSC 111.53(1)(f) were themselves required to be submitted as "information," an applicant would be required to file "natural resources," "auxiliary facilities," and "aesthetics" themselves with the application. Such a reading of the regulation is absurd. *Trott,* 242 Wis. 2d 397, ¶ 14 (regulations should be interpreted to avoid unreasonable or absurd results).

¶ 82. Second, the PSC's interpretation of § PSC 111.53(1)(f)1. is consistent with Wis. Admin. Code § PSC 111.53(1)(f)2., which requires the applicant to file "[t]he construction schedule and timeline, showing construction activities and *permitting expectations* from the beginning of construction to the in-service date." (Emphasis added.) If the permits themselves need to be filed under § PSC 111.53(1)(f)1., then the language concerning the "permitting expectations" of the applicant in

§ PSC 111.53(1)(f)2. is rendered superfluous or is in conflict with § PSC 111.53(1)(f)1. *Basinas v. State,* 104 Wis. 2d 539, 546, 312 N.W.2d 483 (1981)(regulations should be interpreted to avoid conflict among different provisions and so as to avoid rendering provisions superfluous).

¶ 83. Additionally, the PSC's interpretation of § PSC 111.53(1)(f)1. is consistent with the statutes governing the issuance of a CPCN. *Bosco,* 272 Wis. 2d 586, ¶ 19 (valid agency interpretation of its regulations cannot be contrary to statute governing agency). Specifically, the PSC's interpretation of § PSC 111.53(1)(f)1.—requiring only information about regulatory permits to be filed—comports with the statute setting forth the process and timeline for obtaining regulatory permits from the DNR, whereas an interpretation of § PSC 111.53(1)(f)1. that requires the actual permits to be filed before a CPCN application is complete would conflict with the statute.[29]

---

[29] Wisconsin Stat. § 196.491(3)(a)3. provides:

a. At least 60 days before a person files an application under subd. 1., the person shall provide the department with an engineering plan showing the location of the facility, a description of the facility, including the major components of the facility that have a significant air, water or solid waste pollution potential, and a description of the anticipated effects of the facility on air and water quality. Within 30 days after a person provides an engineering plan, the department shall provide the person with a listing of each department permit or approval which, on the basis of the information contained in the engineering plan, appears to be required for the construction or operation of the facility.

b. Within 20 days after the department provides a listing specified in subd. 3.a. to a person, the person shall apply for the permits and approvals identified in the listing. The department shall determine whether an application under this subd. 3.b. is complete and, no later than 30 days after the application is filed, notify the applicant about the determination. If the department

¶ 84. Wisconsin Stat. § 196.491(3), governing the procedure for issuing a CPCN, also describes the process and timeline for obtaining necessary regulatory permits from the DNR. Sixty days before a person files a CPCN application, he must file an engineering plan with the DNR describing the proposed facility. Wis. Stat. § 196.491(3)(a)3.a. Thirty days after the engineering plan is filed (30 days prior to the filing of the CPCN application), the DNR must provide the applicant with a list of the necessary permits. Wis. Stat. § 196.491(3)(a)3.a. The applicant then has 20 days from the time the DNR provides a list of the necessary permits (up until 10 days prior to filing the CPCN application) to apply for the permits. Wis. Stat. § 196.491(3)(a)3.b.

¶ 85. The DNR must determine whether the permit application is complete within 30 days after the person applies for the permits (20 days after the CPCN application is filed and 10 days before the PSC must determine if the CPCN is complete) Wis. Stat. § 196.491(3)(a)3.b. If the permit application is incomplete, the applicant may supplement the application, again triggering the 30–day time period. Wis. Stat. § 196.491(3)(a)3.b. After the DNR permit application is determined to be complete, the DNR then has another 120 days (140 days after the CPCN application is filed

determines that the application is incomplete, the notice shall state the reason for the determination. An applicant may supplement and refile an application that the department has determined to be incomplete. There is no limit on the number of times that an applicant may refile an application under this subd. 3.b. If the department fails to determine whether an application is complete within 30 days after the application is filed, the application shall be considered to be complete. The department shall complete action on an application under this subd. 3.b. for any permit or approval that is required prior to construction of a facility within 120 days after the date on which the application is determined or considered to be complete.

and 110 days after the PSC must determine whether the CPCN application is complete) to determine whether to issue the permits. Wis. Stat. § 196.491(3)(a)3.b.

¶ 86. Therefore, interpreting § PSC 111.53(1)(f)1. to require a CPCN applicant to file the actual regulatory approvals before the CPCN application can be deemed to be complete would clearly conflict with Wis. Stat. § 196.491(3)(a)3.a.-b. Under the statute, the earliest the DNR can issue the required regulatory permits is 140 days after the CPCN application is filed and 110 days after the PSC is required to make its completeness determination. Thus, the statute expressly contemplates that a CPCN applicant will not have the required DNR permits in hand at the time the PSC must render its completeness determination.

¶ 87. Furthermore, § PSC 111.53(1)(f) requires site-related information for "each proposed power plant site." If it is not sufficient for a CPCN applicant to merely file information concerning the required permits, then the applicant would need to obtain a set of permits for each "proposed power plant site." This, in turn, would require, at a minimum, two sets of permit applications to be filed with the DNR. In addition, the DNR would be required to issue permits for at least one site that will not ultimately be the site at which the power plant is built. Such a result would be absurd and in conflict with the purpose of § 196.491, which is to provide a streamlined certificate application process. *RURAL,* 239 Wis. 2d 660, ¶ 31.

¶ 88. As the PSC's interpretation of § PSC 111.53(1)(f)1. is not inconsistent with the text of the regulation and is consistent with the statutes governing the issuance of the CPCN and regulatory approvals, we accord it great weight deference. WEC filed a detailed

table listing: 1) the permits that would be required for ERGS; 2) the activity for which each permit was needed; 3) the agency responsible for issuing each permit; and 4) the statute or code provision pursuant to which each permit would be issued. We cannot conclude that the PSC's determination that the application contained the information required under § PSC 111.53(1)(f)1. was without a rational basis.

3. Transmission Line Agreements

¶ 89. Wisconsin Admin. Code § PSC 111.53(1)(f) requires a person filing a CPCN application to provide "[s]ite-related information for each proposed power plant site, including . . . . 4. Any required transmission line construction, agreements for use of the transmission system to deliver plant power, transmission losses, and effects on system reliability." Although this issue was not raised before the PSC, it was raised in the circuit court, and the circuit court determined that WEC's CPCN application was incomplete because it failed to include the actual transmission line agreements. Clean Wisconsin renews its argument concerning the transmission line agreements before this court. There is no dispute that WEC's application did not contain such agreements.

¶ 90. For the reasons discussed *supra,* in regard to the need to obtain regulatory permits, the PSC's interpretation of § PSC 111.53(1)(f), as requiring only information *concerning* the listed items is entitled to great weight deference. As previously discussed, actually requiring an applicant to file the items listed in § PSC 111.53(1)(f) would be absurd.

330

¶ 91. This is particularly true with regard to § PSC 111.53(1)(f)4. If, as Clean Wisconsin contends, a CPCN applicant is required to obtain and file the actual "agreements for use of the transmission system to deliver plant power," then the applicant must also necessarily file "[a]ny required transmission line construction[.]" Wis. Admin. Code § PSC 111.53(1)(f)4. This interpretation simply makes no sense. Under the PSC's interpretation, an applicant must file information *about* or *concerning* "[a]ny required transmission line construction[]" and information *about* or *concerning* "agreements for use of the transmission system to deliver plant power[.]" Wis. Admin. Code § PSC 111.53(1)(f)4.

¶ 92. Furthermore, as previously noted, § PSC 111.53(1)(f) requires an applicant to file information regarding the listed items "for each proposed power plant site." If Clean Wisconsin's interpretation of § PSC 111.53(1)(f)4. were correct, then an applicant would be required to obtain transmission line agreements for (at a minimum) two separate proposed sites, one of which will not be built upon. Clean Wisconsin fails to explain how a utility is to obtain agreements for the construction of transmission lines for a power plant whose CPCN application has yet to be approved or a plant whose site is uncertain.

¶ 93. Therefore, we accord the PSC's interpretation of § PSC 111.53(1)(f)4. great weight deference. WEC filed over 100 pages of information relating to transmission lines, including a document entitled "Generation Interconnection Study Report"— prepared by the American Transmission Company (ATC)[30]—and a document entitled "Power of the Future

---

[30] According to the parties' submissions, ATC owns all transmission assets in eastern Wisconsin.

(PTF) Facilities Study: Transmission Assessment of Proposed Generator Additions." These documents contain very detailed assessments of the effects of ERGS on existing transmission, required transmission improvements, upgrades, and modifications; detailed breakdowns of the estimated costs for the improvements; and detailed technical schematics for the transmission upgrades. The PSC determined that these filings were sufficient to satisfy § PSC 111.53(1)(f)4. We cannot conclude that this determination was without a rational basis.[31]

4. Other required information

■

¶ 94. Clean Wisconsin's final argument with regard to the PSC's completeness determination is that the PSC erred in determining that WEC's CPCN application was complete because it specifically acknowledged that it was not complete in regard to certain wetland information. The language in the PSC's November 15, 2002, letter to which Clean Wisconsin refers, states:

> While the application is determined to be complete at this time, our determination is, in part, based on [WEC's] commitment to supply additional information related to items 6, 7, and 18 of the Commission's October 7, 2002, incompleteness letter. Substantial amounts of information relative to items 6 and 7 have been provided and will allow our review of the wetland

[31] Although Clean Wisconsin also makes passing reference to Wis. Admin. Code § 111.53(1)(f)9. in its brief, a reviewing court need not address arguments insufficiently developed. *Barakat v. DHSS*, 191 Wis. 2d 769, 786, 530 N.W.2d 392 (Ct. App. 1995).

delineations to begin. Based on the information contained in Supplement 4 and conversations with [WEC's] staff, it is my understanding that the remaining information relative to items 6 and 7, consisting of final wetland reports from the Southeast Regional Planning Commission, will be available approximately in two weeks. In addition, the information relative to subsurface drilling, sampling and testing survey, the wave/environmental climate state survey and the aquatic/benthic environmental lake bottom characterization survey in item 18 will be available on the time line set out as answer 5–SUP-021 of Supplement 4.

While I fully expect to receive the remaining information on the established time frames, failure by [WEC] to submit the information in a timely manner will likely delay the CPCN process as this information is necessary in order to complete our review of the proposed project and issue a joint PSCW/DNR Environmental Impact Statement. Prior to receipt and review of the necessary information, it would be extremely difficult to schedule hearings. . . .

Please be aware that application information that is considered adequate now may require further development later in the Commission's review process. . . .

¶ 95. Contrary to Clean Wisconsin's suggestion, this letter does not state that WEC's application is being determined to be complete even though the wetland information is incomplete. The letter clearly states that WEC filed information sufficient to "allow [the PSC's] review of the wetland delineations to begin." The letter also discusses the timeline for when additional information is to be received. Further, it specifically states "application information that is considered adequate now may require further development later in the Commission's review process."

333

¶ 96. In other words, the PSC's completeness letter acknowledged that WEC's application contained sufficient information for the PSC to begin its review. The PSC stated that WEC may be required to file additional information in the future. Nothing in the letter suggests that WEC's application was lacking information necessary for the PSC to determine that the application was complete. We see nothing unreasonable in the PSC determining an application to be complete yet requesting further information to assist in its review of the CPCN application. Given that the PSC's completeness letter acknowledges that WEC had filed sufficient information for it to begin its review of the CPCN application, Clean Wisconsin has failed to persuade us that the PSC's determination of completeness is unreasonable. *Id.*

¶ 97. We next examine the parties' arguments concerning whether the PSC erroneously issued the CPCN for the two ERGS.

B. Issuance of the CPCN

1. Wisconsin's Energy Priorities Law

¶ 98. The PSC is required to comply with the Energy Priorities Law (EPL), Wis. Stat. § 1.12, when approving CPCNs for large electric generating facilities. *See* Wis. Stat. § 196.025(1). The EPL states Wisconsin's energy policy and gives agencies and governmental units a list of energy source options and the priority in which they should be considered when making decisions. Clean Wisconsin and Calpine raise numerous arguments that the PSC violated the EPL by approving the CPCN for ERGS.

¶ 99. The relevant part of the EPL states:

(4) Priorities. In meeting energy demands, the policy of the state is that, to the extent cost-effective and technically feasible, options be considered based on the following priorities, in the order listed:

(a) Energy conservation and efficiency.

(b) Noncombustible renewable energy resources.

(c) Combustible renewable energy resources.

(d) Nonrenewable combustible energy resources, in the order listed:

1. Natural gas.

2. Oil or coal with a sulphur content of less than 1%.

3. All other carbon-based fuels.

(5) Meeting Energy Demands. (a) In designing all new and replacement energy projects, a state agency or local governmental unit shall rely to the greatest extent feasible on energy efficiency improvements and renewable energy resources, if the energy efficiency improvements and renewable energy resources are cost-effective and technically feasible and do not have unacceptable environmental impacts.

(b) To the greatest extent cost-effective and technically feasible, a state agency or local governmental unit shall design all new and replacement energy projects following the priorities listed in sub. (4).

¶ 100. Wisconsin Stat. § 196.025(1) specifically charges the PSC with the duty to implement these priorities: "To the extent cost-effective, technically feasible and environmentally sound, the [PSC] shall implement the priorities under s. 1.12 (4) in making all

energy-related decisions and orders, including advance plan, rate setting and rule-making orders."

¶ 101. ERGS would use high-sulfur coal as its fuel, which is the lowest-priority fuel under the EPL. Calpine has proposed an alternative facility to be fueled by natural gas, which is the highest priority nonrenewable combustible energy option.

¶ 102. Before discussing the parties' arguments concerning the PSC's interpretation and application of the EPL, we set forth the relevant portions of the PSC's Final Decision and summarize the reasoning given for the PSC's conclusions regarding the EPL, as it is the reasoning in the PSC's decision that frames the parties' arguments on appeal.

¶ 103. We begin by noting that the PSC clearly recognized that the EPL was applicable to its decision:

> Another important legal and policy issue this Commission must decide is whether or not there is enough energy conservation, renewable resources, or a cleaner burning fuel to cancel or delay the construction approvals sought for the SCPC units in this proceeding. State law provides guidance to the Commission in carrying out the state's energy policy. Our obligations are set forth in Wis. Stat. § 1.12.

¶ 104. The PSC then discussed the opposition to ERGS and the argument that the EPL mandates selection of the natural-gas alternative presented by Calpine. The PSC stated it had discretion in applying the EPL and that it was required to consider its obligations under the Plant Siting Law when applying the EPL:

> This [EPL], however, is not a mandate to state agencies that must be mechanically applied to achieve a specific outcome. In the Prefatory Note to 1993 Wis.

Act 414, which enacted this law, the Legislature declares that it "does not want to create inflexible mandates or deprive decision makers of the discretion needed to respond appropriately to the circumstances surrounding energy-related decisions." The Legislature explains that this law uses "a combination of directives and encouragement, while reserving substantial discretionary authority to the decision maker." Such discretion must be applied in this case, to harmonize the directives of the [EPL] with those of the Power Plant Siting Law. The statutory framework for analyzing whether approving a CPCN project would be in the public interest involves a number of factors, beyond those specified in the [EPL]. The Commission must consider the extent to which a proposal may cause individual hardships, as well as concerns about its engineering, economics, safety, reliability, environmental impacts, interference with local land use plans, and impact upon wholesale competition. The Commission is required to balance all of these competing elements, which frequently lead in different directions; no single primary factor is the measure of a CPCN project. Thus, the Commission is responsible for harmonizing the [EPL] and the Power Plant Siting Law, in order to determine what is in the public interest.

¶ 105. The PSC then began its analysis under the EPL by addressing the first listed priority, energy conservation and efficiency: "The applicants' and Commission staff's estimates of achievable energy efficiency do not demonstrate that energy efficiency could reliably or cost-effectively serve to substitute, or postpone, the SCPC units." However, the PSC concluded that "a moderate level of intervention in the energy efficiency market would produce at least 55 MW of cost-effective and technically feasible energy efficiency in WEPCO's service territory by 2008." Therefore, the

PSC ordered WEPCO to submit a plan to the PSC for capturing at least 55 MW through energy efficiency programs.

¶ 106. The PSC next discussed renewable resources and identified wind power and biomass energy as the resources most likely to be cost-effective. It noted that WEPCO had issued two requests for proposals considering 200 MW of wind power and 25 MW of biomass power, but concluded that these "renewable resources are not cost-effective, technically feasible alternatives."

¶ 107. The PSC then considered natural-gas power, stating: "No gas-fired, baseload facilities were presented as either a cost-effective or technically feasible alternative in this record."[32] The PSC explained that it was critical that WEPCO address the need for new baseload facilities immediately:

> A critical part of the Commission's ultimate preference for coal-fired generation over gas-fired generation rests heavily on the discretion accorded to the Commission under the [EPL] and the Power Plant Siting Law. More significantly, the crux of this case is really about the appropriate timing to construct new baseload generation. A fundamental policy choice presented in this case is whether the Commission believes that WEPCO needs to take steps now to address needs for new baseload facilities over the next decade. The Commission believes that the applicants should take those steps now to ensure these facilities are in service in 2009 and 2010.

¶ 108. The PSC's decision that coal-fired baseload generation was appropriate was, in part, based on Electric Generation Expansion Analysis System

_____

[32] A baseload facility provides power "effectively on a constant basis, not less than 70% of the time, day in day out."

(EGEAS) computer modeling projections[33] that demonstrated energy priority alternatives "[could not] replace the need for new baseload, coal-fired units to serve WEPCO." The PSC further stated that the factors in the Plant Siting Law supported its conclusion:

> There are qualitative factors set forth in Wis. Stat. § 196.491(3)(d) that also support the Commission's conclusion that new coal-fired generation is in the public interest and that ERGS is the most cost-effective and technically feasible way to address WEPCO's baseload needs. The Commission's decision to approve SCPC 1 and 2 balances its obligations under the [EPL] and the Power Plant Siting Law. It also reflects the Commission's policy judgment that while natural gas-fired generating facilities may be better suited for peak and intermediate load generation, coal-fired generation provides the most practical means to serve WEPCO's needs for baseload capacity. The evidence in this proceeding demonstrates the advantages of using cleaner burning coal technologies like SCPC as a baseload resource over gas-fired generation.

> The need for new baseload generation is the critical factor that distinguishes this decision from the Port Washington order. The Port Washington order addressed WEPCO's need for new intermediate capacity. The Commission has not approved construction of any new baseload, coal-fired generation in Wisconsin since

---

[33] EGEAS is "a modular production-costing, generation-expansion software tool that is used to find least-cost generation system expansion plans by comparing all combinations of multiple generation options to meet forecasted system load." The inputs used included "forecasted energy and demand, the economic and engineering characteristics of existing and possible new generation units, fuel price forecasts, known or expected energy purchases or sales, desired reserve margin, and the forecasted cost of emission allowances." The complexity of this tool is readily apparent.

1980. The evidence presented reflects the fact that WEPCO's existing fleet of baseload plants is aging. WEPCO's aging baseload resources may be asked to maintain or even increase their historical production as older facilities are retired over the next decade and transmission constraints within WUMS continue to limit the ability of Wisconsin load-serving entities to import electricity. In fact, in Phase I of PTF the Commission approved the retirement of 320 MW of existing baseload, coal-fired generation at Port Washington. The record in this docket demonstrates that WEPCO needs more baseload capacity.

¶ 109. The PSC then examined environmental factors and stated that as part of the proposed plan, WEPCO would install technology to reduce emissions on the existing plants at the site. Finally, it noted that the policy preferences set forth in the EPL are actualized in "the overall pattern of decisions made by each agency," and that since its enactment, the PSC had authorized more than 6,900 MW of natural-gas fueled plants. The PSC emphasized that "[t]he total mix of energy sources that the Commission has approved over this time period shows a pattern of decisions for baseload, intermediate and peaking generating facilities that complies with the state's energy policy."

¶ 110. The dispute regarding the EPL centers on the PSC's focus on the need for "baseload" capacity and its conclusion that the natural gas option was not cost-effective and technically feasible for this project. The PSC concluded that in interpreting and applying the EPL, it was required to consider its obligations under the Plant Siting Law and type of project being proposed. Clean Wisconsin and Calpine argue that the PSC's interpretation of the EPL was erroneous because the concept of "baseload" capacity is not part of the EPL

and because the factors in the Plant Siting Law have no bearing on the requirements of the EPL.

■

¶ 111. As discussed *supra,* this court applies varying degrees of deference to an agency's interpretation of statutes. Calpine and Clean Wisconsin argue that this court should give no deference to the PSC's interpretation of the EPL, asserting that it satisfies none of the four requirements for granting great weight deference discussed *supra.* They assert that the PSC's application of the statute has never been used in a CPCN determination concerning a high sulfur, coal-fueled facility and that the baseload concept is contrary to the plain language of the EPL. In contrast, the PSC contends that great weight deference is appropriate, citing its "substantial experience in processing certificate applications."

¶ 112. We agree with the PSC and conclude that great weight deference is appropriate. The PSC satisfies the first requirement for great weight deference because it is clearly charged by the legislature with applying the EPL in its CPCN determinations. Second, the PSC has frequently and consistently interpreted the EPL in light of its obligations under the Plant Siting Law and the particular requirements of the project being proposed.

¶ 113. For example, in *Application of Madison Gas & Elec. Co.,* No. 05–CE–121 (Wis. PSC Oct. 9, 2003), the PSC examined a proposal to build a natural-gas-powered facility on the campus of the University of Wisconsin-Madison. The purpose of the project was to provide electric power for Madison Gas and Electric Company and to provide steam and chilled water to the university. In its application of the EPL, the PSC discussed wind power, a higher priority energy than

natural gas. The Final Decision stated: "Although there are additional wind resources available, the Commission finds that wind resources are *neither technically feasible nor cost-effective options to displace the need for a project the size and scope presented in this application.*" *Id.* at 13 (emphasis added).

¶ 114. Likewise, in *Application of Wis. Elec. Power Co.,* No. 05–CE-117 (Wis. PSC Dec. 20, 2002) [hereinafter *Port Washington Order*], where the PSC made its determination regarding Part I of the proposal that is the subject of this litigation, the PSC applied the cost effective and technically feasible standards in the context of the Plant Siting Law requirements concerning the proposed natural-gas-fired plants. In its application of the EPL, the PSC discussed energy efficiency and renewable resources but concluded that both were "neither technically feasible nor cost effective options to displace the need for a project the size and scope presented in these applications." *Id.* at 16.

¶ 115. In *Application of Wis. Pub. Serv. Corp.,* No. 6690–CE-187 (Wis. PSC Oct. 7, 2004) [hereinafter *Weston Order*], a decision following this case, the PSC applied the EPL to a situation very similar to the present case. That decision concerned a 515 MW coal baseload unit proposed by the Wisconsin Public Service Corporation. There, the PSC ordered the corporation to submit a plan to capture 32 MW of energy efficiency, but came to the same conclusion as the Final Decision in the present case that natural gas was not a cost-effective or technically feasible alternative to coal for a baseload plant. *Id.* at 16–17.

¶ 116. Contrary to the assertion of Calpine and Clean Wisconsin, it is irrelevant that the present case is the first time the PSC has applied its interpretation of

342

the EPL to a high-sulfur coal facility. The correct test for great weight deference is whether the agency has prior experience in interpreting the statutory section at issue, not whether it has previously applied that interpretation to the precise facts presented on appeal. *Honthaners Rests.*, 240 Wis. 2d 234, ¶ 12. Therefore, we conclude that the PSC's interpretation of the EPL meets the second requirement for great weight deference.

■

¶ 117. Next, we conclude that the third requirement for great weight deference is met because the PSC's interpretation of the EPL requires it to interpret the phrases "cost effective" and "technically feasible," which in turn calls for the PSC to rely on its expertise of highly technical subjects such as economic forecasting and industrial technology. The PSC must use its expertise to determine what is "cost effective" in any given situation or what is "technically feasible."

■

¶ 118. Finally, by interpreting the provisions of the EPL in light of the requirements under the Plant Siting Law, the PSC has provided an interpretation of the EPL that will promote uniformity in the application of the EPL as it relates to CPCN determinations. As such, we conclude that the fourth requirement for great weight deference is satisfied.

■

¶ 119. Clean Wisconsin and Calpine also argue that we cannot give great weight deference to the PSC's interpretation of Wis. Stat. § 1.12(4) because the PSC cannot interpret the statute for all the other agencies that must also apply this provision. We reject this argument because the PSC's interpretation of the EPL

pertains only to CPCN determinations under the Plant Siting Law. Other agencies are free to apply the EPL in the contexts of other determinations that they are authorized to make. Accordingly, we give great weight deference to the PSC's interpretation of the EPL and will not substitute our interpretation of the statute unless the PSC's interpretation is irrational.

¶ 120. Clean Wisconsin and Calpine argue that the PSC's interpretation of the EPL cannot be upheld because it is contrary to the plain text of the EPL. Additionally, Calpine asserts that the determination that gas-powered plants could not support baseload needs is an invalid, unpromulgated "rule" that the PSC adopted in this case, bypassing the proper procedures for creating rules set out in Wis. Stat. § 227.10(1).

¶ 121. We conclude that the PSC's interpretation of "cost effective and technically feasible" must be harmonized with the Plant Siting Law because the EPL is to be applied as the PSC makes energy-related decisions under both statutes. Without consideration of the various statutes an agency is charged with administering, there is no context in which to gauge whether an option is cost effective or technically feasible.

¶ 122. The EPL itself states that the priorities are to be applied "[i]n meeting energy demands." Wis. Stat. § 1.12. Wisconsin Stat. § 196.025(1) states the priorities of § 1.12(4) are to be applied "in making all energy-related decisions and orders." When the PSC makes a determination on a CPCN under the Plant Siting Law, it applies the EPL in the context of determining whether to approve the requested plant siting. The

344

question the PSC should ask is thus: Given the requirements of the Plant Siting Law, what is the highest priority energy option that is also cost effective and technically feasible?[34] Therefore, the PSC's interpretation of the EPL is not contrary to the text of the statute.

¶ 123. We also reject Calpine's argument that the use of "baseload" terminology and the determination that natural gas was not cost effective and technically feasible amounted to an invalid, unpromulgated "rule." The term "baseload" is a way of defining the type of project at issue. The determination that natural gas was not an appropriate alternative was the PSC's conclusion after it analyzed the various alternatives through EGEAS computer modeling and other techniques. The term "baseload" is not a "regulation, standard, statement of policy, or general order," as "rule" is defined under Wis. Stat. § 227.01.

¶ 124. The discussion of the need for "baseload" facilities in the present case is part of the PSC's explanation of the size and scope of the project it has before it. If the PSC determines under the Plant Siting Law that a project of this size and scope (i.e. a baseload plant) is "in the public interest" and is necessary to "satisf[y] the reasonable needs of the public for an adequate supply of electric energy," then it must apply the EPL and choose the highest priority energy option that is both cost effective and technically feasible in the context of that need.

¶ 125. In sum, we cannot conclude that the PSC's interpretation of the EPL is contrary to the text or the

---

[34] If an agency makes an energy determination under a different statute, it would interpret "cost effective and technically feasible" in concert with the provisions of that statute.

statute or is in any way irrational. As such, we turn now and discuss the challenges Clean Wisconsin and Calpine raise to the PSC's general application of the EPL in this case.

¶ 126. Clean Wisconsin and Calpine raise numerous intertwined claims regarding the PSC's general application of the EPL. Clean Wisconsin first argues that the PSC erroneously determined that the EPL did not bind the agency to accept higher priority alternatives that are cost effective and technically feasible. It relies on language in the Final Decision that it argues demonstrates the PSC believes it could approve ERGS even if higher priority alternatives are at the same cost or lower than high-sulfur coal:

> S.C. Johnson asserts that it is not enough that ERGS be close in price to other higher priority options and that the applicants in the present proceeding must prove a "compelling reason" not to abide by the energy priorities described in [EPL]. Under this reasoning, the Commission would be obligated to select a higher priority fuel option unless the applicants have demonstrated that the proposed units at ERGS will be provided at a substantially lower cost than available higher energy priorities.
>
> This [EPL], however, is not a mandate to state agencies that must be mechanically applied to achieve a specific outcome.

¶ 127. Clean Wisconsin also relies on comments from the commissioners at their October 29, 2003, meeting to demonstrate that the commissioners did not feel bound by the EPL. It cites comments by Chairperson Burneatta Bridge that she did not "feel constrained to choose gas in any scenario in which it is the least expensive," by Commissioner Ave Bie that the legislature did not mean for these priorities to be "literal" and

346

by Commissioner Bert Garvin that "the energy priorities themselves are directory and not mandatory as a matter of law."

¶ 128. Clean Wisconsin also argues that the Final Decision incorrectly relies on language in the prefatory note of the Act that created the EPL to defeat the plain meaning of the statute. It argues that there are no ambiguities in the EPL allowing the PSC to consider legislative history such as the prefatory comment, and that even if one does look at the comment, it gives the PSC discretion to determine only whether energy options are cost effective and technically feasible. It also contends there are no conflicts between the EPL and the Plant Siting Law.

¶ 129. Calpine also argues the EPL does not require that alternate proposals completely displace the need for projects like ERGS. Calpine concludes that proper application of the EPL mandates selection of their natural-gas powered alternative.

¶ 130. The bulk of the parties' disagreements on the PSC's application of the EPL relates to the language "to the extent cost-effective and technically feasible." The PSC based its determination that natural gas is not cost effective and technically feasible on its coordinate determination that in this instance, the baseload power needs of the public could not be met by any option other than high-sulfur coal. As the Final Decision stated, "the key question in this docket is not whether additional coal-fired baseload generation should be approved, but when it should be installed."

¶ 131. To the extent the respondents cite to language in the Final Decision and comments by the commissioners that suggest the PSC did not consider

the EPL to be binding, we disagree. The PSC did apply the EPL as we described above and simply came to a conclusion favoring coal over natural gas. We also note that the commissioners clearly explained their decision-making process under the EPL and Plant Siting Law as we described above. Commissioner Garvin stated, "The best cost effective and technically feasible solution will depend . . . on what type of need must be met." Chairperson Bridge stated:

> In addition to the energy priority law, the PSC has responsibilities under the CPCN law. And as I mentioned, these include assuring reliability and assuring an adequate supply of energy. And my approach to the energy priority law is to rank the options that also meet the criteria of the CPCN law.

The Final Decision and the entire transcript of the commissioners' discussion of the EPL demonstrate that the PSC did not disregard the priorities listed in Wis. Stat. § 1.12(4), but rather applied the priorities within the context of the requirements of the Plant Siting Law.

¶ 132. To respond to other arguments by the respondents concerning the interplay between the EPL and the Plant Siting Law, we agree that there is no "conflict" between the two laws. The two statutes work together to provide a framework in which the PSC is to make energy decisions. The respondents assert that the PSC used the discretion discussed in the Prefatory Note of the EPL to bypass the unambiguous statutory priorities. However, we conclude any discretion employed by the PSC in making its determination was necessary to determining whether alternatives were cost effective

and technically feasible, a clear requirement of Wis. Stat. § 1.12(4). The PSC did not bypass the priorities of the EPL.

¶ 133. Relying on the PSC's decision in the *Weston Order*, Calpine also argues that the PSC has interpreted the EPL as not requiring that higher priority alternatives must *completely* displace the need for a lower priority source project in order to be approved.[35] This argument is misleading, however, because the higher priority alternative added to the plan in that case, as was the case here, was "energy efficiency," which is not a tangible source to *provide* energy, but rather, a program designed to *save* energy. As we discussed above, the Weston Order actually applied identical reasoning to that employed in the PSC's Final Decision in the present case.

---

[35] Calpine relies on the following language from the PSC's decision in the *Weston Order:*

> Wis. Stat. § 1.12(4) does not expressly provide that conservation or renewable resources must displace or delay a proposed project; the statute requires that such alternatives be considered if shown to be cost-effective and technically feasible. The plain language of the Energy Priorities Law together with the directive in Wis. Stat. § 196.025, require the Commission to maximize the overall use of the preferred options to the extent possible, even in incremental amounts. This is consistent with the obvious objective of the law, which is to deploy the more environmentally preferable options first when meeting Wisconsin's need for energy.

> The record in this proceeding demonstrates that other options such as conservation and renewable resources do not displace the need for Weston 4. However, as discussed below, this record also establishes a basis to require implementation of additional options that are "cost effective, technically feasible, and environmentally sound" consistent with the Energy Priorities Law.

*Weston Order,* at 11–12.

¶ 134. After considering the parties' arguments concerning the PSC's general application of the EPL in this case, we conclude that the PSC's determination that coal was the only available cost-effective, technically feasible energy option for the baseload needs of the public in this instance was a rational one, and we therefore decline to substitute our own judgment for that of the PSC.

2. The Plant Siting Law

■

¶ 135. In addition to challenging the PSC's general application of the EPL, Clean Wisconsin and Calpine argue that the PSC improperly applied the Plant Siting Law to the CPCN application in this case, raising issues concerning various segments of that statute. We discuss each issue raised in turn. However, before addressing each issue concerning the Plant Siting Law, we must determine what level of deference is appropriate. As this court has previously recognized, "[t]he 'great weight' standard has been called the general rule in Wisconsin." *Hutson,* 263 Wis. 2d 612, ¶ 32. Our case law has established that we should accord an agency's interpretation of the law great weight deference when the " 'legal question is intertwined with factual determinations or with value or policy determinations' " and the agency involved " 'has primary responsibility for determination of fact and policy.' " *Id.* (quoting *Sauk County,* 165 Wis. 2d at 413 (in turn quoting *West Bend Educ. Ass'n,* 121 Wis. 2d at 12)).

¶ 136. We conclude that great weight deference is appropriate here. First, there is no dispute that the legislature has specifically charged the PSC with the interpretation of chapter 196. The legislature has given

the PSC jurisdiction to "supervise and regulate every public utility in this state and to do all things necessary and convenient to its jurisdiction." Wis. Stat. § 196.02(1).

¶ 137. Next, the PSC is the only agency charged with administering § 196.491(3)(d), which has been in existence for 30 years. Further, there can be no doubt the decision to issue a CPCN for a specific plant at a specific location calls for the PSC to utilize its expertise and make a variety of factual findings.

■■

¶ 138. Finally, and most importantly, the PSC's interpretation and application of § 196.491(3)(d) inherently calls for a variety of policy determinations. Even a cursory review of the Plant Siting Law reveals that the PSC is charged with making a number of legislative-type policy determinations when determining if a CPCN should be issued. For instance, the PSC must determine whether: "[t]he proposed facility satisfies the *reasonable needs of the public* for an *adequate supply* of electric energy"; "[t]he design and location or route *is in the public interest* considering alternative sources of supply, alternative locations or routes, *individual hardships,* engineering, economic, safety, reliability and environmental factors"; "[t]he proposed facility will not have *undue adverse impact* on other environmental values"; "[t]he proposed facility will not *unreasonably interfere* with the orderly land use and development plans for the area involved"; and "[t]he proposed facility will not have a *material adverse impact in competition* in the relevant wholesale electric service market." Wis. Stat. § 196.491(3)(d)2.-4., 6.-7. (emphasis added).

¶ 139. All of these determinations are legislative-type determinations that require the PSC to make

factual findings and apply its technical knowledge and expertise. The final decisions as to where and when a proposed power plant should be constructed, how large the plant should be, how it should be constructed, and what fuel it should use are quintessentially legislative policy choices that have been delegated to the PSC.

¶ 140. Because we conclude great weight deference is appropriate, our analysis of the parties' claims regarding the Plant Siting Law will focus on whether the PSC's determination had a rational basis, *Hutson,* 263 Wis. 2d 612, ¶ 32, and was consistent with the statutory language, *Bosco,* 273 Wis. 2d 586, ¶ 19.

a. Reasonable Needs/Public Interest

¶ 141. Under Wis. Stat. § 196.491(3)(d)2.-3., the PSC can approve an application for a CPCN filed by a public utility only if "the proposed facility satisfies the reasonable needs of the public for an adequate supply of electric energy" and "the design and location or route is in the public interest considering alternative sources of supply, alternative locations or routes, individual hardships, engineering, economic, safety, reliability and environmental factors."[36] Part of the calculus that goes into making these determinations is estimating the

---

[36] Wisconsin Stat. § 196.491(3)(d)2.-8. sets out the requirements for granting a CPCN for a proposed power facility:

(d) Except as provided under par. (e) and s. 196.493, the commission shall approve an application filed under par. (a) 1. for a certificate of public convenience and necessity only if the commission determines all of the following:

2. The proposed facility satisfies the reasonable needs of the public for an adequate supply of electric energy. This subdivision does not apply to a wholesale merchant plant.

future energy needs of the state and forecasting the economic impact of proposed plans.

¶ 142. Accounting for the myriad of economic factors that affect demand and energy prices is an incredibly complex task. All parties rely on the EGEAS computer-modeling program to provide estimates of what the optimal construction plans would be, given changes in the many variables affecting the state's future energy situation. WEPCO ran models on EGEAS and presented those findings in its application for the CPCN.

3. The design and location or route is in the public interest considering alternative sources of supply, alternative locations or routes, individual hardships, engineering, economic, safety, reliability and environmental factors, except that the commission may not consider alternative sources of supply or engineering or economic factors if the application is for a wholesale merchant plant. In its consideration of environmental factors, the commission may not determine that the design and location or route is not in the public interest because of the impact of air pollution if the proposed facility will meet the requirements of ch. 285.

4. The proposed facility will not have undue adverse impact on other environmental values such as, but not limited to, ecological balance, public health and welfare, historic sites, geological formations, the aesthetics of land and water and recreational use. In its consideration of the impact on other environmental values, the commission may not determine that the proposed facility will have an undue adverse impact on these values because of the impact of air pollution if the proposed facility will meet the requirements of ch. 285.

5. The proposed facility complies with the criteria under s. 196.49(3)(b) [requires certification that public convenience and necessity require the project] if the application is by a public utility as defined in s. 196.01.

6. The proposed facility will not unreasonably interfere with the orderly land use and development plans for the area involved.

7. The proposed facility will not have a material adverse impact on competition in the relevant wholesale electric service market.

8. For a large electric generating facility, brownfields, as defined in s. 560.13(1)(a), are used to the extent practicable.

¶ 143. The PSC also used EGEAS modeling to choose the best energy option under the requirements of the EPL and the Plant Siting Law. In the Final Decision, the PSC stated: "Almost every EGEAS run shows the need for new baseload generation over the next decade," and "[t]hese EGEAS runs demonstrate that the energy priority resources, alone or in combination, cannot replace the need for new baseload, coal-fired units to serve WEPCO." The PSC used this modeling as well as other factors to conclude that natural-gas-fired units would not be cost effective and technically feasible for baseload capacity in this case. Given the need for more baseload plants and the lack of higher priority alternatives, the PSC approved the CPCN application for the coal-fired units.

¶ 144. Clean Wisconsin and Calpine argue that the PSC improperly applied § 196.491(3)(d)2.-3. to the present case. Clean Wisconsin argues that the PSC failed to make required findings of fact and the EGEAS modeling failed to consider pertinent variables. Calpine joins in arguing that even with the various problems in EGEAS, Calpine's natural-gas-fired plant was the lowest cost option, and therefore was required to be selected. Calpine also argues that its natural-gas alternative could be operated as a baseload facility and that there was no basis for the PSC's determination that "no gas-fired, baseload facilities were presented as either a cost-effective or technically feasible alternative in this record."

i. Required Findings of Fact

¶ 145. Clean Wisconsin argues that the Final Decision did not contain findings of fact and that the findings section "merely recited the statutory criteria

and labeled them 'Findings,' such that it is impossible to review the PSC's decision. *See Stas v. Milwaukee County Civil Serv. Comm'n,* 75 Wis. 2d 465, 475, 249 N.W.2d 764 (1977). This argument is not persuasive. There is no requirement that the agency provide an elaborate opinion. *Wis. Envtl. Decade, Inc. v. PSC,* 98 Wis. 2d 682, 701, 298 N.W.2d 205 (Ct. App. 1990) (WED IV). All that is required is that the findings of fact and conclusions of law are specific enough to inform the parties and the courts on appeal of the basis of the decision. *Id.* Here the findings of fact and conclusions of law explain the basis of the decision, and the Final Decision includes a 50–page analysis of the issues in the case. Therefore, we are easily able to determine whether the PSC acted appropriately.

ii. Alleged Deficiencies in EGEAS Modeling

¶ 146. Clean Wisconsin argues that the EGEAS modeling was defective because: 1) it failed to include known costs related to the ERGS project; 2) it was not utilized to evaluate higher priority fuel sources; and 3) its modeling utilized biased modeling variables. The thrust of its argument is that the EGEAS modeling system is only as good as the data input for its projection, such that flawed inputs would necessarily result in flawed results. We now discuss these three issues.

a) Failure to Include Known Costs

¶ 147. Clean Wisconsin argues that health-related costs regarding ERGS's planned air emissions were introduced into the record but not included in the EGEAS runs. Other allegedly ignored items include mitigation payments to Oak Creek and other local

355

community impacts such as property value impact. The PSC, on the other hand, argues that it did not rely solely on EGEAS modeling and considered all relevant factors.

¶ 148. We reject Clean Wisconsin's challenge because it mischaracterizes the role of EGEAS in the PSC's CPCN determinations. The PSC describes EGEAS as its "primary tool to consider optimal resource options on a quantitative basis," but "it is by no means the only tool." As the Final Decision stated: "Power supply planning is not a science. Determining what resource options will ensure low cost, reliability and environmental sensitivity for the consuming public requires the exercise of judgment and consideration of a wide variety of qualitative factors."

¶ 149. In addition, the PSC notes that the CPCN statute does not require computer modeling and that it did not rely solely on the results output by EGEAS, but rather integrated those results into its analysis of all the requirements of the Plant Siting Law. The PSC relied on significant evidence in the record devoted to mitigation payments. In addition, the PSC's Final Decision specifically stated: "The applicants shall work with neighboring communities to mitigate valid concerns and impacts."

¶ 150. Finally, the PSC asserts that the health-related costs associated with air emissions were outside the scope of the PSC's authority. Wisconsin. Stat. § 196.491(3)(d)3. states:

> In its consideration of environmental factors, the commission may not determine that the design and location or route is not in the public interest because of the impact of air pollution if the proposed facility will meet

the requirements of ch. 285 [a chapter charging the DNR with promulgating rules regarding air pollution control].

The statute prohibits the PSC from determining that a project is not in the public interest based on air emissions so long as ch. 285 standards are met. While cost is a factor under the analysis of the public interest requirement, to include the health-related costs of air emissions could result in a project being rejected for the very reason the statue disallows. Therefore, this interpretation of the PSC's duties is not a rational one.

¶ 151. Examining the numerous requirements listed in Wis. Stat. § 196.491(3)(d)2.-8. and forecasting future energy needs and prices is a highly technical exercise that the PSC is charged with performing. Deciding what economic factors are, or are not, to be included in the computer model is precisely the type of determination that the PSC should be given great deference to carry out, because it is operating well within its area of expertise and it is much better suited to make those decisions than is the judiciary. "It is not the function of a reviewing court to dictate the economic analysis to be employed in a decision [that] is based upon the expertise and lies within the discretion of the PSC." *Seebach v. PSC,* 97 Wis. 2d 712, 728, 295 N.W.2d 753 (Ct. App. 1980). We conclude that the PSC's choice of cost variables for the EGEAS modeling was rational.

b) Failure to Evaluate Higher Priority Fuel Sources

¶ 152. Clean Wisconsin next argues that the PSC failed to run a modeling analysis of natural gas power

"comparable" to the EGEAS runs of coal power it performed. It states that it is "critical to the public interest test, which requires consideration of 'alternative sources of supply,' as well as economic, safety, and environmental factors." The PSC argues that it indeed ran models assuming wind power, natural gas, biomass, and conservation alternatives, and also conducted an "integrated alternative" combining various higher priority sources. Clean Wisconsin argues that the models are not fully "comparable" unless they are premised on the same mega wattage for each source. However, it provides no basis for this requirement. In fact, it provides no basis for the foundation of this argument-:that computer modeling is required.

¶ 153. Our great weight deference review of the alternate source comparison is not concerned with the actual procedures utilized by the PSC, but rather we examine whether there is a rational basis for the determination of the PSC. The record contains significant evidence supporting the PSC's selection of coal over gas for baseload capacity in this case, including: 1) a need for significantly expanded baseload facilities; 2) the cost and volatility of natural gas prices; 3) the possible difficulty of supplying baseload natural gas plants; 4) the lack of coal-powered plants built in the last twenty-five years, coupled with the aging and retirement of existing coal plants; 5) the desire for diversifying the utilities' fuel mix; and 6) multiple EGEAS runs selecting a coal plant, even after the PSC specifically altered inputs in response to such criticisms.

c) Biases in EGEAS Variables

¶ 154. Clean Wisconsin next argues that the PSC ignored flaws in the EGEAS inputs, including artifi-

cially low reliability for existing facilities, artificially high availability for ERGS and inconsistent allocation of costs, which were all biased in favor of making ERGS look more attractive from a cost standpoint. It argues that these biases undermine the reliability of the EGEAS forecasts.

¶ 155. This issue was specifically addressed in the PSC's Final Decision:

> S.C. Johnson criticizes a number of modeling in-puts, alleging that WEC is using improper engineering and fuel data for existing WEPCO units, an improper common systems cost allocation to the OCPP units, a demand and energy forecast that is too high, an im-proper addition of 200 MW of demand obligations for WPPI and MEUW, overly favorable engineering as-sumptions for the proposed SCPC units, and an im-proper early retirement of certain OCPP and Presque Isle units, while it is also ignoring the likely availability of additional energy efficiency efforts that would reduce the growth in electric demand. Commission staff evalu-ated these concerns, revised some of its assumptions, and prepared an EGEAS run to demonstrate how these changes would affect the optimal expansion plan. Be-cause it includes additional energy efficiency to control electric demand, in addition to generation options, Commission staff described this run as an "integrated alternative" that integrates the energy priorities de-scribed in Wis. Stat. §§ 1.12(4) and 196.025. For ex-ample, this EGEAS run includes lower forecast demand and energy growth rates of 1.8 to 2.1 percent per year, instead of the 2.5 to 2.9 percent per year growth rates in the base forecast. In addition, a total of 600 MW of demand is stripped away from the WEPCO base electric demand forecast, in 200 MW increments every two years through 2011, to reflect a more aggressive ap-proach to energy conservation. This integrated alterna-tive also includes a less favorable 4 percent forced outage rate for the SCPC units.

359

> Even with the revised input assumptions of this integrated alternative, the EGEAS model results are not significantly different. EGEAS still selects an SCPC unit, by the year 2012.

¶ 156. While there is also evidence in the record rebutting the charge that various inputs were biased, the above discussion demonstrates that the PSC was aware of the alleged biases in input variables and that even after adjustments were made to account for alleged biases, EGEAS selected a coal-fired baseload plant. As the record is clear that the PSC was aware of these alleged biases and made substantial efforts to adjust its modeling to correct for any defects, we can find no error in the PSC's use of EGEAS modeling to assess the statutory requirements in § 196.491(3)(d)2.-3. The PSC clearly has discretion over what inputs are utilized for EGEAS modeling. Simply put, this court lacks the technical knowledge and expertise to dictate to the PSC what inputs it must utilize in its EGEAS modeling and the values for those inputs.

### iii. Least Cost Alternative

¶ 157. Calpine argues that it is PSC policy to award CPCNs to the least cost alternative, and that in this case, Calpine's natural gas proposal for part of the project was the least cost alternative. Calpine cites to previous PSC decisions to support its argument that the least cost alternative is routinely approved.

¶ 158. This argument ignores the text of the Plant Siting Law and misconstrues the previous decisions of the PSC upon which Calpine relies. An examination of Wis. Stat. § 196.491(3)(d)2.-8. reveals that "economics" is but one factor in the multifaceted

decision-making process the PSC utilizes. As we indicated in our discussion of the EPL *supra,* there is significant evidence in the record supporting the decision to use coal power for baseload capacity.

¶ 159. Contrary to Calpine's argument, prior decisions of the PSC demonstrate that cost is but one factor in the determination. For instance, Calpine relies on the following language from *Investigation on the Comm'n's Own Motion,* No. 05–EI-112 (Wis. PSC Dec. 28, 1993): "Under the Commission's integrated planning and CPCN principles, the least cost overall choice is the option the utility will be authorized to pursue." *Id.* at 19. However, Calpine takes this statement out of context, as immediately preceding that statement, the PSC stated: "The winner . . . at Stage One, is, by definition, the lowest overall cost alternative the utility has available, *considering engineering, economic, health, safety, reliability, efficiency and environmental factors." Id.* (emphasis added). Furthermore, the PSC indicated in the same Final Decision that "[t]he bidding process selected by the Commission requires consideration of a wide range of factors in selecting the winning bid(s)." *Id.* at 23.

¶ 160. In the present case, the PSC clearly followed its past precedent of considering all of the statutorily mandated factors. We conclude there was no "practice" of selecting the least cost alternative while ignoring the other statutory factors.

iv. Natural Gas Baseload

¶ 161. Calpine also argues that their natural-gas alternative could be operated as a baseload facility and that there was no basis for the PSC's determination

that "no gas-fired, baseload facilities were presented." Again, as indicated in our discussion of the evaluation of the EPL, there is significant evidence in the record supporting the decision to use coal power for baseload capacity in this case. Given the abundant evidence supporting the determination that coal power was the only cost-effective, technically feasible option for baseload capacity in this instance, we conclude that it was reasonable for the PSC to rule out natural gas as a baseload fuel.

¶ 162. In sum, we conclude that the PSC's interpretation of the Energies Priority Law and the Plant Siting Law are entitled to great weight deference. Further, we conclude that substantial evidence exists to support the various factual findings made by the PSC in applying the provisions of the EPL and Plant Siting Law in relation to the selection of type of fuel to be used in this project. Finally, we conclude that a rational basis exists to support the PSC's application of these provisions to the facts of this case to select ERGS as a site for new power generation and coal as a baseload fuel source.

b. Adverse Impact on Environmental Values

¶ 163. Calpine also argues that the PSC erroneously failed to apply the portion of the Plant Siting Law relating to consideration of adverse impacts of the proposed project on the environment. Pursuant to Wis. Stat. § 196.491(3)(d)4., the PSC must determine that "[t]he proposed facility will not have undue adverse impact on . . . environmental values . . . ." Although Calpine recognizes that the PSC made this finding, it advances two arguments as to why the PSC could not have made this determination. We reject both of them.

¶ 164. Calpine first contends that the PSC cannot lawfully make this finding because it has inconsistently applied the environmental requirements of Wis. Stat. § 196.491(3)(d)4. For support, Calpine marshals a total of two prior CPCN proceedings involving two of Calpine's facilities, the Fond du Lac Energy Center and a proposed "Sherry plant." Regarding the Fond du Lac Center, Calpine claims that the PSC required Calpine to submit a full characterization of the effluent stream from the facility—including composition, flow rates, temperature, and proposed water treatment chemicals —and also required Calpine to confirm that all such characteristics were in compliance with applicable federal and state requirements.

¶ 165. Regarding the Sherry plant, Calpine argues that the DNR required Calpine to examine the use of certain off-site nonproject alternatives (such as the practicality of using another site already approved by the PSC) and alternative power sources at the Sherry site. To be consistent, Calpine claims that the PSC should have required a commensurate level of analysis for ERGS so that the PSC could have clearly demonstrated that ERGS would meet the requisite environmental standards.

¶ 166. We agree with the PSC that nothing in these two prior proceedings mandates how a Wis. Stat. § 196.491(3)(d)4. analysis is to occur in all cases. Requiring additional information in one project does not necessarily mean it is required in all. Given the particulars of these massive projects, and given the PSC's expertise in handling what specifics ought to be examined in a CPCN proceeding, we must defer to the PSC's determination of what information is required for it to make the required findings under § 196.491(3)(d)4.

¶ 167. Calpine's second argument is that the PSC improperly delegated its ultimate determination of "no undue adverse impacts" under Wis. Stat. § 196.491(3)(d)4. to the DNR.[37] The PSC's final decision recognizes that ERGS remains under continuing regulatory review by the DNR. The PSC noted that certain aspects of ERGS still required regulatory approvals from the DNR, and therefore, the PSC only conditionally issued the CPCN. This court has previously concluded that "an agency may assume that any environmental consequences will be controlled through compliance with the applicable administrative code provisions." *State ex rel. Boehm v. DNR*, 174 Wis. 2d 657, 676, 497 N.W.2d 445 (1993).[38]

¶ 168. Additionally, this court has already recognized the DNR's special expertise on environmental matters. *Wis. Envtl. Decade, Inc. v. DNR*, 115 Wis. 2d

[37] Even under DNR consideration, Calpine claims that aspects of ERGS's once-through cooling system cannot comply with legally recognized environmental standards (including water intake standards and thermal plume requirements) and that ERGS had yet to be shown to comply with wetland regulations. However, the PSC notes that on January 12, 2005, the DNR published notice of its intent to issue the Wisconsin Pollutant Discharge Elimination System (WPDES) permit for the ERGS facility. *See DNR Public Notice of Intent to Reissue a WPDES Permit*, No. WI-0000914–07–0. The PSC also notes that the DNR has found that ERGS complies with wetland requirements. *In the Matter of Waterway and Wetland Alterations Relating to the Wisconsin Electric Power Co. Oak Creek Power Plant Expansion, Called the Elm Road Generating Station*, Nos. 3–SE–01–41–0005–0019 & 1456MW (Nov. 22, 2004).

[38] We note that *State ex rel. Boehm v. DNR*, 174 Wis. 2d 657, 497 N.W.2d 445 (1993), concerned whether to compile an EIS in the first instance.

381, 398, 340 N.W.2d 722 (1983). Thus, it is not error for the PSC to rely on the DNR's expertise and regulatory approval process when making its finding under Wis. Stat. § 196.491(3)(d)4., even if those determinations are forthcoming.[39] Therefore, we reject Calpine's contention that the PSC erred by issuing the CPCN by failing to make the required findings under § 196.491(3)(d)4.

c. Effect on Wholesale Competition

¶ 169. Calpine argues that the PSC incorrectly applied Wis. Stat. § 196.491(3)(d)7., which requires the agency to conclude that "[t]he proposed facility will not have a material adverse impact on competition in the relevant wholesale electric service market" in order to grant a CPCN. After reviewing the PSC's discussion of the wholesale competition provision in the Final Decision, we reject these arguments and conclude Calpine fails to show the PSC's application of Wis. Stat. § 196.491(3)(d)7. was unreasonable.

¶ 170. In its Final Decision, the PSC stated that a determination under Wis. Stat. § 196.491(3)(d)7. requires an analysis of "market power," which it defined as "the ability of a firm to charge prices for its product above what a competitive market would allow." The PSC first noted that its analysis needed to focus only on horizontal market power issues because vertical market power issues were mitigated by the Midwest Independent System Operator's control over the ATC transmission system. The PSC then cited a 2000 "market power

[39] At least with respect to ERGS's once-through cooling, the PSC's order stated that should the DNR determine that ERGS is unpermittable, WEC would then be required to submit a revised project application for approval that redesigns or relocates ERGS as needed.

study" for the conclusion that the agency's rate reviewing power mitigated against market power. The PSC also noted that the Federal Energy Regulatory Agency allows WEPCO to sell in the Wisconsin Upper Michigan (WUMS) wholesale electric service market only at cost-based rates.

¶ 171. In response to concerns that "approval of ERGS would have a material adverse impact on competition by preventing the development of a competitive wholesale generation sector and hindering further electric industry restructuring in Wisconsin," the PSC noted that WEPCO planned to continue contracting for power with independent power producers, and that W.E. Power LLC, the non-utility affiliate that would have majority ownership of the corporations that would construct and own ERGS, "could more easily be divested by WEC than generating assets that are held within WEPCO, should a future legislature split generating plant assets away from utilities."

■

¶ 172. Calpine argues that the PSC incorrectly applied the wholesale competition provision because the PSC abandoned its focus on entry of competitors as the "primary factor" in applying the provision, and that the PSC relied only on its rate review authority, which does not prevent a material adverse impact on competition.

i. Entry of competitors as primary factor

■

¶ 173. Calpine argues that previous PSC Final Decisions have emphasized the need for competitors in the wholesale electric service market. For instance, Calpine cites *Joint Application of Mirant Portage*

*County LLC and Am. Trans. Co. LLC,* No. 05–CE–116 (Wis. PSC Mar. 22, 2002) where the PSC stated: "The record shows that an adverse effect on competition is unlikely because the Mirant Portage County power plant project would essentially act as a new entrant. . . . Consequently, the Portage County project would be adding a new competitor to WUMS, and thereby likely improving the competitive market." *Id.* at 10. Calpine also relies on *Application of Fond du Lac Energy Center, LLC,* No. 9343–CE–100 (Wis. PSC May 5, 2003), where the PSC stated:

> The record shows that an adverse effect on competition is unlikely because, even with the addition of the Fond du Lac Energy Center, Calpine will remain a relatively small operator of power plants in Wisconsin. . . . In summary, even though WUMS is a highly concentrated wholesale electric service market, the fact that Calpine's Fond du Lac Energy Center will act as a new entrant means that the facility is unlikely to have a material adverse impact on competition in WUMS.

*Id.* at 13–14.

¶ 174. Calpine asserts that the PSC's analysis of Wis. Stat. § 196.491(3)(d)7. is flawed because ERGS does not introduce new competitors, while Calpine's proposal would have increased competition in the state. It argues that the focus on entry of competitors is supported by the state's policy of fostering competitive marketplaces as stated in Wis. Stat. § 133.01:

> 133.01. Legislative intent. . . . It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maxi-

367

mum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

■■■

¶ 175. We find Calpine's arguments unpersuasive. The plain language of the provision rebuts the assertion that "introducing competition" is the standard under Wis. Stat. § 196.491(3)(d)7., as the provision states only that a facility cannot have "a material adverse impact on competition." While Wis. Stat. § 133.01 states the general policy of the state, § 196.491(3)(d)7. specifically addresses competition in the context of CPCN determinations. Where two statutes apply to the same subject, the more specific controls, and this is especially true where the specific statute is enacted after the general statute. *Martineau v. State Conservation Comm'n,* 46 Wis. 2d 443, 449, 175 N.W.2d 206 (1970). While introducing competitors can be one way in which the requirement of "no material adverse impact" can be met, it is not the only way to meet the requirement, as other PSC decisions demonstrate.

¶ 176. For example, in the *Port Washington Order,* the PSC stated:

> Capacity and energy from the PWGS facility will be provided to WEPCO via the Facility Lease, at rates this Commission regulates through its review of the lease's economic terms and conditions. This regulation prevents any material adverse impact on competition in WUMS. As the market power study conducted for the Commission in 2000 by Tabors, Caramanis and Associates found, fixed price contracts such as the proposed Facility Lease, mitigate market power. In addition, the Federal Energy Regulatory Commission only allows WEPCO to sell in WUMS at cost-based rates.
>
> . . . WEPCO plans to continue contracting for

power with IPPs, obtaining up to 1,000 MW of capacity from these providers. Furthermore, a stand-alone generation company such as W.E. Power LLC could more easily be divested by WEC than generating assets that are held within WEPCO, should a future legislature split the generating plant assets away from utilities. For these reasons, the Commission finds that approval of the PWGS project will not create material adverse impacts on competition.

*Port Washington Order*, at 24.

¶ 177. Likewise, in its *Weston Order*, the PSC stated:

> Wis. Stat. § 196.491(3)(d)7. requires the Commission to discern whether the addition of Weston 4 to WPSC's electric supply portfolio would have a material adverse impact on competition in the relevant wholesale electric service market. The Commission finds it would not. Prices, terms, and conditions of the capacity and energy being sold to native load customers will be regulated by the Commission.

*Weston Order*, at 19–20. These examples indicate that the PSC previously has concluded that the wholesale competition requirement was met based on factors other than the "introducing competitors" rationale.

ii. Reliance on rate review authority

¶ 178. Calpine argues that the PSC erred by reasoning that its rate reviewing power mitigated against market power. It contends the rate reviewing authority does not encourage the entrance of competitors. We reject Calpine's argument because as we concluded above, an application for a CPCN need not prove that the plan will introduce competitors into the wholesale electric service marketplace in order to meet the re-

quirement in Wis. Stat. § 196.491(3)(d)7. that the "proposed facility will not have a material adverse impact on competition" in that market.

¶ 179. Calpine next argues that using the agency's rate reviewing power as a basis for meeting the wholesale competition requirement in Wis. Stat. § 196.491(3)(d)7. is in error because it renders § 196.491(3)(d)7. superfluous. *In re Disciplinary Proceedings Against Trewin,* 2004 WI 116, ¶ 38, 275 Wis. 2d 116, 684 N.W.2d 121 (2004) (" 'It is a cardinal rule that when interpreting a statute a court must attempt to give effect to every word, so as not to render any portion of the statute superfluous.' ")(citation omitted). Calpine argues that if the wholesale competition requirement in § 196.491(3)(d)7. can be met by the PSC's duty to regulate rates, then § 196.491(3)(d)7. is "mere surplussage."

¶ 180. We reject this argument because we conclude that the PSC did not rely solely on its rate reviewing authority for its conclusion that the wholesale competition requirement was met. The PSC's rate reviewing power was one basis noted in the Final Decision that mitigated against market power. The PSC also noted that the Federal Energy Regulatory Agency allows WEPCO to sell in WUMS only at cost-based rates and that WEPCO planned to continue contracting for power with independent power producers. Further, the PSC noted that W.E. Power LLC, the non-utility affiliate that would have majority ownership of the corporations that would construct and own ERGS, "could more easily be divested by WEC than generating assets that are held within WEPCO, should a future legislature split generating plant assets away from utilities." The PSC cited all of these factors as reasons it concluded ERGS would not materially harm competition, so the argument that

370

PSC's rate review alone satisfies the wholesale competition requirement is not supported by the record.[40]

¶ 181. In sum, we reject Calpine's arguments that the PSC incorrectly applied Wis. Stat. § 196.491(3)(d)7. to its CPCN determination here. We conclude Calpine fails to show the PSC's application of Wis. Stat. § 196.491(3)(d)7. was unreasonable.

d. Common Systems Approval

¶ 182. As previously noted, WEC's CPCN application originally proposed two SCPC units and a single IGCC unit. Construction of these units would involve building certain "common systems" designed to service all three proposed units. The PSC ultimately approved the construction of only the two SCPC units. However, in its final decision and order, the PSC approved the construction of "common systems" capable of supporting a system output greater than that of the two SCPC units. The PSC reasoned:

> In approving construction of the SCPC units for 2009 and 2010, the Commission must ascertain the appropriate costs to be placed into each Facility Lease as the "Approved Amount." ERGS includes common facilities that would serve 1,800 MW of new coal-fired capacity as well as 1,200 MW of existing coal-fired capacity from OCPP, i.e., a 3,000 MW "campus" at this

---

[40] Calpine indicates that in at least one previous CPCN proceeding the PSC required an affiliate of a utility to submit to a market power screen analysis because of concerns about market power. *See Application of Alliant Energy Resources, Inc.,* No. 9349–EB-100 (Wis. PSC Dec. 20, 2002). Calpine does not develop an argument explaining why the market power analysis is necessary or even contend that the PSC was required to order the analysis here. We will not address undeveloped arguments. *See Barakat,* 191 Wis. 2d at 786.

> site. Although the Commission has rejected the IGCC unit, it finds that a 3,000 MW coal campus remains an appropriate size, because it affords future planning flexibility to WEC. The additional cost of sizing common systems at 3,000 MW, instead of 2,400 MW, is approximately $20 million, which is a modest amount to pay in order to provide additional planning flexibility.

Thus, the PSC's final order provided that "[a]lthough the application to construct an IGCC unit is denied, [WEC] may construct common facilities with the SCPC units to accommodate up to 3,000 MW of generation at this site."

¶ 183. The circuit court vacated the PSC's order to the extent that it approved construction of "common systems" not necessary to operate a 2,400 MW facility. The circuit court noted that while the PSC's order demonstrated "prudent foresight," authorization of the construction of these common facilities was error because "there is to be no construction of any generating facility until there has been the issuance of a CPCN" pursuant to § 196.491(3). The circuit court stated that by approving the common facilities, the PSC was forcing ratepayers to bear the cost of a facility for which a CPCN had not been issued. Additionally, the circuit court stated that allowing construction of these facilities would unduly influence the site selection for any future proposed utility construction.

¶ 184. Clean Wisconsin urges this court to affirm the circuit court's order, arguing that the PSC's order violated § 196.491(3)(d)2.-3. and that the "PSC has effectively predetermined that additional coal units at this location are in the public interest, without considering alternative sites, at the same time that it explic-

itly determined that another coal unit is not in the public interest." Clean Wisconsin's Resp. Br. at 49. In contrast, the PSC and WEC argue that the PSC did not approve a new facility without a CPCN; rather, it merely authorized the construction of systems to service the two plants for which it did issue a CPCN and allowed those systems to accommodate future expansion. The PSC and WEC argue there is nothing in § 196.491 that prohibits the PSC's action in this regard. We conclude that the PSC's approval of the common systems was not contrary to law and had a rational basis.

¶ 185. First, we reject the suggestion of Clean Wisconsin and the circuit court that by authorizing the construction of common systems with excess capacity the PSC approved an additional facility without issuing a CPCN in violation of the Plant Siting Law. There is no dispute that the PSC would be required to issue a CPCN for the construction of a third "facility." Wis. Stat. § 196.491(3)(a)1. However, the common systems approved by the PSC are not a "facility," which is defined as "a large electric generating facility or a high-voltage transmission line." Wis. Stat. § 196.491(1)(e).[41] The "common systems" to which Clean Wisconsin objects include "a cooling water structure which will extend from the site onto Lake Michigan and also coal handling facilities." There is no dispute that this equipment is required to operate the two SCPC power plants the PSC approved. The PSC simply authorized WEC to size this

_____

[41] In contrast, WEC's third proposed plant, the IGCC, which was not approved by the PSC, would have required a CPCN in order to be approved. Likewise, the PSC would be required to comply with all applicable laws and issue a CPCN for any proposed future facility at the Oak Creek Site.

equipment to support capacity in excess of the output of the two SCPCs. Simply put, nothing in the text of § 196.491(3) prohibits the PSC from authorizing integral components of a "facility" for which it issues a CPCN to be sized so as to support added capacity.

¶ 186. As the PSC's order does not contravene the express language of § 196.491(3), we must assess whether the PSC had a rational basis for authorizing some of the components of the SCPCs to be sized so as to support added capacity. The PSC's order stated: "The additional cost of sizing common systems at 3,000 MW, instead of 2,400 MW, is approximately $20 million, which is a modest amount to pay in order to provide additional planning flexibility." In essence, the PSC concluded that it would be more cost effective to allow WEC to build needed systems larger than are necessary at the present time rather than requiring the construction of duplicate systems at a higher cost should there be a future expansion at the Oak Creek site. This clearly constitutes a rational basis for the PSC's order.

## 3. Environmental Impact Statement

¶ 187. Clean Wisconsin argues the PSC and DNR's EIS[42] did not adequately consider the environ-

---

[42] The PSC and DNR jointly prepared the EIS, with the PSC functioning as the lead agency. *See* Wis. Admin. Code § PSC 4.60(3).

An EIS is "an environmental analysis which is prepared to inform decision-makers and the public of a proposed action's effect on the environment, and develops, describes and evaluates alternatives in the detailed statement required by s. 1.11 Stats." Wis. Admin. Code § NR 150.02(11) (Jan., 2003). All

mental impacts of ERGS, as required by the Wisconsin Environmental Policy Act (WEPA), Wis. Stat. § 1.11. We disagree.

¶ 188. "The purpose of WEPA is to insure that agencies consider environmental impacts during decision making." *Boehm,* 174 Wis. 2d at 665. That purpose includes effecting an across-the-board adjustment of priorities in the decision-making processes of state agencies. *Wis. Envtl. Decade, Inc. v. PSC,* 79 Wis. 2d 409, 416, 256 N.W.2d 149 (1977) (*WED III*). WEPA "requires that agencies consider and evaluate the environmental consequences of alternatives available to them and undertake that consideration in the framework provided by [§ 1.11]." *Boehm,* 174 Wis. 2d at 665. WEPA constitutes a clear legislative declaration that protection of the environment is an essential mandate of every state agency and an essential component of state policy. *WED III,* 79 Wis. 2d at 416. WEPA does not directly control agency discretion; rather, it represents an important procedural step agencies must take during their decision-making process. *Id.* If the adverse environmental consequences of the proposed action are adequately evaluated, WEPA does not prevent an agency from determining that other values outweigh the environmental costs. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989) ("[National Environmental Policy Act] merely prohibits uninformed—rather than unwise—agency action.").[43]

subsequent references to Wis. Admin. Code § NR 150 are to the January 2003 version unless otherwise indicated.

[43] Because WEPA was patterned on the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1970), federal law

¶ 189. The purpose of the EIS is to enable agencies to take a "hard look" at the environmental consequences of a proposed action. *Milwaukee Brewers Baseball Club v. DHSS,* 130 Wis. 2d 56, 72, 387 N.W.2d 245 (1986); *WED IV,* 98 Wis. 2d at 690. To the extent that relevant information is complete and available,[44] the EIS "shall evaluate reasonably foreseeable, significant effects to the human environment . . . ." Wis. Admin. Code § PSC 4.30(1)(b). The required content of an EIS is set forth in the administrative regulations. *See* Wis. Admin. Code § PSC 4.30(3); Wis. Admin. Code § NR 150.22(2).

¶ 190. This court's review of an EIS is narrow. The PSC's determination that an EIS is adequate is a conclusion of law to which this court accords great weight deference. *Citizens' Util. Bd.,* 211 Wis. 2d at 550. As such, it is not our role to evaluate the adequacy of the EIS; we instead evaluate whether the PSC's determination that the EIS was adequate was reasonable. *Id.* at 553–54. Clean Wisconsin bears the burden of dem-

---

construing NEPA is persuasive authority. *See Wis. Envtl. Decade, Inc. v. PSC,* 79 Wis. 2d 161, 174, 255 N.W.2d 917 (1977) (*WED II*).

[44] If information is incomplete or unavailable, the EIS shall:

1. Indicate the availability of the information.

2. Describe the information's relevance.

3. Summarize available, credible scientific evidence that is relevant to the evaluation.

4. Evaluate effects based upon theoretical approaches or research methods generally accepted in the scientific community.

Wis. Admin. Code § PSC 4.30(b)1.-4.

onstrating that the PSC's determination that the EIS was adequate was without a rational basis.

¶ 191. Aside from these principles, we are also mindful that "[n]o matter how exhaustive the discussion of environmental impacts in a particular EIS might be, a challenger can always point to a potentiality that was not addressed." *Id.* at 554. While reasonable alternatives are to be considered, every potentiality need not be evaluated, as "[t]he duty of an agency to prepare an EIS does not require it to engage in remote and speculative analysis." *Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 72 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519 (1978)). We must assess an EIS in light of the "rule of reason," which requires an EIS "to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." *New York v. Kleppe,* 429 U.S. 1307, 1311 (1976); *See also Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 72. With these principles in hand, we now turn to Clean Wisconsin's arguments.

a. Cost Effectiveness of Lower Emitting Alternatives

¶ 192. Clean Wisconsin argues that the EIS did not analyze the availability and cost effectiveness of lower emitting alternatives to ERGS's SCPC units. Clean Wisconsin claims that ERGS will emit approximately two billion pounds of pollutants into the air over a projected 50 years of operation. As a consequence, Clean Wisconsin contends that the EIS was required to

take a hard look at SCPC technology and consider whether alternative, cleaner technologies—such as wind, natural gas, or IGCC—could be used at a reasonable cost instead of coal-fired technology utilized in ERGS. We conclude that there was a rational basis for the PSC to conclude that the EIS adequately addressed these concerns.

¶ 193. Chapter 4 of the EIS is devoted to the cost effectiveness of lower-emitting alternatives.[45] Our review of that section reveals that the PSC considered the environmental effects of taking no action, increasing energy efficiency (through conservation, load management, and fuel switching), the environmental costs of renewable fuel sources (wind, solar, hydro electric, biomass, and biogas sources), as well as natural gas as alternatives to ERGS. Most of the data concerning these alternatives is extremely technical. With regard to Clean Wisconsin's particular complaint, and as a distilled illustration, we note the EIS evaluated wind generation, both from on and offshore locations. The EIS explained that after considering the overall costs of wind generation (the credit to reserve margin, capital, and operating and maintenance costs, a capacity of 35 percent assuming a 16 mph wind at 100 meters two miles offshore, and the speculative continuing viability of the federal product tax credit for wind generation of $18 per MWh, adjusted for inflation), it is not likely capable of replacing ERGS as a stand-alone alternative. Applying great weight deference, we conclude that the PSC's determination that this evaluation was adequate is reasonable.

---

[45] Although Clean Wisconsin criticizes the PSC's EGEAS modeling, we have already concluded that the choice of variables utilized in EGEAS is a matter left to the sound discretion and expertise of the PSC.

¶ 194. Regarding the consideration of natural gas, we note that the EIS evaluated Calpine's 523 MW natural gas plant proposal, as well as the consequences of a 30-year expansion that relied exclusively on natural gas.[46] Also, the EIS included an appendix incorporating another EIS completed for Calpine's Fox Energy Center, a 530 MW natural gas power plant. *See also* Wis. Admin. Code § PSC 4.60; *WED III*, 79 Wis. 2d at 424 n.14 (agency should not ignore previous investigations). The Fox Energy Center EIS noted that "project emissions from a natural gas-fired plant operating 100 percent of the time are much lower for most criteria pollutants than a similarly sized coal-fired power plant using the SCPC technology." Comparing the coal-fired ERGS with the 1050 MW natural gas-fired Badger Generating Plant, the Fox Energy Center EIS noted that emissions of $NO_x$, CO, $PM_{10}$, $SO_2$, ammonia, and VOC (volatile organic compounds) are all significantly lower in the similarly sized natural gas plant. The Fox Energy Center EIS also noted that $CO_2$ emissions from a 500 MW natural gas-fired combined-cycle plant would be about 450,000 tons per year compared to about 3.5 million or more tons per year for a 600 MW coal plant.

¶ 195. However, the EIS nevertheless concluded that because of the "extreme volatility" of natural gas prices, and the need for predictable planning, a natural

---

[46] We understand Clean Wisconsin's argument to require that natural gas always be selected over lower priority alternatives, notwithstanding the need for adequate supply or other countervailing considerations. We have already concluded that the PSC may take into account the reasonable needs of the public for an adequate supply of electric energy and that the PSC's choice of variables for EGEAS forecasting was reasonable.

gas alternative to ERGS was not cost effective. Thus, there is a rational basis to conclude that the EIS adequately addressed reasonable natural gas alternatives to ERGS.

¶ 196. Finally, Clean Wisconsin argues that the EIS was deficient because it failed to evaluate the effects of constructing enough IGCC units to equal ERGS's capacity. The EIS did note that EGEAS modeling demonstrated that the single 600 MW IGCC unit that was initially proposed as part of ERGS was not cost-effective. Given that the PSC determined that one IGCC unit was not cost effective, the PSC's decision not to evaluate a number of IGCC units in the EIS was not unreasonable. In addition, we note that there was no IGCC proposal submitted that would rival ERGS, and an EIS does not have to engage in remote or speculative analysis. *Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 72. We therefore conclude that the PSC's determination that the EIS adequately discussed natural gas alternatives was reasonable.

b. Once-Through Cooling

¶ 197. Next, Clean Wisconsin contends that the EIS failed to analyze alternatives to ERGS's once-through cooling—a process that would aspirate cold water from Lake Michigan, cycle it through the plant for cooling purposes, and then dispel it back into Lake Michigan—and failed to analyze the impacts this would have on Lake Michigan. The once-through cooling process would draw an enormous amount of water from Lake Michigan (approximately 740,000 gallons per minute), which would possibly kill millions of aquatic organisms every year. Clean Wisconsin notes that there are alternatives to this cooling process, including cool-

ing towers (that withdraw less water and also reuse the water) and dry cooling (that uses very little water and would have virtually no adverse aquatic impacts). Clean Wisconsin also notes that the last coal-fired power plant that was built (in Pleasant Prairie) uses cooling towers. According to Clean Wisconsin, the EIS's failure to discuss these alternatives constitutes a fundamental violation of WEPA. Calpine also adds that the EIS failed to discuss the cumulative impacts of ERGS's once-through cooling. We disagree with both arguments.

■

¶ 198. At the outset, we note that the EIS thoroughly analyzed the consequences of once-through cooling. The EIS examined a monitoring study completed in the mid-1970s of the effects of OCPP's once-through cooling system on Lake Michigan. After noting the large number of aquatic organisms that were impinged and entrained due to this technology,[47] the EIS observed that the study ultimately concluded that once-through cooling has "inconsequential" effects on overall affected populations' ecosystems.[48] The EIS commented that the monitoring report determined:

---

[47] Impingement occurs when fish and other aquatic life are trapped against cooling water intake screens that remove debris from the cooling water as it enters the intake system. In contrast, entrainment occurs when aquatic organisms, eggs, and larvae are drawn into a cooling system, through the heat exchanger, and then pumped back out to the water.

[48] According to the one-year monitoring study conducted from March 1, 1975, through February 29, 1976, of the old OCPP plants, 6,202,407 fish larvae, 9,281,370 eggs, and 15.6 million invertebrates were entrained, and 2,754,118 fish weighing 109,414 pounds were impinged at the plant during the sampling period.

The absolute magnitude of the number of fish, larvae, or eggs impinged or entrained is not a measure of the significance of the impact. Rather, the losses must be evaluated relative to the sizes and productivity of the affected populations. The report concluded that, relative to the Lake Michigan fishery, the impacts of entrainment and impingement were inconsequential to aquatic life in Lake Michigan. The DNR concurred with that conclusion.

¶ 199. Regarding the discharged water, the EIS also indicated that a study of once-through cooling at the OCPP site along with several other studies for large power plants on Lake Michigan conducted in the 1970's "concluded that operation of the power plants did not significantly affect fish populations in the general vicinity surrounding each facility, or in the far-field areas that were studied beyond thermal plume limits." Further, the EIS stated that "[t]hese studies indicated that both the individual and the aggregate impacts of power plant cooling water discharges on the Lake Michigan ecosystem were insignificant, and were limited to localized shifts in fish distribution and periphyton growth in areas immediately associated with the thermal plumes."

¶ 200. Different minds can disagree on what constitutes "inconsequential" effects, but we are not making a qualitative assessment of our own, nor are we independently reviewing the PSC and DNR's conclusion. Instead, we are merely looking for whether there is a rational basis for the PSC to conclude that the EIS took a "hard look" at the environmental effects of the once-through cooling system. We conclude that there is. If the adverse environmental consequences of once-through cooling are adequately evaluated, WEPA does not prevent an agency from determining that other values outweigh the environmental costs. *See Robert-*

*son,* 490 U.S. at 350. Because the adequacy of the EIS is intertwined with factual, value, and public policy considerations, we will defer to those agencies whose responsibility it is to make those determinations. *See Citizens' Util. Bd.,* 211 Wis. 2d at 552.

¶ 201. In addition to the studies from the 1970s, the EIS considered and discussed current data concerning the effects of the proposed once-through cooling structure. The EIS stated:

> In February 2003, the applicants submitted a report, titled "Oak Creek Power Plant and Proposed Elm Road Station Cooling Water Intake and Lake Monitoring Study, February 2003." The report described the results from the first year of a two-year program, which will be used to determine the abundance of fish eggs and larvae in the vicinity of the existing on-shore intake structure and the site of the proposed new off-shore intake structure. The data presented in this and the final report will be used to help establish location, design, and operational parameters for achieving compliance with the impingement and entrainment reduction criteria in the proposed EPA regulations for intake structures at existing facilities.

> This report summarized data from icthyoplankton collections collected from June through September 2002, at transects near the present intake . . . and the site of the new intake . . . . This data clearly shows a marked reduction in total icthyoplankton densities at the 40 ft contour (the depth of the probable new intake structure site) in comparison to near-shore contours. Offsetting the benefit of the reduced icthyoplankton density at the far-shore intake site is the fact that the cooling water demand would increase incrementally as new units are added to the intake.

> The second phase of the study will involve near-shore and far-shore icthyoplankton collections from early May through September, 2003. Off-shore icthyoplank-

ton sampling will be focused more precisely at the proposed intake location.

This February report gave calculated intake velocities at the present nearshore structure ranging from 0.5 to 1.8 ft/second (one to four pumps, respectively). The proposed design velocity at the entrance to the proposed offshore structure (whether consisting of intake cribs or velocity caps) is 1.0 ft/second; however, a velocity range of 0.5 ft/second to 1.0 ft/second is under consideration as detailed design for the caps or cribs is finalized. It should be noted that limiting intake velocity is not the sole factor in determining how best to design an intake structure to minimize adverse environmental impacts to fish and other aquatic life. If the velocity is reduced, there is a proportional increase in the intake area needed. This would require additional cribs or caps. Since the location selected is a sandy featureless area of the lake bottom, the potential impacts of adding more structure to the lake bottom must be weighed against the potential benefits of reducing the approach velocity.

Based on Electric Power Research Institute report [a report drafted in December of 2000], a velocity of 1 ft/second has the potential to pull in salmon that are less than 10 cm in total length. This is based on EPRI's review of all published or otherwise available fish swim speed data. These data generally show that small (under 10 cm in length) salmon have sustainable swimming speeds that are less than 1 ft/second.

Small salmon greater than 10 cm in length size have swimming speeds that are typically greater than one ft/second. Thus, these larger fish should be able to avoid the currents surrounding the intake structure caps/cribs. Data are not available for trout, but the swimming speeds are expected to be similar to salmon. If fish enter the tunnel and reach the pumphouse, fish removal will occur at the traveling water screens. The traveling water screens for this project have not yet been selected, but there are designs and operations (low

pressure and/or continuous screen wash) that can increase fish survival if impingement occurs.

(Footnote omitted.)

¶ 202. In addition to the above in-depth discussion concerning the effects of the intake component of the proposed once-through cooling system, the EIS similarly discussed the effects of the water discharge component of the proposed once-through cooling system. For example, the EIS provided:

**Potential impacts of construction of the water discharge structure**

The impacts to Lake Michigan from the construction of the discharge structure include temporary impacts such as local increases in turbidity within the water column, reductions in local dissolved oxygen levels, and the reductions in local light penetration. The construction of the discharge structure would also temporarily disrupt and possibly destroy the local flora, fauna and aquatic habitat, including fish. Measures such as silt curtains or turbidity barriers would be required to reduce the extent of these temporary impacts. The long-term effects of the placement and operation of the discharge structure include a loss or modification to the existing aquatic and nearshore habitat area, and changes to local water quality. If the discharge structure is placed north of the existing coal dock the presence of the discharge structure may disrupt local wildlife species which utilize the sand beach in this area and would likely require more frequent maintenance dredging of the discharge channel due to littoral drift in this area.

**Potential impacts of operation of the water discharge structure**

The anticipated maximum flow through rate for each SCPC unit and the IGCC is 485,000 gpm with a

temperature rise of 12 [degrees] F. The maximum heat rejection rate for the three units combined would be 8,740 million BTU/h.

The primary effluent from the OCPP is once-through cooling water from the steam condensers. No chemicals are added to the water; therefore, temperature is the only water quality parameter significantly affected by the discharge of cooling water. Heated effluent from the two proposed SCPC units would be discharged north of the coal dock through either a single or combined outfall structure or combined with the SCPC outfall.

. . . .

### Zebra mussel control

At the lake bottom intake structure, the only option for zebra mussel control would be manual cleaning by divers. The intake drop shafts and tunnels should not have significant zebra mussel accumulations because velocities would be too high (over six feet per second) for mussel settlement to occur.

Pump house wet wells, frames for the traveling water screens, pump bell housings and other on-shore equipment would also need to be periodically cleaned. Plant service water would be treated using the copper ion generator that has been successfully used at the existing OCPP units 5–8. This device involves the electrolytic dissolution of a low level of copper ions and also releases an aluminum floc. Parts-per-billion levels of copper cause the mussels to be agitated and the inside of the plant water system becomes less habitable. Mussels likely would continue to free float through the system and ultimately be returned back to the lake. Furthermore, the aluminum floc forms a coating inside of piping, heating exchangers and other equipment using service water which helps inhibit zebra mussel settlement.

The copper ion generator is located downstream of the traveling water screens. Condenser cooling water zebra

386

mussel treatment is not anticipated based on operational experience at other WEPCO facilities on Lake Michigan. This could differ at the ERGS units depending on the water quality from the off-shore intake location and metallurgy of the condenser tubing. At this time, there is not a specific plan for controlling zebra mussels in the condenser cooling water.

¶ 203. In sum, the EIS contained a plethora of data concerning the environmental impacts of the proposed once-through cooling system, including both older and newer studies of the likely effects of the system on the local aquatic environment. In addition to noting a variety of likely adverse environmental impacts of the proposed once-through cooling system, the EIS also discussed proposed remedial action and strategies to lessen the projected effects.[49] We conclude that the data and factual findings contained in the EIS concerning the projected adverse environmental consequences of the once-through cooling system allowed the PSC to take a "hard look" at the environmental consequences of this proposed action, *Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 72, and provided it with a rational basis to conclude that the EIS adequately described the effects of once-through cooling. We again emphasize that the EIS is an informational tool that does not compel a particular decision by the agency or

---

[49] The final EIS also provided:

Currently, US EPA and the DNR disagree on which regulation, "new facility" or "existing facility" is applicable to the ERGS. It has been the DNR's position that the proposed "existing facility" regulation is applicable to the ERGS project. ... The EIS states that, regardless of the characterization of the proposed units as new or existing under the 316(b) requirements, the WPDES permit will require Best Technology Available (BTA). BTA requirements should minimize impingement and entrainment.

prevent the agency from concluding that other values outweigh the environmental consequences of a proposed action.

¶ 204. The EIS also acknowledged that coal-fired plants could be constructed using cooling towers, although the efficiency of such plants would likely be reduced. Commenting on the draft EIS, several entities[50] requested that the EIS discuss other possibilities to once-through cooling. The EIS writers responded:

> Once through cooling water and closed-cycle cooling are commonly used cooling alternatives. WEPCO has proposed to use once-through cooling water for the ERGS. The Clean Water Act does not prohibit the use of once-through cooling water, nor does it compel anyone to use closed-cycle cooling. DNR does not have the authority to require closed-cycle cooling for this project.

In addition, the EIS explained that it would be premature to discuss the comparative effects of once-through cooling versus closed-cycle cooling or cooling towers until the DNR and EPA agree on the BTA to which the ERGS facility would be held.[51]

---

[50] The entities include: The Lake Michigan Federation, Citizens' Utility Board, and S.C. Johnson.

[51] Pursuant to the "new" requirements for existing generation facilities, BTA is determined by the EPA on a case-by-case basis, considering a variety of site-specific factors:

> The phrases "best available demonstrated technology"; and "best available technology"—like "best technology available" in CWA section 316(b)—are not defined in the statute. However, section 304 of the CWA specifies factors to be considered in establishing the best practicable control technology currently available, and best available technology.

¶ 205. While an EIS should analyze reasonable alternatives to the proposed action and discuss measures that can mitigate environmental harm, it is not required to discuss unreasonable alternatives. *Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 72. We construe the EIS's writers' response as concluding that cooling towers are not a reasonable alternative due to the DNR's inability to require them. The EIS writers essentially concluded that until the EPA and DNR determined the BTA applicable to the ERGS facilities, it would not be reasonable to discuss some alternatives the DNR would not be empowered to require through

. . . .

For "best available technology," the CWA directs EPA to consider:

> The age of equipment and facilities involved, the process employed, the engineering aspects . . . of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impacts (including energy requirements), and such other factors as [EPA] deems appropriate.

33 U.S.C. § 1314(b)(2)(B).

Section 316(b) expressly refers to section 301, and the phrase "best technology available" is very similar to "best technology available" in that section. These facts, coupled with the brevity of section 316(b) itself, prompted EPA to look to section 301 and, ultimately, section 304 for guidance in determining the "best technology available to minimize adverse environmental impact" of cooling water intake structures for existing Phase II facilities.

National Pollutant Discharge Elimination System—Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase II Existing Facilities; Final Rule, 69 Fed. Reg. 41,576, 41,583 (July 9, 2004) (to be codified at 40 CFR pts. 9, 122–125).

its permit process. *See Citizens' Util. Bd.*, 211 Wis. 2d at 556 (Section 1.11, Stats., does not require an agency to 'engage in remote and speculative analysis[.]'). Given that the PSC is best situated to determine what constitutes a reasonable alternative, we cannot conclude that the PSC's determination that this analysis is reasonable lacks a rational basis. *See id.* at 553, 560 (PSC may rationally limit its EIS discussion to what it found was reasonably necessary to meet present needs).

¶ 206. Regarding the EIS's discussion of mitigating the harm from the once-through cooling process, the EIS responded to another criticism that the draft EIS did not sufficiently discuss once-through cooling or how it can be deemed to be "best technology available." The EIS stated:

> EPA has promulgated regulations for cooling water intake structures for *new* facilities, and has *proposed* regulations for cooling water intake structures for *existing* facilities. Both the promulgated 316(b) regulations for new facilities and the proposed 316(b) regulations for existing facilities provide for site-specific alternatives to the use of a cooling tower. Currently, US EPA and the DNR disagree on which regulation is applicable to the ERGS facilities. It has been the DNR's position that the proposed "existing facility" regulation is applicable to the ERGS project. *The EIS states that, regardless of the characterization of the proposed units as new or existing under the 316(b) requirements, the WPDES permit will require Best Technology Available (BTA).*
>
> If ultimately the DNR and EPA agree that the intake should be regulated under the promulgated "new facility" regulation, then WEPCO would request a site-specific determination of the BTA. At that juncture, the

DNR would require the comparative impact analysis of closed versus open cycle cooling.

If ultimately the DNR and EPA agree that the intake should be regulated under the proposed "existing facility" regulation, then the *DNR will require WEPCO to demonstrate that the location, design, and operation of the intake will reduce fish and shellfish impingement mortality by 80 to 95 percent and entrainment by 60 to 90 percent.* Fish deterrent systems, barrier nets, modified Ristroph screens with fish return systems, aquatic filter barriers, variable speed pumps, fine mesh traveling screens, angled and modular inclined screens, and low pressure spray washes may be used.

Siting of the intake is also critical for minimizing impingement and entrainment. In general, the littoral zone of large lakes, such as Lake Michigan, serve as the principal spawning and nursery area for most species of freshwater fish, and is considered one of the most productive areas of the waterbody. The placement of the intake structure beyond the littoral zone should reduce impingement and entrainment. The 2002/2003 study that WEPCO is currently conducting is intended to be part of that demonstration.

If WEPCO is unsuccessful in demonstrating the percent reductions, it would seek a site-specific determination of BTA. At that juncture, the DNR would require the comparative impact analysis of closed-versus open-cycle cooling.

(Final two emphases added.)

¶ 207. The EIS's recognition that the applicants will have to work with the EPA and DNR to achieve BTA regardless of whether the facility is considered "new" or "existing" demonstrates how the intake structure will have to mitigate harm. An EIS "may be validly approved by the agency even though conditioned on

further development of mitigation measures." *County of Bergen v. Dole,* 620 F. Supp. 1009, 1061 (D.N.J. 1985). Because the environmental evaluation process is a continuing one, "it is not necessary, nor is it possible, that every detail be contained in the [EIS]. General commitments to future action suffice to meet mitigation requirements." *Id.* Therefore, it is reasonable to conclude that this particular commitment to interagency cooperation with the DNR and EPA satisfies the EIS's mitigation assessment obligation.

c. Alternatives to OCPP Site

¶ 208. Clean Wisconsin also contends that the EIS failed to analyze alternatives to the OCPP site. We do not agree.

¶ 209. As the EIS noted, the site selection process started with over 140 potentials. Due to 55 screening criteria of various social, environmental, technical, and economic considerations, that number was narrowed down to five: Pleasant Prairie (in Kenosha County); Haven (in Sheboygan County); Ozaukee (in Ozaukee County); Little Suamico (in Oconto County); and North Oak Creek (in Milwaukee County), also known as the OCPP.

¶ 210. The sites in Ozaukee and Little Suamico were eliminated due to the increased cost of acquiring substantial amounts of land and the environmental impact of developing greenfield sites. The Haven site was rejected because of its irregular shape and because once-through cooling was not available. Similarly, the Pleasant Prairie site was eliminated because it could not accommodate all of ERGS's facilities and because cooling towers would have to be constructed given the

significant distance from Lake Michigan. *See Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1041 (10th Cir. 2001) ("Alternatives that do not accomplish the purpose of an action are not reasonable.").

¶ 211. Upon evaluating the North Oak Creek site, other possible sites near the southern end of WEPCO-owned OCPP property in Racine County were identified. All of these sites, which shared the advantages of once-through cooling and use of existing transmission and rail line infrastructure, were the sites that were eventually identified in the CPCN application:

> One of the proposed sites is in the city of Oak Creek in Milwaukee County at the east end of Elm Road, north of the existing OCPP. This site is referred to as the North Site throughout this EIS. A second site, the South Site, is located south of the existing OCPP along the lakeshore. A variation of the South Site was proposed as the applicants' third site alternative. For purposes of description and analysis in this document, this alternative will be referred to as South-Exp Option.

¶ 212. Clean Wisconsin renews its argument that these OCPP sites are not alternatives. We have previously determined that it was reasonable for the PSC to consider the OCPP alternatives as "alternative sites." The EIS noted some of the distinctions between the sites that we discussed *supra:* "1) having building footprints in different municipalities and counties resulting in different entities receiving shared-revenue payments if the ERGS proposal is approved, 2) separate service water discharge locations, and 3) significant differences in the amount of excavation required to build and safely operate the facilities." The EIS proceeded to analyze the sites' existing structures and general topography, as well as how the terrain will have

to be redesigned and augmented to accommodate ERGS. In addition, the EIS noted significant differences in wetland impacts among the OCPP alternatives and differences in other environmental impacts, such as air quality. Thus, we are satisfied that there is a rational basis to conclude that the EIS adequately considered alternate sites.

d. Air Pollution

■■■■

¶ 213. Clean Wisconsin's next argument is that the EIS fails to present sufficient information regarding ERGS's adverse impacts with regard to health consequences from air pollution. WEPA requires an EIS to disclose any significant health consequences of a proposed action's environmental impacts. *See Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 106–07 (1983) (concluding that "NEPA requires an EIS to disclose the significant health, socioeconomic, and cumulative consequences of the environmental impact of a proposed action"). We are satisfied that the PSC had a rational basis for concluding that the EIS adequately discussed ERGS's health impacts.

¶ 214. Chapter 7 of the EIS discussed the air emissions from ERGS and the general health and environmental concerns related to these pollutants. For example, the EIS noted that not only has particulate matter been correlated with increased hospitalizations for asthma attacks, worsening of lung disease, and heart disease, it has also been estimated to cause over 15,000 premature deaths in the United States per year.

¶ 215. Regarding the effects of $NO_x$, the EIS stated:

High levels of $NO_2$ may be fatal to humans, while lower levels affect the delicate structure of lung tissue. Humans exposed to high concentrations suffer lung irritation and potential lung damage. Long-term lower levels of exposures can destroy lung tissue, leading to emphysema. Concentrations of $NO_x$ as low as 0.1 ppm, can cause lung irritation and measurable decreases in lung function in asthmatics. Children, the elderly and people with lung diseases, such as asthma, emphysema or bronchitis are sensitive to $NO_x$.

¶ 216. Similarly, regarding $SO_2$, the EIS stated:

Sulfur dioxide causes a wide variety of health and environmental impacts because of the way it reacts with other substances in the air. $SO_2$ irritates the respiratory system and can cause pronounced health problems. Sulfate particulates are a primary factor in the production of hazy atmospheric conditions. Acid rain is caused by $SO_2$ and $NO_x$ reacting with other substances in the air (see Acid Rain section). Corrosion and damage to metals and masonry may also result from increased sulfur dioxide emissions.

Severe health effects are associated with increased sulfur dioxide emissions. Peak levels of $SO_2$ in the air can cause breathing difficulty for people with asthma. Long-term exposure to high levels of $SO_2$ gas and particles may cause respiratory illness and aggravate existing heart disease. Sulfate particles are associated with increased respiratory symptoms, respiratory disease, and premature death. Exposure to high concentrations of sulfur dioxide for short periods of time can constrict the bronchi and increase mucous flow, making breathing difficult. Children, the elderly, those with chronic lung disease, and asthmatics are especially susceptible to these effects.

In comparable fashions, where possible, the EIS also

395

discussed acid rain, greenhouse gases (as they relate to global warming), VOCs, HAPs (hazardous air pollutants), and mercury.[52]

¶ 217. Moreover, in response to a specific request that the EIS "[p]rovide information on the human health effects, morbidity, and mortality related to the emission of the proposed ERGS facilities," the EIS added:

> The chemicals found in emissions from coal-fired power plants are known to adversely affect the respiratory system (as well as have other effects), depending on the concentrations and the duration of exposure.
>
> Several scientific studies in recent years have found a relationship between increased levels of air emissions from these types of sources and increased respiratory symptoms. This means that people with existing lung diseases such as asthma, bronchitis, emphysema, and other diseases could experience an increase in the severity and frequency of symptoms as a result of increased emissions. There is evidence in the scientific literature that increases in particulate matter levels can also cause morbidity and mortality as well. Infants and children breathe in more air per pound of body weight and are perhaps more susceptible due to developing immune and nervous systems and other factors related to growth. Children can also be more active and spend more time outdoors and experience

---

[52] Mercury has received considerable attention lately. Indeed, one commentator critiqued the draft EIS for failing to more carefully evaluate the effects of mercury on marine life and fish consumption advisories. The EIS candidly observes that the "scientific understanding of the impact of mercury emissions on the environment is still developing, [therefore] a specific answer to these questions is not possible." *See Izaak Walton League of America v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981) ("So long as the environmental impact statement identifies areas of uncertainty, the agency has fulfilled its mission under NEPA.").

increased exposure to outdoor air pollution as a result. In addition, mercury is emitted from coal-fired combustion. Mercury has been associated with neurological and other effects (here the main exposure route is through ingestion of fish).

In summary, there are numerous hazardous air pollutants released into the air from coal combustion. Past DNR analyses have evaluated the virgin fossil fuel exemption and found that, from the inhalation perspective, the risks resulting from well controlled facilities with tall stacks are low. Thus, a facility that meets applicable Wisconsin DNR requirements would not be likely to cause a significant inhalation risk. It is also true however, that as concentrations of air pollutants increase, even if they are below a federal or state standard, that there is a likelihood of increased respiratory symptoms and other adverse health effects occurring. For example, in the case of fine particulate matter ($PM_{2.5}$), when US EPA evaluated the available data on health effects vs. exposure, there was no clear threshold that defined a safe vs. unsafe level of exposure.

¶ 218. We agree with the PSC that the EIS's evaluation constituted a hard look at the environmental health consequences from ERGS's air pollution emissions. Although Clean Wisconsin may take issue with the PSC's failure to somehow quantify the precise health impacts of ERGS, we find that the PSC's determination that the EIS adequately evaluated the health impacts of ERGS was reasonable.

e. Effects of Transmission System

¶ 219. Given the significant concentration of baseload power generation at the OCPP site, Clean Wisconsin asserts that there will be considerable strain

on the high voltage transmission system, which would inevitably require upgrades that would not be required if the generation was located elsewhere. Because of the massive construction that will be required to complete these improvements, Clean Wisconsin contends that the EIS was required to consider the accompanying environmental consequences. To the extent that it could, the EIS does do this.

¶ 220. Insofar as Clean Wisconsin's arguments relate to problems that will arise with ERGS construction, chapter 6 of the EIS discussed issues pertaining to transmission lines. In that chapter, the EIS described the necessary interconnections, the substation changes that will have to occur on the OCPP site, possible system-wide transmission projects, and stability issues, including associated solutions and ongoing studies. Recognizing that certain transmission improvements could change after further study, the EIS assumed that ERGS will need a major new transmission line to connect to the electric system. The EIS noted that rebuilding existing transmission line rights-of-way minimizes environmental effects, "because land uses have adjusted to the barrier of the right-of-way and because the right-of-way is already disturbed to some extent." In contrast, should new lines need to be constructed, the EIS explained that the level of environmental effects will vary, depending on the location of the new right-of-way and the design of the structures.

¶ 221. Insofar as Clean Wisconsin's argument relates to future problems that may arise and the environmental consequences that the answers to those problems could pose, those are merely potentialities that may come to fruition; possibilities that an EIS is not legally required to consider. *See Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 72. Given the little

available information regarding the required transmission lines at the time the EIS was drafted, we conclude that the PSC's determination that the discussion is adequate is reasonable.

f. Assessment of Wetland Impacts

¶ 222. Clean Wisconsin also argues the EIS is deficient in its assessment of wetland impacts. We again disagree.

¶ 223. Chapter 8 of the EIS discussed a variety of wetland issues, including the potential impact of ERGS. Depending on the eventual site chosen, the EIS quantified the estimated wetland acres that would be filled (to create berms and for grading) and the corresponding wetland reduction percentage. Chapter 8 and chapter 10 (entitled "Land Resources") also discussed the secondary impacts on surrounding wetlands. The EIS recognized that at the time of its drafting, no mitigation plans or strategies had been proposed that would minimize the consequences of placing fill in wetlands.

¶ 224. Even absent mitigation plans, and regardless of the site chosen at OCPP, the EIS considered that four of the eight wetlands would remain unaffected, while the remaining four would be reduced anywhere from 12–20 percent. Therefore, we conclude that the PSC had a rational basis to conclude the EIS was adequate with regard to wetland impacts.

g. Responsiveness Summary

¶ 225. Lastly, Clean Wisconsin maintains that the EIS's responsiveness summary is inadequate. However, this argument is little more than an adornment of its

399

previous arguments, particularly its contentions that the EIS did not adequately discuss cooling towers, mitigation measures, and health-related impacts from air pollution. We have already rejected these arguments above, and therefore, we do not address them further here.

¶ 226. We once again emphasize that our review of the EIS adequacy determination is not a review of the PSC's factual findings. *Citizens' Util. Bd.*, 211 Wis. 2d at 550. Because the PSC's determination of the adequacy of the EIS represents its conclusion that the requirements of Wis. Stat. § 1.11 have been met on the facts before it, we defer to the PSC as the agency whose responsibility it is to make that determination. *Id.* at 552. In sum, we conclude that the PSC's determination that the EIS was adequate is reasonable.

4. Conditional Issuance of CPCN

¶ 227. Clean Wisconsin argued to the circuit court that the PSC improperly "issued" the CPCN before WEC obtained all necessary permits from the DNR as required by Wis. Stat. § 196.491(3)(e).[53] The circuit court agreed and vacated the PSC's order on that ground. Before this court, the PSC argues that the circuit court's holding was erroneous. We agree, and therefore reverse the circuit court's holding as to the legitimacy of the PSC's issuance of the CPCN conditioned on the future action of the DNR.

---

[53] We note since this court heard oral argument, all necessary permits for the construction of the proposed plant have been issued, although legal challenges to some permits are still pending.

¶ 228. In order to obtain a CPCN, a utility must navigate the stringent procedural requirements of Wis. Stat. § 196.491. This statute requires the PSC and DNR to operate in tandem to accomplish the legislative goal of approving a utility's plan to construct a new facility capable of generating over 100 MW of electric power. Given the mammoth scope of that regulatory task, the timeline is tight. The following time requirements apply to the interplay between the DNR permitting process and the PSC's CPCN decision.

¶ 229. First, at least 60 days before filing a CPCN application, the utility "shall provide the [DNR] with an engineering plan." Wis. Stat. § 196.491(3)(a)3.a. Within 30 days of receiving the engineering plan, the DNR must respond with a list of permits required to construct the proposed facility. *Id.* Twenty days after the DNR provides the list of required permits, the utility must apply for the identified permits. Wis. Stat. § 196.491(3)(a)3.b. Thirty days after receiving the permit applications, the DNR must make a "completeness" determination, and 120 days after a favorable completeness determination, the DNR must take final action on the applications. *Id.* Thus, theoretically the DNR permit approval process should take, at most, 200 days from the filing of the engineering plan to the DNR's final action.

¶ 230. The *soonest* the applicant may submit the CPCN application to the PSC is 60 days after the initial submission of the engineering plan to the DNR. Wis. Stat. § 196.491(3)(a)3.a. Thirty days after the applicant submits the CPCN application, the PSC's completeness determination is due. Wis. Stat. § 196.491(3)(a)2.

¶ 231. Upon pronouncing the application "complete," the PSC has 180 days to approve the completed application. Wis. Stat. § 196.491(3)(g). This period may

be extended, by court order, for an additional 180 days. *Id.* Thus, the PSC approval process theoretically takes, at most, 210 days, or 390 days if the PSC receives a court-ordered extension.

¶ 232. The PSC must remain cognizant that it "may not issue a certificate of public convenience and necessity under this subsection until the [DNR] has issued all permits and approvals identified in the listing specified in par. (a)3.a. that are required prior to construction." Wis. Stat. § 196.491(3)(e).

¶ 233. Theoretically, this should not be an obstacle, because the DNR must act within 200 days after the utility files the engineering plan, or 140 days after the utility files the CPCN application with the PSC. Therefore, at the time of DNR final action, the PSC should still have at least 40 days (and potentially as many as 220 days) to finish its evaluation of the application.

¶ 234. However, the closely interrelated nature of the legislative timelines means that the PSC's timeline is at the mercy of any difficulties that arise in obtaining the DNR permits. In reality, these two separate timelines do not always march in lockstep. For example, the utility often must submit several different permit applications to the DNR. In this case, the DNR required separate permits for air pollution impacts, a site grading permit, a stormwater permit, and other water-related permits and approvals. If even one of these permit approvals falls behind schedule, it is possible, as happened here, that the DNR will not have fully acted at the time when the PSC must make a final decision on the CPCN application. This lag in the timeline can occur for many reasons. For example, the DNR may determine

that one particular permit application is not "complete," thus setting back the timeline applicable to that particular permit.

¶ 235. If, for whatever reason, the DNR permits are not timely issued, the PSC is placed in a precarious position.[54] If the PSC's time limit elapses before final DNR action, the PSC effectively has four options: 1) deny the application; 2) take no action, and thus passively allow the CPCN to become effective by operation of law;[55] 3) unconditionally approve the application in violation of its statutory duties; or 4) conditionally approve the application.

¶ 236. In this case, it is undisputed that the applicant had not obtained all the required DNR permits at the time the PSC issued its "final decision."[56] The PSC chose the fourth option listed above; it conditionally approved the CPCN. In its final decision, under the heading "Certificate of Public Convenience and Necessity," the PSC stated: "W.E. Power LLC . . . may commence construction of two 615 MW . . . electric generating units, as described in WEC's project application and modified by this Final Decision . . . ." *Application of Wis. Elec. Power Co.*, No. 05–CE–130 at 56 (Wis. PSC Nov. 10, 2003). The PSC conditioned its approval of the CPCN as follows: "This Final Decision

[54] Unlike the CPCN, the DNR permits do not automatically issue if the DNR does not act within the statutory time limit. *Compare* Wis. Stat. § 196.491(3)(g) *with* Wis. Stat. § 196.491(3)(a)3.b.

[55] Pursuant to Wis. Stat. § 196.491(3)(g), if the PSC fails to take final action, it "is considered to have issued a [CPCN] with respect to the application."

[56] *Application of Wis. Elec. Power Co.*, No. 05–CE–130 at 1, 53–54 (Wis. PSC Nov. 10, 2003).

takes effect on the day after it is mailed. The CPCN for the ERGS facility takes effect only when the DNR issues all permits and approvals that it identified, pursuant to Wis. Stat. § 196.491(3)(a)3.a., as being required prior to construction of the facility." *Id.* at 62.

¶ 237. Upon reviewing the order, the circuit court determined that the PSC acted improperly:

> [Wisconsin Stat. § 196.491(3)(e)] plainly states that the Commission shall not do what is being done here, issue the CPCN before the regulatory permits have been obtained .... Potentially, this is a matter of substantial consequence. The Commission in its Order notes the possibility that [if] the planned draw of 1.4 billion gallons of Lake Michigan water daily is not approved, cost of the proposal will escalate by some $200 million and may even preclude project viability. The approval stated in the Order was issued in clear violation of sec. 196.491(3)(e), Wis. Stats. It is the Order of this court that the PSC Order is hereby vacated and the matter remanded to the Commission to permit the applicant to demonstrate that the required regulatory permits have been obtained.

¶ 238. On appeal, the PSC raises two theories to justify its action and explain why it believes the circuit court is mistaken. First, the PSC argues that its final decision did not actually "issue" the CPCN; rather, it simply approved the utility's CPCN application.[57] Second, and alternatively, the PSC argues that it gave "full

---

[57] Clean Wisconsin notes that the PSC did not raise this argument before the circuit court, and so we could consider it waived. We decline to do so, as the issue has been fully briefed and argued, and there are no factual disputes. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443, 287 N.W.2d 140 (1980).

effect to the statute" by issuing the CPCN but staying its effectiveness until the DNR issued the necessary permits.

¶ 239. We implicitly rejected the PSC's first argument in *RURAL,* 239 Wis. 2d 660. In *RURAL,* the PSC approved a CPCN with the condition that "RockGen Energy shall obtain from [the] DNR all permits and approvals that are required before beginning any construction." *Id.,* ¶ 58. The court determined that this approach, "a conditional order," effectively "issued" the CPCN. *See id.,* ¶¶ 16, 58, 61.

¶ 240. Our *RURAL* opinion did not fully explain the reason for its use of that terminology, so that we here proceed to make explicit what is implicit in *RURAL.* If we agreed with the PSC that the CPCN did not "issue" until the DNR permits became effective, we would effectively be amending the statute to allow the PSC to extend the time limit within which it must finally act to approve or deny a utility's application. We decline to do so.[58]

¶ 241. We agree with Clean Wisconsin that the statute contemplates only one decision by the PSC. If the PSC's decision did not take effect until after the DNR's final action, the PSC's "final decision" would not be final. Rather, it would be an interim endorsement anticipating the final action: issuance of the CPCN. The statute is clear: the PSC must take final action within

---

[58] It has long been the position of this court that in a general sense, statutes creating time limits, such as statutes of limitation, "should not be extended by judicial construction." *Gutter v. Seamandel,* 103 Wis. 2d 1, 24, 308 N.W.2d 403 (1981) (quoting *Pugnier v. Ramharter,* 275 Wis. 70, 77, 81 N.W.2d 38 (1957)). Although the instant case does not involve a statute of limitation, we find that the underlying principle is the same.

the statutory time period. Accordingly, we hold that the PSC's final decision conditionally issued the CPCN.

■■■■■

¶ 242. Alternatively, the PSC argues that if the court finds, as we do, that its decision "issued" the CPCN, such conditional issuance was the only way for the PSC to reasonably harmonize and give full effect to the language in § 196.491(3)(e), the impending statutory timelines, and the need to maintain an adequate energy supply. In arguing this point, both parties rely on the *RURAL* decision.

¶ 243. In *RURAL,* the court evaluated the PSC's action on a CPCN application submitted under the nonstatutory provisions of 1997 Wis. Act 204, § 96. Those provisions decreased the time limit within which the PSC had to make a final determination on a CPCN application from 180 days to 90 days; however, the provisions applied for only a limited time and with respect to only certain eastern Wisconsin utilities. *See* 1997 Wis. Act 204, § 96. At the end of the 90–day period, the DNR had not acted with respect to one permit. *RURAL,* 239 Wis. 2d 660, ¶ 60. As it did in the instant case, the PSC conditionally issued the CPCN. *Id.,* ¶ 58.

¶ 244. On review, the appellant environmental group argued that by so doing, the PSC violated § 196.491(3)(e). This court disagreed, "given the particulars of this case. . . . [H]ad the PSC strictly complied with Wis. Stat. § 196.491(3)(e), the result would have defeated, rather than fulfilled, the purpose of § 96 and Act 204." *Id.,* ¶ 59. Instead, the court approved the PSC's method: "We believe that the PSC took an approach that not only harmonized the conflicting mandates of § 96 and Wis. Stat. § 196.491(3)(e), but also fulfilled the purpose to expedite the construction of much-needed electric generation capacity." *Id.,* ¶ 61.

¶ 245. The PSC cites this language as evidence of the court's recognition of the PSC's power to condition a CPCN upon the DNR's issuance of the required permits. However, the court in *RURAL* appeared to limit its holding: "Where the PSC has before it an application to process according to the longer timeline in Wis. Stat. § 196.491(3), the PSC should, and could, comply with subdivision (e)." *Id.,* ¶ 59. That is exactly the situation presented here. The PSC basically argues that this single sentence from *RURAL* is inconsistent with the rest of the opinion, and asks us to withdraw it as dicta because the *RURAL* court's concern about harmonizing the statute and the need for reliable energy generation applies similarly to applications made under § 196.491.

¶ 246. We conclude that great weight deference is appropriate as to this issue. First, the legislature has specifically charged the PSC with the interpretation of chapter 196. Under Wis. Stat. § 196.02(1), the PSC "has jurisdiction to supervise and regulate every public utility in this state and to do all things necessary and convenient to its jurisdiction."

¶ 247. Second, unlike the situation in *RURAL,* the PSC is not interpreting nonstatutory provisions of a recently passed act. Instead, it is applying § 196.491(3)(e), which it has exclusively administered since that statute's enactment in 1975. Before the circuit court, the PSC reiterated: "[T]he commission's interpretation of the law that describes when DNR permits should be issued has been its standard practice for many years and remains its standard practice today. . . . [W]e always stay the execution of our CPCN orders until after the necessary DNR permits have been received."

¶ 248. Third, there is no dispute that the agency employed its expertise and specialized knowledge in forming this interpretation. Fourth, while we may not necessarily agree that the PSC's interpretation of the statute is the best available, we conclude that it will provide "uniformity and consistency" in the application of the statute in that the PSC, the DNR, utilities, and the public have a standard rule under which to operate. Once we have determined that the PSC's interpretation of this issue is subject to great weight deference, we need merely decide whether that interpretation is "reasonable." *Harnsichfeger,* 196 Wis. 2d at 661 (collecting cases).

¶ 249. Therefore, we proceed to evaluate the PSC's interpretation of the statutory language to determine whether it is reasonable. Statutory interpretation begins with the plain language of the statute. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. However, the statute is not interpreted in a vacuum; it is considered in the context of the surrounding provisions. *Id.,* ¶ 46.

¶ 250. It is certainly true, as Clean Wisconsin points out, that the statute says the PSC may not issue the CPCN before the DNR has issued the necessary permits. However, it also is true that the PSC has the power to issue conditional orders. Wis. Stat. § 196.395;[59] *see also RURAL,* 239 Wis. 2d 660, ¶ 59. This power, though, is not unlimited. Rather, "the power contained in sec. 196.395 to issue conditional . . . orders is subject . . . to the procedural requirements of

---

[59] Wisconsin Stat. § 196.395 reads in part: "The commission may issue conditional, temporary, emergency and supplemental orders."

408

other provisions of ch. 196, Stats., because they are in pari materia." *RURAL,* 239 Wis. 2d 660, ¶ 59 (quoting *Mid-Plains Tel. v. PSC,* 56 Wis. 2d 780, 787, 202 N.W.2d 907 (1973) (quoting *Wisconsin Tel. Co. v. PSC,* 232 Wis. 274, 287 N.W. 122 (1939))).

¶ 251. Clean Wisconsin argues that the PSC's power to issue conditional orders does not extend to waiving the directives of § 196.491(3)(e), because that would violate the "in pari materia" rule expressed in *RURAL* and our earlier cases. Nevertheless, the *RURAL* court allowed the PSC to condition CPCN issuance on DNR permit issuance, plainly a "procedural requirement[] of other provisions of ch. 196." *Id.*

¶ 252. These competing interpretations do not conclusively settle the question of whether the PSC's interpretation is "reasonable." Accordingly, we proceed to review the legislative history of the statute and the administrative history of the PSC's interpretation in order to determine whether the PSC's present interpretation is reasonable.

¶ 253. The PSC's interpretation is longstanding and consistent, and in fact predates the passage of the CPCN law. Before 1975 utilities had to obtain a "certificate" from the PSC authorizing them to "commence the construction of any public utility plant, extension or facility . . . ." Wis. Stat. § 196.49(1) (1975). The PSC thus certified that "public convenience and necessity require such work . . . ." Wis. Stat. § 196.49(4) (1975).

¶ 254. In 1977, considering WEC's 1975 application to construct a coal-fired power plant in Kenosha County, the PSC conditioned its certificate on three prerequisites, including: "That applicant obtain any

409

needed authorization from the Wisconsin Department of Natural Resources in the areas in which that department has jurisdiction."[60]

¶ 255. The duties of the PSC sharply increased in 1975. In that year, the legislature passed Assembly Bill 463, which became chapter 68, Laws of 1975. The essential language in current § 196.491(3)(e), like most of § 196.491, dates back to that act. It has changed little since. In 1975, the provision read: "The [PSC] may not issue a certificate of public convenience and necessity until the [DNR] has issued all permits and approvals designated under sub. (2m) as necessary prior to the issuance of the certificate of public convenience and necessity." *See* ch. 68, Laws of 1975.

¶ 256. One piece of the legislative history of 1975 Assembly Bill 463 seems, at first glance, to run counter to the PSC's interpretation. An early draft of the bill contained the language:

A failure of the department to have issued any of the permits or approvals for which preliminary application has been made under par. (a) may not prevent issuance of the certificate of convenience and necessity, but the applicant may not undertake the specific part of the construction or the specific operation until the permit or approval therefor has been granted by the department [of natural resources].

Drafting records, ch. 68, Laws of 1975, on file at Wisconsin Legislative Reference Bureau, Madison, Wisconsin. This language, deleted from a subsequent draft, embodies the approach that the PSC now uses. The

---

[60] *Application of Wis. Elec. Power Co.,* 62 Wis. PSC 131, 145 (1977).

deletion of this language from the draft weighs against the reasonableness of PSC's interpretation of the statute.

¶ 257. However, the 1975 law as enacted contained a provision authorizing the DNR to waive compliance with § 196.491(3)(e): "At any time prior to the issuance of the certificate of public convenience and necessity, the department may, *in consultation with the commission, waive the necessity of obtaining any such permit or approval in advance of such certificate.*" Wis. Stat. § 196.491(2m) (1975) (emphasis added). This provision established an escape hatch that allowed the PSC to avoid the dilemma that occurs when the PSC's time limit for action draws to a close before the DNR has issued its final decision on the permit applications.

¶ 258. 1997 Wis. Act 204 removed the DNR's authority to waive compliance with § 196.491(3)(e) and reinstated the potential for the PSC to face the present dilemma. Shortly thereafter, the PSC began conditioning CPCN grants on DNR permit approvals; in fact, within the past five years, almost all its CPCN orders have been so conditioned.[61]

---

[61] *See, e.g., Application of Mirant Portage County LLC,* No. 05–CE–116, at 21 (Wis. PSC Mar. 22, 2002) ("Mirant shall not begin construction on the project until the appropriate DNR . . . permits have been obtained . . . ."); *Application of Rock River Energy LLC,* No. 9346–CE–100, at 21 (Wis. PSC Sept. 24, 2002) ("The CPCN for the Riverside Energy Center takes effect only after the DNR issues all permits and approvals that it identified, pursuant to Wis. Stat. § 196.491(3)(a)3.a. . . . ."); *Application of the Rainy River Energy Corp.,* No. 05–CE–128, at 12 ("The CPCN for the Superior Generation Project takes effect only after the DNR issues all permits and approvals that it identified, pursuant to Wis. Stat. § 196.491(3)(a)3.a. . . . ."); *Joint Application of Fox Energy Co. LLC and Am. Trans. Co. LLC,* No.

411

¶ 259. Under these circumstances, we agree with the *RURAL* court that the PSC's "conditional issuance" approach harmonizes the goal of the statutes with the "purpose [of] expedit[ing] the construction of much-needed electric generation capacity." *RURAL,* 239 Wis. 2d 660, ¶ 61. As the court put it: "[T]he PSC reasonably interpreted and applied both § 96(1)(e)3. of Act 204 and Wis. Stat. § 196.491(3)(e) to give them both full effect by issuing the certificate here with the condition that [the utility] obtain all necessary permits prior to starting construction." *Id.* The same is true of the PSC's interpretation of § 196.491(3)(e) in this case. Had the PSC simply approved the CPCN without conditions, or through inaction allowed the CPCN to be approved through operation of law, it would have acted without regard for the requirements of § 196.491(3)(e). It did not do so. By conditionally approving the CPCN, it maintained the requirements of that section while simultaneously satisfying the strict time limits of chapter 196.

¶ 260. The PSC and the DNR are independent regulatory agencies. The PSC has no authority to order the DNR to complete its review by a certain date. Clean Wisconsin argues that if Wisconsin Electric had timely

---

05–CE–115, at 26 (Wis. PSC Nov. 8, 2002) ("Fox Energy shall not begin construction on the project until all air and water permits and approvals that the DNR identified . . . have been obtained . . . ."); *Application of Fond du Lac Energy Center, LLC,* No. 9343–CE–100, at 18 (Wis. PSC May 5, 2003) ("The CPCN for the Fond du Lac Energy Center takes effect only after the DNR issues all permits and approvals that it identified . . . as being required . . . ."); *Application of Madison Gas & Elec. Co.,* No. 05–CE–121, at 43 (Wis. PSC Oct. 9, 2003) ("This final decision takes effect on the day after it is mailed. The CPCN for the WCCF takes effect when DNR issues all permits and approvals that it identified . . . as being required . . . .").

filed all the appropriate permit applications with the DNR, then the DNR would have been forced to take final action before the PSC did. Yet nothing in § 196.491 gives the PSC the authority to extend the statutory time limits based on the applicant's, or the DNR's, failure to act within other time limits. The PSC is limited to the options described above.

¶ 261. We further observe that, practically speaking, the PSC's approach works. In this case, for example, the DNR has now issued the required permits. The PSC's method prevents applicants from escaping compliance with § 196.491(3)(e) while simultaneously maintaining the reliable supply of energy for the public. The PSC has simply concluded that rather than make an applicant start from scratch and begin the cycle again, it will conditionally issue the CPCN so long as the applicant has complied with the other statutory requirements. This does not excuse the applicant from ultimately complying with § 196.491(3)(e) and obtaining the necessary permits, and thus, the object of the statute is maintained.

¶ 262. Under the great weight deference standard of review, our role is not to say whether we believe the PSC's approach is the best way to handle this regulatory issue. We are limited to deciding whether it is "a reasonable agency decision that comports with the purpose of the statute." *See RURAL,* 239 Wis. 2d 660, ¶ 46 (quoting *UFE,* 201 Wis. 2d at 286–87). Because we cannot say that the PSC's approach fails that test, we reverse the circuit court's decision vacating the PSC's order pursuant to this issue.

C. Mitigation Payments

¶ 263. On April 2, 2003, the City of Oak Creek entered into an agreement with WEC and its subsidiar-

413

ies regarding the construction of ERGS. The agreement included provisions relating to air quality issues, the redevelopment of certain property, payment of mitigation costs, and the compromise of city claims. The agreement noted that "it is anticipated that the construction and operation of the new facilities may have certain effects on the City" and that "in order to mitigate any such effects on the City, WEC and the City desire to enter into this agreement."

¶ 264. The section of the agreement pertaining to payment of mitigation costs provided, in pertinent part:

> WEPCO shall support, and shall use its best efforts to have approved, an annual mitigation payment to the City in the amount of $1.5 million for the first unit (Elm Road Unit 1), $750,000 for the second unit (Elm Road Unit 2), and $250,000 for the third unit (Elm Road Unit 3), respectively (a "Mitigation Payment"). If, and to the extent, approved by the PSCW, Mitigation Payments will be made on a calendar year basis. The first Mitigation Payment for each unit shall be made thirty days after commencement of construction . . . of a unit. Thereafter, Mitigation Payments shall be paid in one annual payment on June 30th each year during the Lease Term. . . . The obligation to pay Mitigation Payments is independent of the receipt of shared revenue funds from the State of Wisconsin and of any future changes in state law pertaining to utility taxation. Notwithstanding anything to the contrary contained herein, in no event will WEC or any of the Subsidiaries have any obligation under this paragraph 3 in the event that (i) the PSCW determines that the payments described in this Section 3 may not be properly included in the rent payments under the Facility Lease, or (ii) a unit of the New Facility permanently ceases operation after start-up and is decommissioned.

There is no dispute that the mitigation payments to which the agreement refers will be passed onto ratepay-

ers if the agreement is approved and that the mitigation payment is contingent upon WEC's ability to pass the costs of the payment on to ratepayers.

¶ 265. In its final decision and order issuing the CPCN, the PSC approved only partial mitigation payments under this agreement. The PSC limited mitigation payments to the period during which ERGS would be constructed, noting that a change in state law pertaining to shared revenue would offset the City's costs once ERGS was constructed:

> This new shared revenue program commences the annual payments when a generating unit becomes operational. Shared revenue payments to the city of Oak Creek will be $1.6 million for the first SCPC unit and increase to $3.2 million for the second unit. These payments will be added to the shared revenue payments that the city is currently receiving for the existing OCPP [$750,000 per year].

> Under Act 31, the annual state shared revenue payments to the city of Oak Creek when ERGS is completed will exceed the amount the city is requesting in the form of mitigation payments from WEPCO ratepayers. Thus, mitigation payments are not required while compensating shared revenue dollars for ERGS are forthcoming. The shared revenue payments, however, will not begin until 2009 when SCPC 1 is first scheduled to be in service, and the city has introduced evidence that it will begin incurring costs as soon as construction commences. For this reason, the Commission finds it appropriate to authorize annual mitigation payments, as described in the Development Agreement, for the period from the commencement of construction of SCPC 1 until the year when SCPC 2 enters service, which is scheduled for 2010. The shared revenue payments for ERGS that commence in 2009, however, will partially offset the city's costs and it is appropriate to reduce the annual mitigation payment by the amount

of shared revenue that the city receives for ERGS. When ERGS is fully in service, the shared revenue payments will fully replace any mitigation payment under the Development Agreement, so any further mitigation payment cannot be billed to WEPCO. If, however, state shared revenue payments decrease during the course of the 30–year Facility Lease and are no longer sufficient to offset fully the mitigation payment that would have been paid under the Development Agreement, the Commission finds it reasonable for W.E. Power LLC to make a partial mitigation payment to the city that equals the remaining portion.

¶ 266. Following the PSC's final decision and order, the legislature enacted 2003 Wis. Act 89. Section 33 of 2003 Wis. Act 89 created Wis. Stat. § 196.20(7) (2003–04).[62] This section provides:

(a) In this subsection, "mitigation payment" means, as approved by the commission, an unrestricted or recurring monetary payment to a local unit of government in which an electric generating facility is located to mitigate the impact of the electric generating facility on the local unit of government. "Mitigation payment" does not include payments made or inkind contributions for restricted purposes to directly address health or safety impacts of the electric generating facility on the local unit of government.

(b) Except as provided in par. (c), an electric public utility may not recover in rates any of the following:

1. The cost of mitigation payments paid by the utility.

2. The cost of mitigation payments paid by the owner or operator of an electric generating facility that

---

[62] All subsequent references to Wis. Stat. § 196.20(7) are to the 2003–04 version.

the owner or operator recovers from the utility by selling electricity to the utility, by leasing the facility to the utility, or by any agreement between the owner or operator of the electric generating facility and the public utility.

(c) The commission shall only approve a mitigation payment agreement that is received by the commission before June 10, 2003, and, if the commission finds the agreement to be reasonable, shall not subsequently modify the agreement.

¶ 267. The City sought review of that portion of the PSC's order modifying the mitigation payment agreement. When addressing this issue, the circuit court noted:

The parties agree that the agreement between the City of Oak Creek and WEC was submitted to the PSC before June 10, 2003 and involves a "mitigation payment" within the meaning of sec. 196.20(7), Wis. Stats., as amended by 2003 Wisconsin Act 33. The parties further agree that the treatment of the agreement by the PSC is to be governed by section 196.20, Wis. Stats., as amended by 2003 Wisconsin Act 89, Section 33, effective December 18, 2003 . . . .

¶ 268. The circuit court concluded that under the statute, the PSC was limited to accepting a mitigation payment agreement in whole or rejecting it in whole. Thus, the circuit court concluded that the PSC was without jurisdiction to modify the agreement. As such, it remanded this issue to the PSC to accept or reject the agreement in whole.

¶ 269. Before this court, the PSC argues that § 196.20(7) does not apply retroactively and that in any event, it does not curtail the PSC's ratemaking authority or require the PSC to approve a mitigation agreement in its entirety. In contrast, the City argues that the PSC has

waived any argument that § 196.20(7) does not apply retroactively, as it conceded the applicability of the statute in the circuit court. The City asserts that § 196.20(7) specifically exempts payments for "health and safety impacts" from the statutory limitations. As such, the City argues that the PSC had no authority to review the reasonableness of payments for "health and safety impacts." In the alternative, the City asserts that even if § 196.20(7) is inapplicable, the PSC erroneously exercised its ratemaking authority under Wis. Stat. § 196.37 because there is not substantial evidence to support the conclusion that passing the mitigation payments onto ratepayers would be "unjust or unreasonable."

¶ 270. We begin by first addressing the issue of waiver.

> The waiver rule is a rule of judicial administration, and as such, a reviewing court has the inherent authority to disregard a waiver and address the merits of an unpreserved issue in exceptional cases. Also, Wis. Stat. §§ 751.06 and 752.35 provide a procedural mechanism for discretionary appellate review and reversal on grounds not preserved in the circuit court.

*Village of Trempealeau v. Mikrut,* 2004 Wi 79, ¶ 17, 273 Wis. 2d 76, 681 N.W.2d 190 (citation omitted).

¶ 271. We believe this case to be one of the "exceptional" cases where it is appropriate to relieve parties of any waiver. Given the public importance of the legal issues and ultimate result in this case, it is more important in this instance to settle the legal issues raised correctly, rather than hold parties to any waiver. We also note that if we were to hold the PSC to any waiver

regarding the retroactive application of § 196.37, the City would be precluded from arguing that the agreement at issue falls within the exclusion to the statutory definition of "mitigation agreement" in § 196.20(7)(a). The circuit court specifically stated: "The parties agree that *the agreement between the City of Oak Creek* and WEC was submitted to the PSC before June 10, 2003 and *involves a 'mitigation payment' within the meaning of sec. 196.20(7) . . . .*" (emphasis added).

¶ 272. Wisconsin Stat. § 196.20(7)(c) provides: "The commission shall only approve a mitigation payment agreement that is received by the commission before June 10, 2003, and, if the commission finds the agreement to be reasonable, shall not subsequently modify the agreement." There is no dispute that the agreement in this case was received by the PSC before June 10, 2003.[63] However, the effective date of 2003 Wis. Act 89 was December 17, 2003, a full month after the PSC rendered its final decision and order.[64] Although § 51 of 2003 Wis. Act 89 contained three specific initial applicability provisions, § 196.20(7) was not listed in any of them.

■■■■

¶ 273. Simply put, 2003 Wis. Act 89 was not in effect on November 10, 2003, the date the PSC rendered

---

[63] We note that the City's position on appeal is somewhat inconsistent. On the one hand, it argues that Wis. Stat. § 196.20(7) applies to the agreement at issue because the agreement was filed before June 10, 2003. Yet, the City also argues that the agreement at issue is not subject to the provisions of Wis. Stat. § 196.20(7)(c) because the agreement is not a "mitigation agreement" as defined in Wis. Stat. § 196.20(7)(a).

[64] Pursuant to Wis. Stat. § 991.11, every act of the legislature takes effect the day after its date of publication unless the act specifically provides otherwise.

its final decision and order in this case. Thus, there simply was no way the PSC could have evaluated the mitigation payment agreement in this case under the standards set forth in § 196.20(7). Further, there is nothing in the text of 2003 Wis. Act 89 that expressly indicates the legislature intended § 196.20(7) to apply retroactively to PSC orders issued before the Act's effective date. Likewise, there is no "necessary implication" in the text of § 196.20(7) that the statute was intended to apply retroactively. *State v. Chrysler Outboard Corp.,* 219 Wis. 2d 130, 162, 580 N.W.2d 203 (1998).

¶ 274. That the statute provides the PSC "shall only approve a mitigation payment agreement that is received by the commission before June 10, 2003" does not "necessarily implicate" an intent that the statute apply retroactively. Given the effective date of 2003 Wis. Act 89 and the absence of § 196.20(7) from the initial applicability provisions of § 51 of the Act, the only "necessary implication" in the statute is that the statute applies to mitigation payment agreements received by the PSC prior to June 10, 2003, that are considered by the PSC on or after December 18, 2003. A contrary conclusion would require every mitigation payment agreement approved or rejected by the PSC issued prior to December 18, 2003, to be reconsidered. Therefore, we conclude that Wis. Stat. § 196.20(7) does not apply to the agreement at issue in this case.[65]

---

[65] Even if we assume, arguendo, that the statute does apply retroactively to the PSC's order in this case, under the City's argument, the statute nonetheless would not apply to the agreement at issue here. The City argues that the agreement here is not a "mitigation payment agreement" as defined in § 196.20(7)(a) because the agreement here relates to "health and safety impacts." If we were to accept the City's argument, then § 196.20(7)(c) simply has no bearing in this case because

¶ 275. The City concedes that if § 196.20(7) does not apply to this case, then the PSC decision in relation to the agreement between the City and WEC is to be evaluated under § 196.37, governing the PSC's ratemaking authority. As noted *supra,* under the agreement, the mitigation payments from WEC are contingent upon the PSC approving the payments as part of WEC's "Facility Lease." Given that the "Facility Lease" is part of WEC's PTF expansion project, which is designed to provide adequate service to ratepayers, the PSC would be required to allow WEC to pass the costs of the lease onto ratepayers, *Wis. Pub. Serv. Corp. v. PSC,* 109 Wis. 2d 256, 263, 325 N.W.2d 867 (1982), assuming such increased rates were not "unjust" or "unreasonable." Wis. Stat. § 196.37(2).

¶ 276. Wisconsin Stat. § 196.37(2) provides:

> If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or that any service is inadequate, or that any service which reasonably can be demanded cannot be obtained, the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed in the future.

¶ 277. The City agrees that in analyzing the PSC's determination under the framework of § 196.37(2), the

────────────

the statute applies only to "mitigation payment agreement[s]." Rather than excepting agreements related to "health and safety impacts" from the reasonableness standard in § 196.20(7)(c), as the City argues, the statute simply does not apply at all to agreements that fail to meet the definition of "mitigation payment agreement" in § 196.20(7)(a).

appropriate inquiry is whether the PSC's decision had a rational basis. The PSC's final decision and order notes that due to a substantial change in the state's shared revenue law, the City will receive an annual sum of money exceeding the sum the City would receive from WEC ratepayers once the first proposed power plant is scheduled to be in service. Under the new law, municipalities hosting a power plant are to be paid double and sometimes triple what they receive under the current law.

¶ 278. The PSC concluded that "mitigation payments are not required while compensating shared revenue dollars for ERGS are forthcoming." The PSC further concluded that the increased money in shared revenue would "partially offset the city's costs" once the first plant is in service and once both plants were in service "the shared revenue payments will fully replace any mitigation payment under the Development Agreement[.]" The PSC further noted "the annual state shared revenue payments to the City of Oak Creek when ERGS is completed will exceed the amount the city is requesting in the form of mitigation payments from [WEC] ratepayers." Therefore, the PSC ruled that "it is appropriate to reduce the annual mitigation payment by the amount of shared revenue that the city receives for ERGS."

¶ 279. The PSC, noting the City would incur costs during the construction of ERGS, left intact the mitigation payments in full while the first SCPC is being constructed and merely reduced mitigation payments during the construction of the second SCPC in proportion to the amount of money the City would receive in increased shared revenue. Bearing in mind that one of the purposes of judicial review of final orders of the PSC is to "protect the interests of the ratepayer," *Algoma,* 91

Wis. 2d at 265, we cannot conclude that the PSC's decision that ratepayers in this state should not be double-taxed for the ERGS project is without a rational basis.

¶ 280. While the City argues that the costs of ERGS project to the City are far in excess of the amount requested as mitigation payments, the PSC specifically found that "mitigation payments are not required while compensating shared revenue dollars for ERGS are forthcoming." Given the public hearing testimony that the increased shared revenue payments are "almost exactly the same amount as the city is requesting in the form of mitigation payments[,]" we cannot conclude the PSC's finding was without "substantial evidence." Therefore, we uphold the PSC's determination that the mitigation payments to the City from ratepayers under its agreement with WEC should be reduced in an amount corresponding to the increased monies the City will receive in the form of shared revenue. As such, we reverse that part of the circuit court's decision reversing and remanding this issue to the PSC.

## V. CONCLUSION

¶ 281. In sum, we hold as follows. First, we uphold the PSC's determination that WEC's application was "complete." In reaching this conclusion, we hold: that the PSC's determination of completeness is judicially reviewable; that the PSC reasonably concluded that WEC's application contained two distinct site alternatives; that WEC's application contained all necessary information relating to DNR permits; and that WEC's application contained all necessary information relating to transmission line agreements.

¶ 282. Second, we conclude that the PSC's approval of WEC's CPCN application was not contrary to

law or unreasonable. When it approves an application for a power-generating facility like the one WEC proposed, the PSC must interpret, harmonize, and apply the provisions of the EPL, the Plant Siting Law, and WEPA. Applying a deferential standard of review, we conclude that the PSC reasonably performed all these tasks in issuing the CPCN. We also conclude that the PSC did not exceed its authority in conditionally issuing the CPCN.

¶ 283. Third, we conclude the PSC did not erroneously reduce the mitigation payments from WEC to the City of Oak Creek, as we conclude this decision was a proper exercise of the PSC's ratemaking authority.

¶ 284. Thus, we uphold the PSC's order in all respects.

*By the Court.*—The decision of the circuit court is reversed.

¶ 285. N. PATRICK CROOKS, J., did not participate.

## Appendix: Glossary of Terms

**ATC** – American Transmission Company; owns all transmission assets in eastern Wisconsin.

**Baseload** – Capable of producing power effectively on a constant basis, not less than 70 percent of the time, day in day out.

**Brownfields** – Abandoned industrial sites, some of which have actual or perceived environmental contamination.

**BTA** – Best Technology Available.

**CPCN** – Certificate of Public Convenience and Necessity.

**EIS** – Environmental Impact Statement.

**EGEAS** – Electric Generation Expansion Analysis System; a software tool that is used to find least-cost generation system expansion plans.

**Entrainment** occurs when aquatic organisms, eggs, and larvae are drawn into a cooling system, through the heat exchanger, and then pumped back out to the water.

**EPA** – Environmental Protection Agency

**EPL** – Wisconsin's Energy Priority Law, Wis. Stat. § 1.12(4).

**ERGS** – Elm Road Generating Station; WEC's proposed power plant.

**Greenfields** – Pristine, undisturbed land; as opposed to brownfields.

**HAPs** – Hazardous Air Pollutants.

**IGCC unit** – Integrated Gasoline Combined Cycle Unit, proposed with ERGS.

**MW** – Mega-Watt.

**Impingement** – Occurs when fish and other aquatic life are trapped against cooling water intake screens that remove debris from the cooling water as it enters the intake system.

**Market Power** – Ability of a firm to charge prices for its product above what a competitive market would allow.

**NEPA** – National Environmental Policy Act.

**NOx** – Nitrogen Oxides.

**OCPP** – Oak Creek Power Plant.

**OCPP property** – site on which Oak Creek Power Plant is located; divided into three individual sites considered for ERGS: 1) North Site; 2) South Site; and 3) South-Site-Exp.

**PM** – Particulate Matter.

**PTF** – Power the Future.

**SCPC units** – Super-Critical Pulverized Coal units of ERGS.

**SOx** – Sulphur Oxides.

**VOC** – Volatile Organic Compounds.

**WEPA** – Wisconsin Environmental Policy Act, Wis. Stat. § 1.11.

**WPDES** permit – Wisconsin Pollutant Discharge Elimination System permit issued by DNR.

**WUMS** – Wisconsin Upper Michigan System wholesale electric service market.

¶ 286. LOUIS B. BUTLER, JR., J. (*concurring*). It is not our function to determine this state's energy policy or to decide whether the construction of the power plants here is in the public interest. Majority op., ¶ 35. These are legislative determinations assigned to the PSC. *Id.;* *see also* Wis. Stat. § 196.491(3)(d)3. (2001–02). We cannot substitute our judgment for that of an administrative agency determining a legislative matter within its province. Majority op., ¶ 35; *see City of Beloit v. Town of Beloit,* 37 Wis. 2d 637, 647, 155 N.W.2d 633 (1968).

¶ 287. While I am troubled by the environmental analysis conducted by the Public Service Commission (PSC), particularly with the little information that is set forth in the Environmental Impact Statement (EIS), for me, this is a standard of review case. Our review of an EIS is narrow, and the PSC's determination that an EIS is adequate is to be accorded great weight deference. Majority op., ¶ 190; *see Citizens' Util. Bd. v. PSC,* 211 Wis. 2d 537, 550, 565 N.W.2d 554 (Ct. App. 1997). It is not our role to determine the adequacy of the EIS, but we instead evaluate whether the PSC's determination that the EIS was adequate was reason-

able. Majority op., ¶ 190; *see Citizens' Util. Bd.*, 211 Wis. 2d at 553–54. We will sustain the PSC's determination of adequacy unless we are persuaded that there is no rational basis for that determination. Majority op., ¶ 190; *see Citizens' Util. Bd.*, 211 Wis. 2d at 553. Because I agree with the majority that the PSC's determination that the EIS was adequate is reasonable, I join the majority's decision and mandate.

¶ 288. Nevertheless, I write separately because, but for the standard of review, I would conclude that the EIS is premised upon what I construe to be a faulty conclusion which leads to a systemic analytical flaw in the EIS. But for the standard of review, I would conclude that that flaw undermines the adequacy of the EIS regarding the long-term environmental consequences of building the coal-fired power plants.

¶ 289. Under our narrow standard of review, we have concluded that the EIS thoroughly analyzed the consequences of the power plants' once-through cooling system. Majority op., ¶ 198. Our conclusion is based in large part upon the fact that the EIS examined a one-year monitoring study in 1975–76 of the then Oak Creek Power Plant's (OCPP's) once-through cooling system's effects on Lake Michigan. *Id.* The EIS noted that, notwithstanding the loss of millions of aquatic life forms,[1] the 1970s monitoring report concluded that the

---

[1] Impingement occurs when fish and other aquatic life are trapped against cooling water intake screens that remove debris from the cooling water as it enters the intake system. In contrast, entrainment occurs when aquatic organisms, eggs, and larvae are drawn into a cooling system, through the heat exchanger, and then pumped back out to the water.

According to the monitoring study, 6.2 million fish larvae, 9.3 million fish eggs, and 15.6 million invertebrates were entrained. Also, 2.8 million fish weighing 109,414 pounds were

impacts of entrainment and impingement as a result of once-through cooling were "inconsequential" to aquatic life in Lake Michigan. *Id.* This conclusion in part led to the determination in the EIS that the operation of the power plants did not significantly affect fish populations, and that the individual and aggregate impacts of power plant cooling water discharges on the Lake Michigan ecosystem were insignificant. *Id.,* ¶ 199.[2]

¶ 290. In my view, the problem with the determinations reached by the EIS is that they are based upon the faulty conclusion that the impacts of entrainment and impingement were "inconsequential" to aquatic life in Lake Michigan. "Inconsequential" has been defined as "irrelevant" and "inconsequent." *Webster's Third New International Dictionary,* 1144 (3d ed. 1986). The definition of "inconsequent" includes "of no consequence: lacking worth, significance, or importance." *Id.* "Inconsequential" has been further defined as "lacking importance." *The American Heritage Dictionary,* 314 (3d ed. 1992).

¶ 291. When we allude in the opinion to the fact that "different minds can disagree on what constitutes 'inconsequential effects,' " majority op., ¶ 200, I happen to be one of those different minds. I fail to see how the "wholesale destruction of millions of fish and other aquatic life"[3] is of no consequence, irrelevant, and lacking importance. Of course there are consequences to losing tens of millions of aquatic life forms comprised

---

impinged. Alewife comprised 78 percent of the number impinged, while smelt accounted for 21 percent. Forage fish added one percent and salmonids were negligible.

[2] Results of the 1976 OCPP study did notice localized influences on fish distribution, including slight changes in the areal distribution of resident fishes.

[3] Bradley, J., dissenting, ¶¶ 310–11.

of fish, crustaceans and shellfish during a one-year time span. We simply have no way of knowing what those consequences are over time precisely because the EIS assumes that there will be no long-term impacts because the short-term impacts on aquatic life are inconsequential. Given this conclusion, the "hard look" taken by the PSC at the environmental consequences of the OCPP was necessarily limited in its focus as there was no need to look at these "inconsequential" consequences over time.

¶ 292. The dissent may be correct that Lake Michigan's ecosystem has changed significantly in the last 30 years. Bradley, J., dissenting, ¶ 316. The dissent is correct that the proposed cooling system is substantially different and much more ambitious than the one examined in 1976. *Id.* at ¶ 317. Yet, the EIS does not take into account the long-term cumulative effects that a larger plant will have on that different ecosystem because the EIS accepts the conclusion that any environmental effects are inconsequential. If there are no consequences to the proposed action, then there is simply no need to take a "hard look" at those nonexistent consequences over any extended period of time.

¶ 293. I do not take issue with our opinion. It is not our role to determine the adequacy of the EIS. Because I cannot conclude that there was no rational basis for the PSC's determination, I cannot substitute my judgment for that of the PSC. The PSC has been authorized to make that determination. The PSC has teams of environmental experts available to it to assist in making that determination. This decision properly rests with the PSC. Having said that, I still conclude that because that determination rests on a house of

cards, I simply do not agree that the EIS was adequate. I am therefore troubled by the result that I am legally compelled to join.

¶ 294. As I stated during the oral argument in this matter, everything about this case screams of its extreme importance for the state and people of Wisconsin, in terms of its energy needs and the environment. It is far more important that we "get it right and do it correctly," as opposed to just getting this done. The people of Wisconsin, the state's energy needs, and our environment will be best served should the PSC decide to take one more good hard look at long-term environmental consequences while evaluating those consequences (good, bad, or unknown) over time instead of assuming that there are no consequences. That being said, I reluctantly join the decision and mandate of the court, as our standard of review requires.

¶ 295. For the foregoing reasons, I respectfully concur.

¶ 296. ANN WALSH BRADLEY, J. (*dissenting*). Employing the mantra of great weight deference, the majority defers to the Public Service Commission (PSC) in all respects. Yet, an agency's conclusion is not entitled to great weight deference if it directly contravenes the plain meaning of a statute or its own administrative rules.

¶ 297. This court is burdened with the task of ensuring that the PSC's process meets the statutory and regulatory demands. Because the agency's conclusions regarding the adequacy of the Environmental Impact Statement (EIS) are contrary to the basic requirements of both the PSC's own rules and the Wisconsin Environmental Policy Act (WEPA), I conclude that no deference is due. Rather, I determine that the

PSC's decision to approve the project based on an inadequate EIS was in error.

¶ 298. The proposed Oak Creek Power Plant (OCPP) would be the largest power plant construction project in this state's history. Many of the briefs filed in this case, either challenging or supporting the decision of the PSC, are filed on behalf of those parties who have substantial financial interests in the project. One brief, however, stands alone.

¶ 299. The State of Illinois has filed a brief on behalf of its citizens because it recognizes that the project's effect would not respect state boundaries. Inevitably, any harm caused by the project to Lake Michigan and its fishery would necessarily affect Illinois residents as well.

¶ 300. The State of Illinois shares my conclusion that the EIS is inadequate. Citing federal regulations, Illinois asserts that an EIS is expressly required to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

¶ 301. Although voicing concerns about the failure of the EIS to consider alternative sources of energy that would reduce mercury emissions, a primary focus of the State of Illinois is the project's proposed cooling system. This type of system has been banned in Illinois for more than 30 years. The State of Illinois charges that the PSC has "declined to conduct even the most basic inquiry into alternatives to the environmentally-destructive cooling system proposed by the applicant, to which Illinois has found alternatives for more than three decades . . . ." In concluding its argument, it asserts that both Illinois and Wisconsin citizens are

431

"entitled to an EIS that gives full consideration to cooling technologies that will reduce damage to their shared Lake Michigan resource." I agree.

¶ 302. Accordingly, while I believe that the majority opinion in many regards is flawed, I focus upon the inadequacy of the EIS prepared in this case. In its decision, the majority applies a great weight deference standard of review and rubber-stamps the PSC's acceptance of the EIS. The majority explains that its "determination that the EIS was adequate is reasonable." Majority op., ¶ 226.

¶ 303. I am mindful of the narrow scope of permissible judicial review here. However, an agency's interpretation of a statute or regulation cannot be upheld if it is inconsistent with its plain meaning:

> A court does not ... give deference to an agency's interpretation of a statute when the court concludes that the agency's interpretation directly contravenes the words of the statute, is clearly contrary to legislative intent, or is otherwise unreasonable or without rational basis.

*State ex rel. Parker v. Sullivan,* 184 Wis. 2d 668, 699–700, 517 N.W.2d 449 (1994) (citing *Lisney v. LIRC,* 171 Wis. 2d 499, 506, 493 N.W.2d 14 (1992)).

¶ 304. I conclude that the PSC's decision to accept the EIS was contrary to the plain language of the law. The EIS (1) failed to adequately evaluate the proposed action's cumulative environmental effects and (2) failed to adequately evaluate reasonable alternatives to the proposed action.

## I. *The EIS*

¶ 305. As noted by the majority, WEPA is patterned after its federal counterpart, the National Envi-

ronmental Policy Act (NEPA). Majority op., ¶ 188 n. 42.[1] The object of both statutes is to ensure that agencies carefully consider environmental impacts before committing to undertake certain "major" actions. *State ex rel. Boehm v. DNR,* 174 Wis. 2d 657, 665, 497 N.W.2d 445 (1993); *Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664, 666 (7th Cir. 1997). To this end, the statutes require agencies to prepare an EIS on actions that would significantly affect the quality of the human environment. Wis. Stat. § 1.11(2)(c); 42 U.S.C. § 4332(c).

¶ 306. The purpose of the EIS is to enable agencies to take a "hard look" at the environmental consequences of its proposed action. *Milwaukee Brewers Baseball Club v. DHSS,* 130 Wis. 2d 56, 72, 387 N.W.2d 245 (1986) (citing *New York Natural Resources Def. Council, Inc. v. Kleppe,* 429 U.S. 1307, 1311 (1976)). This "hard look" is necessary in order to inform the "commission and the public of significant environmental impacts of a proposed action and its alternatives, and reasonable methods of avoiding or minimizing adverse environmental effects." Wis. Admin. Code § PSC 4.30(1).

¶ 307. To fulfill its function, "the EIS must set forth sufficient information for the general public to make an informed evaluation, and for the decisionmaker to 'consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action.' " *Sierra Club v. U.S. Army Corps of Engineers,* 701 F.2d 1011, 1029 (2d Cir. 1983) (citations omitted). "In so doing, the EIS insures

---

[1] As a result, federal NEPA case law is an essential source of guidance regarding the proper implementation of WEPA, constituting highly relevant persuasive authority. *State ex rel. Boehm v. DNR,* 174 Wis. 2d 657, 676 n. 4, 497 N.W.2d 445 (1993).

the integrity of the process of decision by giving assurance that stubborn problems or serious criticisms have not been 'swept under the rug.' " *Id.*

¶ 308. This "hard look" requirement "sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C. Cir. 1971). If an agency's "decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse." *Id.* at 1115. Indeed, courts have not hesitated to invalidate an EIS that fails to include the requisite level of discussion and analysis.[2]

## II. *The Failure To Evaluate Cumulative Effects*

¶ 309. One of the more controversial aspects of the project is its proposed cooling system, a type banned by both Illinois and Indiana. *See, e.g.,* 35 Ill. Adm. Code 302.509; 327 IAC 2–1.5–8(c)(4)(D)(v)(AA). The system uses cold water from Lake Michigan to cool steam after it passes through the electric turbine, so that the steam

---

[2] *See, e.g., League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181, 1191–92 (9th Cir. 2002) (EIS failed to consider impacts of pesticide drift outside target spray area); *Utahns For Better Transp. v. U.S. Dept. of Transp.,* 305 F.3d 1152, 1179–80 (10th Cir. 2002), *modified on other grounds,* 319 F.3d 1207 (10th Cir. 2003) (highway project's impacts to migratory birds); *Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800, 810–11 (9th Cir. 1999) (impacts of land exchange); *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.,* 123 F.3d 1142, 1160–61 (9th Cir. 1997) (cumulative impacts of highway); *Town of Huntington v. Marsh,* 859 F.2d 1134, 1140–43 (2d Cir. 1988) (effects of discharge to Long Island Sound).

condenses to water and can be fed back into the coal-fired boiler to be converted back into steam. Because the cold water would be used only once before being piped back to Lake Michigan, the system is known as "once-through" cooling.

¶ 310. The drawback of the once-through cooling system is that it has the potential to cause large-scale destruction of aquatic life. The system functions by taking in vast amounts of water on a continuing basis. Here, the proposed facility would, together with the existing units, suck in approximately 2,250,000 gallons per minute, i.e., 3.24 billion gallons per day. Experts in this case testified that the massive water intake required for once-through cooling would result in the wholesale destruction of millions of fish and other aquatic life.

¶ 311. For instance, fish eggs and larvae passing through the fine filter screens to the power plant's condensers could suffer a mortality rate as high as 97 percent.[3] Likewise, larger fish would be killed or fatally injured through impingement when they are pressed against the filter screens by the force of the intake. Even with mitigating measures in place, "[t]he proposed once-through cooling system will result in the annual destruction of tens of millions of fish, crustaceans and shellfish by entrainment and impingement."[4] The aquatic environment of Lake Michigan will be forever altered.

¶ 312. The minimum content of an adequate EIS includes the proposed action's cumulative environmental effects. Wis. Admin. Code § PSC 4.30(3) requires in relevant part that an EIS contain:

> (b) An analysis of the probable impact of the proposed action on the environment, including:

---

[3] Direct testimony of Dr. Peter A. Henderson. R. 18, Item 157 at 4287.

[4] *Id.* at 4285.

1. An evaluation of positive and negative effects on the affected local and regional environments, *including the proposed action's direct, indirect and cumulative environmental effects.*

(Emphasis added.)

¶ 313. Likewise, WEPA clearly mandates that the EIS contain a "detailed statement" of:

1. The environmental impact of the proposed action;

2. Any adverse environmental effects which cannot be avoided should the proposal be implemented.

Wis. Stat. § 1.11(2)(c)1&2.

¶ 314. Here, after sparse discussion, the EIS dismisses cumulative effects of once-through cooling as "inconsequential" to the ecosystem of Lake Michigan. It notes:

relative to the Lake Michigan fishery, the impacts of entrainment and impingement were *inconsequential* to aquatic life in Lake Michigan.

(Emphasis added.)

¶ 315. This conclusion, however, was not based on a current analysis of Lake Michigan and the proposed water intake system. Rather, it was based on a 1975–76 monitoring study of the Lake and the then existing water intake system of the power plant. There are two problems with reliance on this study.

¶ 316. First, Lake Michigan's ecosystem has changed significantly in the last 30 years. For example, there are 36 new nonindigenous species that have been first observed in Lake Michigan since 1976. Nat'l Oceanic & Atmospheric Admin. Great Lakes Envtl. Resarch Lab., Great Lakes Aquatic Nonindigenous Species List (May 27, 2003). Available at http://www.glerl.noaa.gov/res/Programs/invasive/ansmechofintro052703.html.

The EIS does not take into account the significant changes to the ecosystem.

¶ 317. Second, the proposed cooling system is substantially different and much more ambitious than the one examined in the 1970s. Its intake system, extending almost two miles into Lake Michigan, would be ten times longer than the original structure. Moreover, the total exposure width of the proposed system would be more than twice that of the original system.[5] The estimated 3.24 billion gallons of water consumed each day represents a 183% increase over the consumption considered in the 1975–76 study.[6] Again, the EIS fails to consider these substantial differences.

---

[5] The original water intake system at OCPP consisted of eight pumps, divided equally between two pumphouses. The pumps, positioned 50 feet inland from the lakeshore, drew water from a 900–foot long, 200–foot wide, artificial channel in Lake Michigan. Each pumphouse was connected to the lakeshore via an intake structure fitted with mesh screens to prevent fish from being drawn into the water system. The width of these intakes effectively regulated the amount of water subject to intake. The width of the intake on the north pumphouse was 35 feet; on the south pumphouse, the width was 58 feet; the total exposure width of the system was thus 93 feet.

By contrast, the proposed water intake structure would be located up to 9,000 feet offshore, at a depth of 43 feet. The intake itself would be an array of 24 cylinders, each 8 feet in diameter and 32 feet long, connected to 27–foot diameter tunnel bored 200 feet below the surface of Lake Michigan. The total exposure width of the proposed system would be 192 feet, more than twice that of the original system analyzed in the 1976 study.

[6] The study relied on data collected from periodic sampling—89 total samples over a one-year period—of the north pumphouse. WEPCO, Intake Monitoring Studies, at II-1 (1976). The four pumps at this site were each rated at 110,000 gpm, with the four pumps at the south pumphouse rated at 198,000 gpm.

¶ 318. In an attempt to curb the criticism for reliance on a study conducted almost 30 years ago, the majority quotes from the EIS' reference to a 2003 report. Majority op., ¶ 201. In doing so, the majority attempts to substitute an interim report of data collection for the mandated evaluation of the environmental impact of the aquatic life.

¶ 319. The interim 2003 report describes the data compiled during the first year of a two-year study. It is narrow in scope and limited to counting fish eggs and larvae in the vicinity of the existing and proposed structures.

¶ 320. The report fails to consider the impact of entrainment and impingement on tens of millions fish, crustaceans, and shellfish. Indeed, the report offers no conclusion whatsoever as to the environmental impact of the proposed structure. This interim data collection report of an incomplete study falls short of providing a "hard look" at the environmental consequences of the proposed action.

¶ 321. In light of these shortcomings, there was no adequate evaluation of the "proposed action's direct, indirect and cumulative environmental effects" as re-

---

Thus, the maximum volume of water intake at the existing OCPP structure was 1,232,000 gpm, or 1.77 billion gallons per day. *Id.* at I-3.

The proposed water intake system would consist of three parts: the remaining OCPP units, originally the south pump-house; the two proposed SCPC plants; and the proposed IGCC plant. The remaining OCPP units are still rated to 792,000 gpm. The proposed SCPC plants would demand an estimated 970,000 gpm. Finally, the proposed IGCC plant would demand an additional 485,000 gpm. All totaled, the proposed ERGS water intake system would consume an estimated 3.24 billion gallons of water each day.

quired by Wis. Admin. Code § PSC 4.30(3). Absent from the EIS is any "detailed statement" of the "environmental impact of the proposed action" as mandated by WEPA. By relying on outdated and incomplete studies, the EIS failed to assess the future cumulative environmental effects of *this* proposed action. As such, the PSC's decision to accept the EIS contravened the basic requirements of the PCS's own rules and WEPA.

## III. *The Failure To Evaluate Reasonable Alternatives*

¶ 322. In contrast to the proposed once-through cooling system, two available alternative cooling technologies, "cooling towers" and "dry cooling," would reduce water intake by 90 percent or more.[7] The former operates by continuously circulating a limited amount of water, drawing in more only as necessary to replace the water that evaporates in the cooling process. The latter, meanwhile, uses even less water, operating on the same principle as an automobile radiator.[8]

¶ 323. Analysis of alternatives is "the heart of the environmental impact statement." *Milwaukee Brewers,* 130 Wis. 2d at 73. Accordingly, the minimum content of an adequate EIS includes an evaluation of the reasonable alternatives to the proposed action.

¶ 324. Wis. Admin. Code § PSC 4.30(3)(c) requires in relevant part:

---

[7] Direct testimony of Dr. Peter A. Henderson. R. 18, Item 157 at 4298.

[8] The Great Lakes region hosts five dry-cooling stations: Olmstead County Waste-to-Energy Facility (1 megawatt in Rochester, MN); Chicago Northwest Waste-to-Energy Facility (1 megawatt); Arbor Hills Landfill Gas Facility (9 megawatts in Northville, MI); Pine Bend Landfill Gas Facility (6 megawatts in Eden Prairie, MN); and Mallard Lake Landfill Gas Facility (9 megawatts in Hanover Park, IL).

(c) *An evaluation of the reasonable alternatives to the proposed action* and significant environmental consequences of the alternatives, including those alternatives that could avoid some or all of the proposed action's adverse environmental effects and the alternative of taking no action.

(Emphasis added.)

¶ 325. Likewise, WEPA mandates that the EIS contain a "detailed statement" of "[a]lternatives to the proposed action." Wis. Stat. § 1.11(2)(c)3.

¶ 326. Additionally, the water intake structure must satisfy the requirements of the Clean Water Act, which requires that "the location, design, construction, and capacity of cooling water intake structures reflect the *best technology available* for minimizing adverse environmental impact." 33 U.S.C.A. § 1326(b) (emphasis added).

¶ 327. While an agency is not required to evaluate "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective," *All Indian Pueblo Council v. United States,* 975 F.2d 1437, 1444 (10th Cir. 1992), "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Resources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1307 (9th Cir. 1994).

¶ 328. Here, the EIS failed to evaluate reasonable alternatives to the proposed once-through cooling system that would greatly reduce harm to aquatic life in Lake Michigan. Instead, the EIS merely states that measures should be taken to mitigate the harm that would be caused, and that additional studies of entrainment and impingement should be conducted after the system has been built.

¶ 329. As one aquatic life expert indicated, this approach amounts to closing the barn door after the horse has left. After all, once an open-cycle cooling system is allowed, there is very little that can be done to significantly reduce its harm to the aquatic environment. The expert explained, "It is my opinion that there are few options to protect lake life from an offshore intake of the size proposed and that these options are further restricted if implementation is attempted after design and completion of construction."[9]

¶ 330. When asked by several entities[10] why the EIS failed to discuss any alternatives to environmentally-destructive once-through cooling system, the EIS writers both acknowledged and defended this complete failure. They explained:

> Once-through cooling water and closed-cycle cooling are commonly used cooling alternatives. WEPCO has proposed to use once-through cooling water for the ERGS. The Clean Water Act does not prohibit the use of once-through cooling water, nor does it compel anyone to use closed-cycle cooling. DNR does not have the authority to require closed-cycle cooling for this project.

¶ 331. There are two problems with this explanation. First, it is illogical. The conclusion that one need not address the common alternative of closed-cycle cooling because the DNR does not have the authority to require it is a non sequitur. Second, and more importantly, it is against the clear language of the PSC's own rule and WEPA.

---

[9] Direct testimony of Dr. Peter A. Henderson. R. 18, Item 157 at 4314.

[10] The entities include Lake Michigan Federation, Citizens' Utility Board, and SC Johnson.

¶ 332. Absent from the EIS is the required evaluation of:

> alternatives, including those alternatives that could avoid some or all of the proposed action's adverse environmental effects . . . .

Wis. Admin. Code § PSC 4.30(3)(c).

¶ 333. Likewise, missing from the EIS is a "detailed statement" of "[a]lternatives to the proposed action." Wis. Stat. § 1.11(2)(c)3.

¶ 334. The majority proceeds to whitewash this inadequacy by construing "the EIS's writers' response as concluding that cooling towers are not a reasonable alternative due to the DNR's inability to require them." Majority op., ¶ 205. It then explains, "[g]iven that the PSC is best situated to determine what constitutes a reasonable alternative, we cannot conclude that the PSC's determination that this analysis is reasonable lacks a rational basis." *Id.*

¶ 335. Contrary to the assertions of the majority, there is nothing unreasonable about closed-cycle cooling. This would not require the authors of the EIS to engage in "remote and speculative analysis." *Id.* Indeed, many other power plants have also been using cooling towers for decades, including the last coal-fired plant that Wisconsin Energy Corporation built, Pleasant Prairie. Tellingly, the EIS writers themselves described closed-cycle cooling as a "commonly used . . . alternative[]."[11]

¶ 336. As such, the EIS needed to evaluate these alternatives, along with their significant environmental

---

[11] Since oral argument in this case, Clean Wisconsin and SC Johnson have filed a lawsuit in the Dane County Circuit Court, challenging the Wisconsin Department of Natural Resources issuance of a permit to operate the controversial once-through cooling system that would serve the proposed OCPP.

consequences. Wis. Admin. Code § PSC 4.30(3)(c). This analysis, of course, need not be extraordinarily detailed. However, "more than nothing was required." *Utahns For Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1166 n. 6 (10th Cir. 2002), *modified on other grounds*, 319 F.3d 1207 (10th Cir. 2003).

¶ 337. Instead of evaluating these alternatives, however, the PSC asserts that the proposed water intake structure is the "best technology available." Again, citing to the 1975–76 monitoring study conducted in conjunction with permits related to the original power plant, the PSC states:

> The report concluded . . . . ["]The impact on the environment must be considered to be minimal." In an April 15, 1977 letter to Wisconsin Electric Power Company, the Department [of Natural Resources] concurred with this conclusion. The Department has not evaluated this conclusion since 1977.

¶ 338. I agree with the State of Illinois that the PSC has "declined to conduct even the most basic inquiry into alternatives to the environmentally-destructive cooling system proposed by the applicant . . . ." The relevance of the 1975–76 study to the proposed project is tenuous at best. It certainly cannot

---

At a public hearing on that matter, Peter Howe, a biologist for the Environmental Protection Agency, submitted 22 pages of testimony expressing his serious reservations with the permit. "Testimony of Peter H. Howe in Objection to Conditions in Draft WPDES Permit No. WI-0000914–07–0," Prepared February 13, 2005, available at the Department of Natural Resources.

Howe noted that "all power plants built in the past 20 years of which [he was] aware use closed cycle cooling." *Id.* Additionally, Howe observed, "if cooling towers had been selected, we would not be having the following debate on entrainment, thermal or mercury . . . ."

be viewed as a thorough analysis of what represents the "best technology available" for the proposed site, as required by the Clean Water Act. 33 U.S.C.A. § 1326(b).

¶ 339. In the end, the EIS provides but a fleeting consideration of the environmental impact of the proposed water intake system, and no consideration whatsoever of the reasonable alternatives. Therefore, the PSC's decision to accept the EIS was contrary to the requirements of its own administrative rules and WEPA. Accordingly, I conclude that no deference is due.

¶ 340. I recognize that this project is important for southeast Wisconsin and the state as a whole. Yet it is also critically important to the citizens of this state that the process approving the project adheres to the requirements of law. Because the PSC decision to accept the EIS was in error, this court should reverse the agency's decision and remand to the PSC for the mandated evaluations.

¶ 341. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.